20001724CA - DECOURSY, RICHARD vs. DEUTSCHE BANK NATIONAL TRUST ...     Page 1 of 1

Case 5:21-cv-00014-TKW-MJF    Document 1-1    Filed 01/14/21    Page 1 of 316

# EXHIBIT A

## 20001724CA - DECOURSY, RICHARD vs. DEUTSCHE BANK NATIONAL TRUST COMPANY

### SUMMARY

| | | | | | |
|---|---|---|---|---|---|
| **Judge:** | FISHEL, JOHN L II | **Court Type:** | Circuit Civil | **Case Type:** | OTHER |
| **Case Number:** | 20001724CA | **Uniform Case Number:** | 032020CA001724CAXXXX | **Status:** | OPEN |
| **Clerk File Date:** | 10/6/2020 | **Status Date:** | 10/6/2020 | **Waive Speedy Trial:** | ☐ |
| **Total Fees Due:** | 0.00 | **Booking Number:** | | **Agency:** | |
| **Agency Report Number:** | | **Custody Location:** | | **Foreclosure:** | ACTIVE - 10/6/2020 |

### PARTIES

| TYPE | PARTY NAME | ATTORNEY |
|---|---|---|
| PLAINTIFF | DECOURSY, RICHARD | |
| DEFENDANT | DEUTSCHE BANK NATIONAL TRUST COMPANY | |

### EVENTS

| DATE | EVENT | JUDGE | LOCATION | RESULT | |
|---|---|---|---|---|---|
| 1/6/2021 8:45 AM | HEARING - CIVIL | FISHEL, JOHN L II | JUDGES CHAMBERS | Not Assigned | |

### CASE DOCKETS

| IMAGE | DATE | ENTRY |
|---|---|---|
| 37 | 1/13/2021 | EP - DEFT MOTION TO QUASH SERVICE OF PROCESS |
| 1 | 1/5/2021 | EP - NOTICE OF CANCELLATION OF HEARING FOR 01/06/2021 AT 8:45 AM |
| 48 | 1/5/2021 | EP - MOTION TO VACATE DEFAULT AND OPPOSITION TO FINAL JUDGMENT AFTER DEFAULT |
| 4 | 12/31/2020 | EP - NOTICE OF SERVICE OF INTERROGATORIES |
| 2 | 12/31/2020 | EP - REQUEST FOR PRODUCTION |
| 54 | 12/30/2020 | EP - REQUEST FOR JUDICIAL NOTICE OF PINELLAS COUNTY FORELCOSURE CASE |
| 123 | 12/30/2020 | EP - REQUEST FOR JUDICIAL NOTICE OF OTHER LEE SEGAL CASES |
| 9 | 12/30/2020 | EP - NOTICE OF FILING LEGAL AUTHORITY CITED BY PTF IN COMPLAINT |
| 2 | 12/30/2020 | EP - NOTICE OF LIMITED APPEARANCE FOR DFT |
| | 12/30/2020 | HEARING - CIVIL SET FOR 01/06/2021 AT 8:45 AM IN JC/ , JDG: FISHEL, JOHN L II |
| 2 | 10/30/2020 | EP - AMENDED NOTICE OF HEARING: 01/06/21 @ 8:45AM |
| 1 | 10/30/2020 | EP - ORDER GRANTING TELEPHONIC APPEARANCE |
| 3 | 10/29/2020 | EP - AFFIDAVIT IN SUPPORT OF SUMMARY JUDGMENT |
| 2 | 10/29/2020 | EP - MOTION TO APPEAR TELEPHONICALLY |
| 1 | 10/29/2020 | EP - NOTICE OF HEARING-1/6/21 AT 8:45 |
| 3 | 10/29/2020 | EP - MOTION FOR SUMMARY JUDGMENT |
| 2 | 10/29/2020 | EP - MOTION FOR DEFAULT/ DEFAULT ENTERED ON DEUTSCHE BANK |
| 1 | 10/14/2020 | EP - RETURN OF SERVICE - SERVED - DEUTSCHE BANK - 10/08/20 |
| 1 | 10/6/2020 | PAYMENT $410.00 RECEIPT #2020039086 |
| 2 | 10/6/2020 | EP - SUMMONS ISSUED- DEUTSHCE BANK NATIONAL TRUST COMPANY |
| 13 | 10/6/2020 | EP - INITIAL COMPLAINT |
| 3 | 10/6/2020 | EP - CIVIL COVER SHEET |
| | 10/6/2020 | JUDGE FISHEL, JOHN L II: ASSIGNED |
| | 10/6/2020 | DIVISION E ASSIGNED |
| | 10/6/2020 | CLERK TF/DOR SUMMONS ASSESSED $10.00 |
| | 10/6/2020 | CASE TYPE : OTHER |
| | 10/6/2020 | CIVIL-OTHER FILING FEES ASSESSED $400.00 |
| | 10/6/2020 | CASE FILED 10/06/2020 CASE NUMBER 20001724CA |

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

I.    **CASE STYLE**

IN THE CIRCUIT COURT OF THE <u>FOURTEENTH</u>  JUDICIAL CIRCUIT,
IN AND FOR <u>BAY</u>  COUNTY, FLORIDA

<u>Richard Decoursy</u>
Plaintiff

Case # _____20001724CA_____
Judge _____

vs.

<u>Deutsche Bank National Trust Company as Trustee</u>
Defendant

II.    **AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☒  over $100,000.00

III.    **TYPE OF CASE**     (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
       ☐ Business governance
       ☐ Business torts
       ☐ Environmental/Toxic tort
       ☐ Third party indemnification
       ☐ Construction defect
       ☐ Mass tort
       ☐ Negligent security
       ☐ Nursing home negligence
       ☐ Premises liability—commercial
       ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
       ☐ Commercial foreclosure
       ☐ Homestead residential foreclosure
       ☐ Non-homestead residential foreclosure
       ☐ Other real property actions

☐Professional malpractice
       ☐ Malpractice—business
       ☐ Malpractice—medical
       ☐ Malpractice—other professional
☒ Other
       ☐ Antitrust/Trade regulation
       ☐ Business transactions
       ☐ Constitutional challenge—statute or ordinance
       ☐ Constitutional challenge—proposed amendment
       ☐ Corporate trusts
       ☐ Discrimination—employment or other
       ☐ Insurance claims
       ☐ Intellectual property
       ☐ Libel/Slander
       ☐ Shareholder derivative action
       ☐ Securities litigation
       ☐ Trade secrets
       ☒ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**    **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**    **NUMBER OF CAUSES OF ACTION:** [  ]
(Specify)

   <u>Two</u>

**VI.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ Lee Segal</u>               Fla. Bar # <u>37837</u>
           Attorney or party                       (Bar # if attorney)

<u>Lee Segal    </u>               <u>10/06/2020</u>
 (type or print name)                   Date

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

      Plaintiff,

                                                   Case No.:  20001724CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

      Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff, RICHARD DECOURSY, by and through his undersigned counsel, sues Defendant, Deutsche Bank National Trust Company, as Trustee ("Defendant"), and would show:

### BACKGROUND

1.      All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

2.      Venue is proper in Bay County, Florida.

3.      On or about November 22, 2006, Plaintiff's wife, Lilliana Decoursy, entered a promissory note ("the Note") and mortgage ("the Mortgage") with Freedom Mortgage Corporation ("FMC"), which Mortgage was recorded in the Pinellas County Official Records at Book 15548, Page 2692 in connection with her ownership of the property located at 2861 Thaxton Drive, Unit 46, Palm Harbor, FL 34684 ("the Property").  Plaintiff has owned the Property since that time.

4.      Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance.

1

5.      Shortly after closing on this loan, FMC sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

6.      Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust.   The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was called Residential Accredit Loans, Inc., Series 2007-QS6 ("the Trust").

7.      Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities.  The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments.  Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

8.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages").  In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default.  Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral.  This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates.  As such, the tax liability "passed

2

through the trust" directly to investors to avoid double taxation.  Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

9.     Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties").  The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter.  The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

10.     Deutsche Bank Trust Company Americas ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity.  As Trustee, it owed fiduciary duties to the Certificateholders.  The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust.  The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

11.     Deutsche's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of

impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

12.      Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

13.      By 2009, however, the Depositor was no longer in business. As Trustee of the Trust, Deutsche was still responsible for collecting cash flows on behalf of the Certificateholders. Yet it was failing to do so. Plaintiff's wife, for example, stopped making payments under the Note in May, 2013 – one of many Borrowers who did so. As a result, a lawsuit was filed against Plaintiff, Pinellas County Case No. 18-2703-CI ("the Lawsuit"), with Deutsche Bank National Trust Company, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6 named as the plaintiff. The genesis of the Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

14.      At all times relevant, Deutsche Bank National Trust Company, as Trustee was the alter ego of Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed, Pass-Through Certificates, Series 2007-QS6. The corporate veil is hence able to be pierced, and Deutsche Bank National Trust Company, as Trustee is liable for the acts described herein to the same extent as Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed, Pass-Through Certificates, Series 2007-QS6. As such, the two are hereafter referred to as one and the same.

15.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious.

16.     First, Defendant was neither the owner nor the holder of the Note by operation of law.  In fact, it was illegal for Defendant to own or hold the Notes.  Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.     Second, the Lawsuit was brought in the name of the Trust, which was identified in the style of the Lawsuit as the party prosecuting the case ("as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates Series 2007-QS6").  However, the beneficiaries of the Trust, *i.e.* the Certificateholders, did not authorize the Lawsuit, benefit from it, or even know it had been filed.  Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet it purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff. Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18.     Despite the foregoing, the Servicers, purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Lawsuit to be prosecuted in Defendant's name and represented, under oath, that Defendant was the owner and holder of the Note.  As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

19.     To support its position in the Lawsuit, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal.  (At any one

5

time, only one servicer was assigned to the Loan.  However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein.  As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

20.     First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Trust beneficiaries, *i.e.* the Certificateholders, as they did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome.  Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make the Trust the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

21.     Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law.  Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit, under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

22.     Third, the Servicer represented in the Lawsuit caused to be recorded in the Official Records of Pinellas County, Florida, an Assignment of Mortgage ("the Assignment") at Book 16891, Page 1573.  In truth, however, the Assignment was a complete fraud.  After all, it was executed by Mortgage Electronic Registration Systems, Inc. ("MERS"), not as nominee, but in its own capacity.  Yet MERS had no interest whatsoever in the Note, as its own website reflects. Unfortunately, the Servicer caused the Assignment to be prepared and recorded anyway – it being prepared by David Stern, a disbarred lawyer – knowing it was false and fraudulent, reflecting a transaction that did not exist.  The Servicer nonetheless prepared and caused to be recorded the

Assignment – a violation of Fla. § 817.535(2)(a) and a criminal infraction, a felony under Florida law.

23. Fourth, the Servicer relied on a chain of endorsements on the Note, including one by FMC to Residential Funding Company, LLC ("RFC") ("the First Endorsement"), a second by RFC to Deutsche Bank Trust Company Americas, as Trustee ("DBTCA") ("the Second Endorsement"), and a third by DBTCA to Defendant ("the Third Endorsement"). All three endorsements, however, were fraudulent. The First Endorsement was not actually signed by FMC, but was placed on the Note by the Servicer in a fraudulent effort to convey standing where none existed. Tellingly, that was done after FMC ceased to exist. Similarly, the Third Endorsement was not executed by DBTCA, but by Ocwen Loan Servicing, LLC, purportedly as attorney in fact for DBTCA. Notwithstanding what the Note reflects, no such attorney in fact relationship existed, and the Servicer was not authorized to execute the Third Endorsement. Suffice it to say these endorsements were all done in a fraudulent, perjurious, and illegal effort to procure standing in Defendant's name where none otherwise existed.

24. Fifth, the Servicers repeatedly represented, in the Lawsuit, that Defendant had been damaged as a result of Lilliana Decoursy's non-payment of the installment payments due under the Note. These representations were knowingly false, fraudulent, and perjurious at all times relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trust. Suffice it to say Servicer's repeated representations in the Lawsuit that Defendant was

not damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

25.     Sixth, the Servicer represented that it was authorized to modify the Note and Mortgage as an agent of Defendant.  Plaintiff and Liliana Decoursy reasonably relied upon such representations by entering a loan modification.  Yet the Servicer is not actually the agent of Defendant, and its representations otherwise were a false and fraudulent way to induce Plaintiff to pay money that he otherwise would not have had to pay.  The Modification was also recorded in the Official Records,

26.     Seventh, the Servicer filed in the Lawsuit a Limited Power of Attorney from Deutsche ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuit as an agent of the Trust.  These representations, however, were entirely fraudulent – and known to be so by all involved.  In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein.  In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit.

27.     Eighth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit.  In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the holder of the Note and was damaged by Plaintiffs' non-payment, were true – knowing they were not.  This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the

Servicers were doing so and actively participating in that fraud scheme.  Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendant, the entity for which they were counsel of record in the Lawsuit.  Suffice it to say the Servicers did not actually represent Defendant.

28.    At all times relevant, Deutsche knew that the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious.  Nonetheless, Deutsche has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

29.    For instance, in its capacity as Trustee, Deutsche has executed many limited powers of attorney.  Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers to go to court and create the impression they were an agent of Defendant and authorized to prosecute a foreclosure in Defendant's name and otherwise act on its behalf even if actual authority were lacking.

30.    At the same time, though, Deutsche knew the Servicers were using Deutsche's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts.  If this misconduct ever came to light, Deutsche wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent."  That is why:  (i) Deutsche insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) Deutsche insisted that the servicers indemnify it for all

9

actions taken on its behalf; and (iii) when high-ranking officers within Deutsche, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of Deutsche, and conceded that Deutsche never owned or held any promissory notes.

31.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers – perpetuated in the name of Deutsche, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment with Deutsche, did nothing.  Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

32.     Despite its feigned ignorance, Deutsche knew full well what was happening.  In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, Deutsche failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name.  In fact, Deutsche continues to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

33.     Further proof that Deutsche's "ignorance" of the Servicers' illegality was feigned, and that Deutsche knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the Servicers.  After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship.  Here, conversely, Deutsche, *i.e.* the principal, wanted Servicers, *i.e.* the agent, to indemnify Deutsche for all actions the servicers took in their name.  The obvious reason for such an unusual indemnification is that

10

Deutsche knew that Servicers were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and Deutsche wanted someone else to pay in the event the fraud scheme ever came to light.

34.     Deutsche's motive for participating in the foregoing was clear – money.  After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to Deutsche for those payments.  Facilitating and encouraging the foregoing misconduct hence enabled Deutsche to avoid significant payments out of its own pocket.

35.     Unaware of the fraudulent and illegal acts of Defendant and the Servicers, as described herein, and using the Lawsuit as leverage, Defendant succeeded in convincing Lilliana Decoursy to modify the Mortgage on the Property.  This prevented Plaintiff from selling the Property without regard for the Mortgage.  Even though the modified mortgage was procured through fraud and illegality, and Defendant had no interest in the Property, this hence required the modified mortgage be paid as part of any sale.  Unfortunately, Plaintiff did not discover the fraudulent nature of Defendant's actions until 2020, after extensive investigation, the delay in discovery being attributed largely to Defendant's ongoing scheme to conceal its misconduct from Plaintiff, this Court, its own attorneys, and the public.

## COUNT ONE

36.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

37.     Plaintiff realleges and incorporates by reference paragraphs 1-35 above.

38.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4).   To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property – to wit, the modified mortgage.

39.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the full amount owed under the modified mortgage, interest on that amount, and the attorney's fees and costs incurred defending the Lawsuit.

40.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

## **COUNT TWO**

41.     This is an action for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

42.     Plaintiff realleges and incorporates by reference paragraphs 1-35 above.

43.     Through a series of fraudulent misrepresentations, as set forth above, Defendant induced Plaintiff to enter the modified mortgage, encumbering title to the Property through false pretenses, fraud, and illegality.

44.     As a result of Defendant's actions, Plaintiff has been damaged.  Those damages include, but are not limited to, the full amount owed under the modified mortgage, interest on that money, and attorney's fees and costs arising from having to defend the Lawsuit.

WHEREFORE Plaintiff demands judgment against Defendant for damages, general and special, interest, attorney's fees, and costs.  Plaintiff further demands a trial by jury and such other and further relief that this Court deems proper.

This 4th day of October, 2020.

Respectfully submitted,

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

13

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

     Plaintiff,

                                          Case No.:   20001724CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

### **SUMMONS**

THE STATE OF FLORIDA
To:  Each Sheriff of the State

      YOU ARE COMMANDED to serve this summons and a copy of the complaint or petition in this action on Defendant, Deutsche Bank National Trust Company, as Trustee, 60 Wall Street, New York City, New York, 10005.

The Defendant is hereby required to serve written defenses to said Complaint on Plaintiff's attorney, Lee Segal, Esquire, whose address is 18167 US Hwy 19 N, #100, Clearwater, FL 33764, Lee@segalschuh.com.

      Not counting the day of service of this summons, you have twenty (20) calendar days in which to file an Answer and defenses. You must file the original of your Answer and defenses with the Clerk of this Court either before or immediately after you serve the Plaintiff's attorney. If you fail to serve such an Answer within this twenty-day period, then a default and a Judgment may be entered against you without further notice.

WITNESS my hand and the seal of this Court on _____10/6/2020_____, 2020.

                                 CLERK OF THE CIRCUIT COURT

                        By: ___Jennifer Sullivan_____
                             As Deputy Clerk

<u>IMPORTANT</u>

     A lawsuit has been filed against you.  You have twenty (20) days after this summons is served on you to file a written response to the attached Complaint with the Clerk of this Court.  A phone call will not protect you.  Your written responses, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case.  If you do not file your responses on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from this Court.  There are other legal requirements.  You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or legal aid office (listed in the phone book).

     If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the Plaintiff's attorney named above.



**Bay County Receipt of Transaction**
**Receipt # 2020039086**

BILL KINSAUL
Clerk of Court
Bay County, Florida

SEGAL, LEE
18167 U.S. HIGHWAY 19 N.
SUITE 100
CLEARWATER, FL 33764

Cashiered by:  JSULLIVAN
On: 10/06/2020   3:08 pm
Transaction # 2292685

| CaseNumber  20001724CA |
|---|

**Judge   JOHN L FISHEL II**

**RICHARD DECOURSY** *VS* **DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE**

Comments:

| Fee Description | Fee | Prior Paid | Waived | Due | Paid | Balance |
|---|---|---|---|---|---|---|
| (VOCF) CIVIL-OTHER FILING FEES | 400.00 | 0.00 | 0.00 | 400.00 | 400.00 | 0.00 |
| (VSUM) CLERK TF/DOR SUMMONS | 10.00 | 0.00 | 0.00 | 10.00 | 10.00 | 0.00 |
| **Total** | **410.00** | **0.00** | **0.00** | **410.00** | **410.00** | **0.00** |
| **Grand Total** | **410.00** | **0.00** | **0.00** | **410.00** | **410.00** | **0.00** |

| PAYMENTS |
|---|

| Payment Type | Reference | | Amount | Refund | Overage | Change | Net Amount |
|---|---|---|---|---|---|---|---|
| EFILE | 29247231 | OK | 410.00 | 0.00 | 0.00 | 0.00 | 410.00 |
| | | | **410.00** | **0.00** | **0.00** | **0.00** | **410.00** |

Filing # 114929367 E-Filed 10/14/2020 09:17:21 AM

IN AND FOR BAY COUNTY FLORIDA
Attorney: Segal & Schuh Law Group P.L. PH: (727) 824-5775
Address: 18167 US Highway 19 North Suite 100 Clearwater, NY 33764

Client's File.:    00693

# AFFIDAVIT OF SERVICE

Richard Decoursy

Deutsche Bank National Trust  Company as Trustee

Plaintiff

Defendant

| | |
|---|---|
| Index Number: 200001724 CA | |
| Date Filed: 10/6/2020 | |
| Date Received  10/6/2020 at 6:52 PM | |
| Court Date: | |

STATE OF NEW YORK, COUNTY OF SUFFOLK, SS.:
**Michael S. Levey** , being sworn says: Deponent is not a party herein; is over the age of 18 years and resides in the State of .
On **10/8/2020**, at **10:44 AM** at: **CT CORP  28 LIBERTY STREET, NY, NY 10005** Deponent served the within
**Summons Complaint**

upon: **DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE,**  therein named.

☐ **#1 INDIVIDUAL**
By delivering a true copy of each to said recipient personally; Deponent knew the person so served to be the person described in as said recipient therein.
☐ **#2 SUITABLE AGE PERSON**
By delivering thereat a true copy of each to  (Authorized Agent) a person of suitable age and discretion. Said premises is recipient's:☐ actual place of
business / employment  ☐ dwelling house (usual place of abode) within the state.

☐ **#3 AFFIXING TO DOOR**
By affixing a true copy of each to the door of said premises which is defendants
☐ actual place of business / employment  ☐ dwelling house (usual place of abode) within the state. Deponent was unable with due diligence to find
defendant or person of suitable age and discretion thereat having called there

☒ **#4 Corporation or Partnership or Trust or LLC or Medical Profession**
By delivering thereat a true copy of each to ALEXANDER PRIVAT APPROVED MAIL ROOM CLERK  personally. Deponent knew said entity so served
to be the entity described in said aforementioned document as said defendant and knew said individual to be an Authorized Agent thereof.

☐ **#5 MAILING**
On , deponent enclosed a copy of same in a postpaid envelope properly addressed to defendant at defendant's last known ☐ Actual Place of
Residence ☐ Actual Place of Business,  and deposited the envelope in an official depository, personally or via agency, under the exclusive care and
custody of the U.S. Postal Service within New York State. The envelope bore the legend "personal and confidential" and did not indicate on the
outside, thereof by return address or otherwise that the communication was from an attorney or concerned an action against the defendant.

☒ **#6 DESCRIPTION**
Sex: Male         Color of skin: Black          Color of hair: Black     Glasses:
Age: 22 - 35 Yrs.     Height: 5ft 9inches - 6ft 0inches           Weight: 161-200 Lbs. Other Features:

☐ **#7 MILITARY SERVICE**
I asked the person spoken to whether defendant was in active military service of the United States or the State of New York in any capacity whatever
and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated.
☒ **#8 WITNESS FEES**  Subpoena Fee Tendered in the amount of
☒ **#9 OTHER**
Per Jacquelin Walton at the security desk,  the respondent Deutsche Bank of 60 Wall Street NY NY has directions to continue to serve process at CT
Corp 28 Liberty Street NY NY 10005 as no one currently is present in the building who is authorized to accept legal papers.  As of 9/24/20 she does
not know when this method will revert to the original service address.

Sworn to before me on 10/8/2020

Robert J Monteleone
NOTARY PUBLIC STATE OF NEW YORK
No. 02M06010691
Qualified in Suffolk County
My Commission Expires October 16, 2022

Michael S. Levey

1209939

Michael S.Levey 450 Route 25 A East Setauket NY 11733 631 788 8021 received by Attorney (Firm) and or Pro Se Litigant

o/b/o Segal & Schuh Law Group P.L.  (727) 824-5775 18167 US Highway 19 North Suite 100 Clearwater , NY 33764

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

      Plaintiff,

                                     Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

      Defendant.

_____/

## MOTION FOR CLERK'S DEFAULT

      Plaintiff, RICHARD DECOURSY, by and through his undersigned counsel, moves this Court for a default in their favor and against Defendant, Deutsche Bank National Trust Company, as Trustee, and would show:

      1.      On October 8, 2020, Defendant was personally served with the Summons and Complaint. An Affidavit of Service so reflecting is contained in the court file.

      2.      On October 28, 2020, Defendant's deadline to respond to the Complaint came and went, yet Defendant failed to file/serve any paper or otherwise respond.

      3.      The Clerk of this Court should enter a default against Defendant.

                                */s/ Lee Segal, Esquire*
                                Lee Segal, Esquire (FBN 37837)
                                **Segal & Schuh Law Group, P.L.**

## DEFAULT

      A default is hereby entered against Defendant, Deutsche Bank National Trust Company, as Trustee, as to all relief sought in the Complaint, for failure to serve any paper as required by law.

             *10/29/2020*

                                      Deputy Clerk

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via regular U.S. Mail to Defendant, Deutsche Bank National Trust Company, as Trustee, 60 Wall Street, New York City, New York 10005 and 28 Liberty Street, New York City, New York 10005 on this 29th day of October, 2020.

<u>/s/ Lee Segal, Esquire</u>
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

      Plaintiff,

                                      Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

      Defendant.

_____/

## MOTION FOR FINAL SUMMARY JUDGMENT
## AFTER DEFAULT

      Plaintiff, RICHARD DECOURSY, by and through his undersigned counsel and pursuant to Fla.R.Civ.P. 1.510, moves this Court for entry of final summary judgment in his favor and against Defendant, Deutsche Bank National Trust Company, as Trustee ("Defendant"), and would show:

      1.      This is a lawsuit alleging various fraudulent and criminal misconduct, as set forth in Counts One and Two of the Complaint.

      2.      Defendant was personally served with process, yet it did not respond to the Complaint, resulting in a clerk's default.

      3.      By operation of law, the default acts as an admission of all well-pled allegations in the Complaint.  See Cellular Warehouse, Inc. v. GH Cellular, LLC, 957 So. 2d 662, 665 (Fla. 3d DCA 2007) (a defaulted defendant "admits all well-pleaded allegations in a complaint").  Under Fla.R.Civ.P. 1.500(e), "[f]inal judgments after default may be entered by the court at any time." While additional proof is necessary to establish the amount of unliquidated damages, the default is conclusive on all issues of liability, obviating the need for further notice, hearing, or evidence.

1

See Pony Express Courier Corp. of Florida v. Zimmer, 475 So. 2d 1316, 1319 (Fla. 2d DCA 1985);

see also Wiseman v. Stocks, 527 So. 2d 904, 905 (Fla. 1st DCA 1988) ("By his default, [defendant]

admitted the truth of this allegation; accordingly, the lower court had no legal right to consider

evidence relating to the issue.").

4.      Contemporaneous with the filing of this motion, Plaintiff is filing an affidavit in

support, reflecting the damages owed.  See Affidavit in Support of Motion for Summary Judgment.

5.      Plaintiff prosecuted Count One under Fla. Stats. §§ 817.535 and 772.103(1)-(4),

part of the Civil Remedies for Criminal Practices Act.  As such, Plaintiff is entitled to the treble

damages authorized under the statute, as alleged in the Complaint.[1]

6.      The pleadings, default, and Affidavit in Support of Summary Judgment leave no

genuine issues of material fact.  This Court should enter final judgment in Plaintiff's favor on the

monetary damages sought in Count One for the following amount: $587,595.00 ($195,865.00,

reflecting the value of the property, multiplied by three), plus $33,900 in attorney's fees as special

damages ($11,300, reflecting the fees incurred in litigating Defendant's fraudulent foreclosure

claims, multiplied by three), for a total of $621,495.00.  See Affidavit in Support of Summary

Judgment.

WHEREFORE Plaintiff respectfully requests relief in accordance with the foregoing.

---

[1]      Count Two of the Complaint seeks these same damages, albeit under a different theory of
recovery.  In the event this motion is granted, Count Two would become moot.  Plaintiff is not
seeking a double recovery.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via regular U.S. Mail to Defendant, Deutsche Bank National Trust Company, as Trustee, 60 Wall Street, New York City, New York 10005 and 28 Liberty Street, New York City, New York 10005 on this 29th day of October, 2020.

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

     Plaintiff,

                                                 Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

## NOTICE OF HEARING

Please take notice of the following hearing:

| | |
|---|---|
| Matter: | Plaintiff's Motion for Final Summary Judgment After Default |
| Date/Time: | January 6, 2021 at 8:45 a.m. CT |
| Judge: | Hon. John L. Fishel, II |
| Location: | Bay County Courthouse<br>300 E. 4th St.<br>Panama City, FL 32401 |
| Telephone: | (850) 747-5320.  If Defendant wishes to appear, it must contact Plaintiff's undersigned counsel at the number listed below so the two parties can conference before calling the Court. |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

via regular U.S. Mail to Defendant, Deutsche Bank National Trust Company, as Trustee, 60 Wall

1

Street, New York City, New York 10005 and 28 Liberty Street, New York City, New York 10005

on this 29th day of October, 2020.

/s/ Lee Segal, Esquire
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

     Plaintiff,

                                        Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

## MOTION FOR TELEPHONIC APPEARANCE

Plaintiff RICHARD DECOURSY, by and through his undersigned counsel, moves this Court for an Order permitting telephonic appearance, and would show:

1.     On January 6, 2021 at 8:45 a.m. CT, this Court is scheduled to conduct a hearing on Plaintiff's Motion for Final Summary Judgment After Default.

2.     A clerk's default has been entered against Defendant, and it has no counsel.  As such, this hearing is scheduled for 15 minutes and is not anticipated to last even that long.  No evidence is necessary, and there is no good cause to prevent phone attendance.

3.     The undersigned's office is quite some distance from the location of this hearing. Phone attendance would greatly help the undersigned.

WHEREFORE Plaintiff respectfully requests relief in accordance with the foregoing.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via regular U.S. Mail to Defendant, Deutsche Bank National Trust Company, as Trustee, 60 Wall

Street, New York City, New York 10005 and 28 Liberty Street, New York City, New York 10005

on this 29th day of October, 2020.

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

     *Plaintiff,*

                                      Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

## NOTICE OF FILING

Please take notice of the filing of the Affidavit in Support of Summary Judgment of Plaintiff, Richard Decoursy.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via regular U.S. Mail to Deutsche Bank National Trust Company, as Trustee, 60 Wall Street, New York City, New York 10005 and 28 Liberty Street, New York City, New York 10005 on this 29th day of October, 2020.

Respectfully submitted,

*/s/ Lee Segal*_____

Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

1

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

     *Plaintiff,*

                                    Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.
_____/

## AFFIDAVIT IN SUPPORT OF SUMMARY JUDGMENT

I, Richard Decoursy, testify as follows:

1.    I am over 18 years of age, competent, and state these facts upon my personal knowledge.

2.    I own the property located at 2861 Thaxton Drive, Unit 46, in Palm Harbor, Florida ("the Property") and have owned it for many years.

3.    The value of the Property is $195,865.00. I arrived at this value by taking the average value of Property One set forth on Zillow.com, $195,865.00, a website that I frequently use to help guide my valuations of real estate. In addition, I know this to be the value because the Property is identical to another property in the same complex that recently sold for at or about this amount. I know this based on my ownership of Property One and my knowledge of property values in the neighborhood.

4.    Over the course of many years, I incurred $11,300 in attorney's fees in defending foreclosure lawsuits on the Property.

_____    10-29-2020
Richard Decoursy                      Date

2

STATE OF FLORIDA
COUNTY OF PINELLAS

Before me, the undersigned authority, on this 29 day of October 2020, personally appeared Richard Decoursy, who is personally known to me or who produced drivers license as identification and who, having been duly sworn, deposes and says that the foregoing facts are true and correct.



Notary

Notary Public State of Florida
Erin Reynolds
My Commission GG 965284
Expires 03/03/2024

3

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

     Plaintiff,

                                         Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

## ORDER GRANTING TELEPHONIC APPEARANCE

THIS CAUSE, having come before this Court on the Motion for Telephonic Appearance

of Plaintiff, RICHARD DECOURSY, and the Court, being duly advised in the premises, it is

hereby;

ORDERED AND ADJUDGED as follows:

1.        The motion is GRANTED.

2.        Plaintiff's counsel may attend the hearing on January 6, 2021 at 8:45 a.m. CT via

telephone by calling 850-747-5320.

DONE AND ORDERED in Chambers in Bay County, Florida on this 30 day of October,

2020.

                                             _____

                                           Hon. John L. Fishel, II
                                           Circuit Court Judge

cc:    Lee Segal, Esq.
       Deutsche Bank Nat'l Trust Co., as Trustee

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

      Plaintiff,

                                       Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

      Defendant.

_____/

### AMENDED NOTICE OF SUMMARY JUDGMENT / FINAL HEARING

Please take notice of the following hearing:

| | |
|---|---|
| Matter: | Plaintiff's Motion for Final Summary Judgment After Default; Final Hearing on damages (evidence may be taken) |
| Date/Time: | January 6, 2021 at 8:45 a.m. CT |
| Judge: | Hon. John L. Fishel, II |
| Location: | Bay County Courthouse 300 E. 4th St. Panama City, FL 32401 |
| Telephone: | (850) 747-5320.  If Defendant wishes to appear, it must contact Plaintiff's undersigned counsel at the number listed below so the two parties can conference before calling the Court. |

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

via regular U.S. Mail to Defendant, Deutsche Bank National Trust Company, as Trustee, 60 Wall

1

Street, New York City, New York 10005 and 28 Liberty Street, New York City, New York 10005

on this 30th day of October, 2020.

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

2

IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA

**RICHARD DECOURSY,**

      **Plaintiff,**

                                       **CASE NO.: 20-CA-001724**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee,**

      **Defendant.**
_____/

## NOTICE OF LIMITED APPEARANCE
## <u>AND DESIGNATION OF EMAIL ADDRESSES</u>

PLEASE TAKE NOTICE that the undersigned counsel, Jason H. Okleshen and Beth A.
Norrow, and the law office of Greenberg Traurig, P.A. hereby serves their Notice of Limited
Appearance for Defendant, **DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee**
("DBNTC"). Counsel is appearing for the limited purpose of challenging whether service of
process was valid, and for vacating Default and Judgment(s) after Default. Counsel hereby gives
the following designations for purposes of electronic service and request that all future pleadings,
notices, documents or electronic filings be served upon the undersigned attorney and law firm.

| | | | |
|---|---|---|---|
| Primary: | norrowb@gtlaw.com | Primary: | Okleshenj@gtlaw.com |
| Secondary: | dunnla@gtlaw.com | Secondary: | FLService@gtlaw.com |

Dated: December 30, 2020

Respectfully submitted,

Jason H. Okleshen, Esq.
Florida Bar No. 496170
Okleshenj@gtlaw.com
**Greenberg Traurig, P.A.**
777 S. Flagler Dr., Ste. 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222

Beth A. Norrow, Esq.
Florida Bar No. 061497
norrowb@gtlaw.com
**Greenberg Traurig, P.A.**
450 S. Orange Ave., Ste. 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: /s/ *Beth A. Norrow*
    Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company, as Trustee*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 30, 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court using the State of Florida e-filing system which will send a notice of electronic service to:

Lee Segal
18167 US Hwy 19 N., #100
Clearwater, FL 33764
lee@segalschuh.com
marie@segalschuh.com

                    /s/ Beth A. Norrow
                    Beth A. Norrow

*ADMIN 37983564*

2

**IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA**

**RICHARD DECOURSY,**

    **Plaintiff,**

                              **CASE NO.: 20-CA-001724**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee,**

    **Defendant.**

_____/

## DEFENDANT'S NOTICE OF FILING
## LEGAL AUTHORITY CITED BY PLAINTIFF IN COMPLAINT

    Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee, by and through the undersigned attorneys, hereby gives notice of filing the attached Legal Authorities cited in Plaintiff's Complaint.

    1.      § 772.013, Florida Statutes – ***STATUTE DOES NOT EXIST***;

    2.      § 772.014, Florida Statutes – ***STATUTE DOES NOT EXIST***;

    3.      § 817.535, Florida Statutes – prohibiting recording in official records, with the intent to defraud another, any false instrument purporting to affect an owner's interest in the property;

Dated: December 30, 2020

Jason H. Okleshen, Esq.
Florida Bar No. 496170
Okleshenj@gtlaw.com
**Greenberg Traurig, P.A.**
777 S. Flagler Dr., Ste. 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222

Respectfully submitted,

Beth A. Norrow, Esq.
Florida Bar No. 061497
norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Ste. 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: */s/ Beth A. Norrow*
       Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company, as Trustee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 30, 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court using the State of Florida e-filing system which will send a notice of electronic service to:

Lee Segal
18167 US Hwy 19 N., #100
Clearwater, FL 33764
lee@segalschuh.com
marie@segalschuh.com

/s/ Beth A. Norrow
Beth A. Norrow

*ADMIN 37988366*

2





## 2020 Florida Statutes

The Florida Statutes are updated annually after the conclusion of a regular legislative session, typically published in July/August.

Home > Laws > 2020 Florida Statutes

Year:  2020    Search Term:  772.014    Within Chapter:

Search    Reset

## No matching search results

West's Florida Statutes Annotated
Title XLVI. Crimes (Chapters 775-899)
Chapter 817. Fraudulent Practices (Refs & Annos)
Part I. False Pretenses and Frauds, Generally

West's F.S.A. § 817.535

## 817.535. Unlawful filing of false documents or records against real or personal property

Effective: October 1, 2013

Currentness

(1) As used in this section, the term:

(a) "File" means to present an instrument for recording in an official record or to cause an instrument to be presented for recording in an official record.

(b) "Filer" means the person who presents an instrument for recording in an official record or causes an instrument to be presented for recording in an official record.

(c) "Instrument" means any judgment, mortgage, assignment, pledge, lien, financing statement, encumbrance, deed, lease, bill of sale, agreement, mortgage, notice of claim of lien, notice of levy, promissory note, mortgage note, release, partial release or satisfaction of any of the foregoing, or any other document that relates to or attempts to restrict the ownership, transfer, or encumbrance of or claim against real or personal property, or any interest in real or personal property.

(d) "Official record" means the series of instruments, regardless of how they are maintained, which a clerk of the circuit court, or any person or entity designated by general law, special law, or county charter, is required or authorized by law to record. The term also includes a series of instruments pertaining to the Uniform Commercial Code filed with the Secretary of State or with any entity under contract with the Secretary of State to maintain Uniform Commercial Code records and a database of judgment liens maintained by the Secretary of State.

(e) "Public officer or employee" means, but is not limited to:

1. A person elected or appointed to a local, state, or federal office, including any person serving on an advisory body, board, commission, committee, council, or authority.

2. An employee of a state, county, municipal, political subdivision, school district, educational institution, or special district agency or entity, including judges, attorneys, law enforcement officers, deputy clerks of court, and marshals.

3. A state or federal executive, legislative, or judicial officer, employee, or volunteer authorized to perform actions or services for any state or federal executive, legislative, or judicial office, or agency.

4. A person who acts as a general or special magistrate, auditor, arbitrator, umpire, referee, hearing officer, or consultant to any state or local governmental entity.

5. A person who is a candidate for public office or judicial position.

(2)(a) A person who files or directs a filer to file, with the intent to defraud or harass another, any instrument containing a materially false, fictitious, or fraudulent statement or representation that purports to affect an owner's interest in the property described in the instrument commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) A person who violates paragraph (a) a second or subsequent time commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(3) If a person is convicted of violating subsection (2) and the owner of the property subject to the false instrument is a public officer or employee, the offense shall be reclassified as follows:

(a) In the case of a felony of the third degree, to a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) In the case of a felony of the second degree, to a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(4)(a) If a person is convicted of violating subsection (2) and the person committed the offense while incarcerated in a jail or correctional institution or while participating in a pretrial diversion program under any form of pretrial release or bond, on probation or parole, or under any postrelease supervision, the offense shall be reclassified as follows:

1. In the case of a felony of the third degree, to a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

2. In the case of a felony of the second degree, to a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) If a person's offense has been reclassified pursuant to this subsection, the sentencing court shall issue a written finding that the offense occurred while incarcerated in a jail or correctional institution and direct that a copy of the written finding and judgment of conviction be forwarded to the appropriate state institution or county facility for consideration of disciplinary action and forfeiture of all gain-time or any early release credits accumulated up to the date of the violation.

(5) If the person is convicted of violating subsection (2) and the owner of the property covered by the false instrument incurs financial loss as a result of the instrument being recorded in the official record, including costs and attorney fees incurred in correcting, sealing, or removing the false instrument from the official record as described herein, the offense shall be reclassified as follows:

(a) In the case of a felony of the third degree, to a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) In the case of a felony of the second degree, to a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(6) A person who fraudulently records a claim of lien in the official records pursuant to part I of chapter 713 is subject to the fraud provisions of s. 713.31 and not this section.

(7) If a person is convicted of violating this section, the sentencing court shall issue an order declaring the instrument forming the basis of the conviction null and void and may enjoin the person from filing any instrument in an official record absent prior review and approval for filing by a circuit or county court judge. The sentencing court may also order the instrument forming the basis of the conviction sealed from the official record and removed from any applicable electronic database used for recording instruments in the official record.

(8)(a) Any person adversely affected by an instrument filed in the official record which contains a materially false, fictitious, or fraudulent statement or representation has a civil cause of action under this section without regard to whether criminal charges are pursued under subsection (2). A notice of lis pendens in accord with s. 48.23 shall be filed which specifically describes the instrument under challenge and the real or personal property affected by the instrument.

(b) Upon a finding that the instrument contains a materially false, fictitious, or fraudulent statement or representation such

that the instrument does not establish a legitimate property or lien interest in favor of another person:

1. The court shall determine whether the entire instrument or certain parts thereof are null and void ab initio. If the court finds the instrument void in its entirety, it may order the instrument sealed from the official record and removed from any electronic database used for indexing or locating instruments in the official record. The court may also, permanently or for a period of time, enjoin the defendant who filed the instrument or who directed the filer to file the instrument from filing or directing a person to file an instrument in the official records without prior review and approval for filing by a circuit or county court judge, provided that as to third parties who may have given value for an interest described or granted by any instrument filed in violation of the injunction, the instrument shall be deemed validly filed and provides constructive notice, notwithstanding any failure to comply with the terms of the injunction.

2. Upon a finding of intent to defraud or harass, the court or jury shall award actual damages and punitive damages, subject to the criteria in s. 768.72, to the person adversely affected by the instrument. The court may also levy a civil penalty of $2,500 for each instrument determined to be in violation of subsection (2).

3. The court may grant such other relief or remedy that the court determines is just and proper within its sound judicial discretion.

(c) The prevailing party in such a suit is entitled to recover costs and reasonable attorney fees.

(d) The custodian of any official record shall, upon payment of appropriate fees, provide a certified copy of the sealed instrument to the party seeking relief under this section for use in subsequent court proceedings; in addressing or correcting adverse effects upon the person's credit or property rights, or reporting the matter for investigation and prosecution; or in response to a subpoena seeking the instrument for criminal investigative or prosecution purposes.

(e) Upon request, the custodian of any official record shall, upon payment of appropriate fees, provide a certified copy of the sealed instrument to any federal, state, or local law enforcement agency.

(f) If feasible, the custodian of the official record where the instrument is recorded shall record any court order finding that the instrument is null and void in its entirety or in certain parts thereof.

(g) An instrument removed from an electronic database used for recording instruments in the public record pursuant to this section shall be maintained in a manner in which the instrument can be reduced to paper form.

(9) A government agency may provide legal representation to a public officer or employee if the instrument at issue appears to have been filed to defraud or harass the public officer or employee in his or her official capacity. If the public officer or employee is the prevailing party, the award of reasonable attorney fees shall be paid to the government agency that provided the legal representation.

817.535. Unlawful filing of false documents or records against..., FL ST § 817.535

(10) This section does not apply to the procedures for sealing or expunging criminal history records as provided in chapter 943.

**Credits**

Added by Laws 2013, c. 2013-228, § 1, eff. Oct. 1, 2013.

Notes of Decisions (4)

West's F. S. A. § 817.535, FL ST § 817.535
Current through Chapter 184 (End) of the 2020 Second Regular Session of the Twenty-Sixth Legislature

End of Document © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT IN AND FOR BAY COUNTY, FLORIDA**

**RICHARD DECOURSY,**

      **Plaintiff,**

                         **CASE NO.: 20-CA-001724**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee,**

      **Defendant.**

_____/

## REQUEST FOR JUDICIAL NOTICE OF OTHER LEE SEGAL CASES

Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee ("DBNTC") by and through its undersigned counsel and pursuant to Fla. Stat. §§ 90.202(11), (12), hereby files this Request for Judicial Notice in support of Defendant's Motion to Vacate Default and Motion to Quash Service of Process and for all other purposes applicable in this matter, and states:

1.      Section 90.202(6) of the Florida Evidence Code specifically provides that a court may take judicial notice of the "[r]ecords of any court of this state." § 90.202(6), Fla. Stat. (2017); *see also Hunt v. State*, 613 So. 2d 893, 898 n.5 (Fla. 1992) (recognizing that the Supreme Court took judicial notice of the record in another case on the basis of section 90.202(6) of the Florida Statutes); *Martin v. Garrison*, 658 So. 2d 1019, 1021 (Fla. 4th DCA 1995) (taking judicial notice of court records). In interpreting this provision, Florida appellate courts have also taken judicial notice of deeds recorded in the Official Records of a Florida County. *See Gonzalez v. Chase Home Fin. LLC*, 37 So. 3d 955, 958 (Fla. 3d DCA 2010) (taking judicial notice of a deed and mortgage recorded in Miami-Dade County's official records); *see also Beggi v. Ocean Bank*, 91 So. 3d 193,

195 n. 3 (Fla. 3d DCA 2012) (recognizing quitclaim deeds that were recorded in the official records of Miami-Dade County when the appellee requested taking of judicial notice of same). Indeed, the Florida Supreme Court has stated that "[c]ourts may take judicial cognizance of all public documents and public records." *Conyers v. State*, 123 So. 817, 818 (Fla. 1929).

2.      Further, Sections 90.202(11) and 90.202(12) of the Florida Statutes also permit the Court to take judicial notice of "[f]acts that are not subject to dispute because they are generally known within the territorial jurisdiction of the court" and/or "[f]acts that are not subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." *See* Fla. Stat. §§ 90.202(11), (12).

3.      Pursuant to this statute, DBNTC requests that the Court take judicial notice of the Court records filed in the following actions, which fall squarely within the above-referenced sections:

i.      ***Ziferryn Ventures, LLC,*** *as Trustee of the 8172 Via Rose Land Trust v. Deutsche Bank National Trust Company, as Indenture Trustee*; Charlotte County Circuit Court Case No. 20-000747-CA, which includes, but is not limited to:

- Complaint filed on August 20, 2020; **Exhibit "1".**
- Order filed on December 2, 2020; **Exhibit "2".**

ii.      *8172 Via Rosa Land Trust, by:* ***Ziferryn Ventures, LLC***, *as Trustee v. Deutsche Bank National Trust Company, as Indenture Trustee for MortgageIT Trust 2005-2*; Clay County Circuit Court Case No. 2020-CA-000929.

- Complaint filed on December 3, 2020; **Exhibit "3".**

iii.      ***Inland Assets, LLC***, *as Trustee for the 4417 Rudder Way Land Trust v. Deutsche Bank National Trust Company, as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2*; Pasco County Circuit Court Case No. 2020-CA-001794.

- Complaint filed on August 11, 2020; **Exhibit "4".**
- Order filed on October 21, 2020; **Exhibit "5."**

iv.    *4417 Rudder Way Land Trust, By: **Inland Assets, LLC**, Trustee v. Deutsche Bank National Trust Company, as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2*; Pasco County Circuit Court Case No. 20-245-CA.

- Complaint filed on October 20, 2020; **Exhibit "6".**

v.    ***Anna Lofgren** v. Deutsche Bank National Trust Company, et, al.*; Bradford County Circuit Court Case No. 20-CA-340.

- Complaint filed on September 10, 2020; **Exhibit "7".**

vi.    ***Anna Lofgren** v. Deutsche Bank National Trust Company, as Trustee.*; Okeechobee County Circuit Court Case No. 2020-000212-CA

- Complaint filed on December 13, 2020; **Exhibit "8".**

vii.    ***Michael Haulsee and Marcia Haulsee** v. Deutsche Bank Trust Company, Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates Series 2007-QS4*; removed from Okaloosa County Circuit Court to Northern District Court, then ordered to the appropriate venue the Middle District of Florida Case No. 8:20-cv-02410-T-60SPF.

- District Court Docket and Complaint filed on August 17, 2020; **Exhibit "9".**
- Haulsee Notice of Pendency of Other Actions; **Exhibit "10"**

viii.    ***Michael Haulsee and Marcia Haulsee** v. Deutsche Bank National Trust Company, as Trustee*; Bay County Circuit Court Case No. 20-001663-CA.

- Complaint filed on September 23, 2020; **Exhibit "11".**

4.    Judicial notice of these documents will allow this Court "to arrive at the best decision[] on the merits."  Dorothy F. Easley, *Judicial Notice on Appeal: A History Lesson in Recent Trends*, 84 Fla. B.J. 45, 46 (Dec. 2010) (noting that courts consider additional sources referred to in briefs or conduct their own independent research to arrive at the best decisions on the merits).

**WHEREFORE**, DBNTC respectfully request that the Court take judicial notice of the documents filed in the above- referenced cases, together with such other relief this Court deems just and necessary.

Dated: December 30, 2020

Respectfully submitted,

Jason H. Okleshen, Esq.
Florida Bar No. 496170
Okleshenj@gtlaw.com
**Greenberg Traurig, P.A.**
777 S. Flagler Dr., Ste. 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222

Beth A. Norrow (FBN 061497)
norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Suite 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: /s/ *Beth A. Norrow*
        Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company, as Trustee*

## CERTIFICATE OF SERVICE

I CERTIFY that on December 30, 2020, I electronically filed the foregoing with the Clerk of Court via the Florida E-Filing Portal, which shall cause a copy to be served via email to the following:

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste. 100
Clearwater, FL 33764
lee@segalschuh.com
marie@segalschuh.com

/s/ Beth A. Norrow
Beth A. Norrow

4

# EXHIBIT 1

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT,
IN AND FOR CHARLOTTE COUNTY, FLORIDA

ZIFERRYN VENTURES, LLC, as Trustee
of the 8172 Via Rosa Land Trust,

      Plaintiff,

v.

                                    Case No.:   **20000747CA**

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Indenture Trustee for MortgageIT Trust 2005-2,

      Defendant.

_____/

## **COMPLAINT**

Plaintiff, ZIFERRYN VENTURES, LLC, as Trustee of the 8172 Via Rosa Land Trust ("Plaintiff" or "the Trust"), by and through its undersigned counsel, sues Defendant, Deutsche Bank National Trust Company, as Indenture Trustee for MortgageIT Trust 2005-2 ("Defendant"), and would show:

1.      All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

2.      Venue is proper in Charlotte County, Florida, as the causes of action alleged herein accrued here.

3.      For many years, Rosana Monteiro-Kamel ("Monteiro") was the owner of the following property in Orlando, Orange County, Florida ("the Property"):

> Lot 50, Mirabella at Vizcaya Phase Three, according to the Plat thereof as recorded in Plat Book 52, Pages 32 through 35, Public Records of Orange County, Florida.

> More commonly known as:  8172 Via Rosa, Orlando, FL 32836

4.      On March 21, 2005, Monteiro executed a promissory note ("the Note") and mortgage ("the Mortgage") in favor of MIT Lending ("MIT"), as recorded in the Orange County

1

Official Records at Book 7892, Page 1503.  The Mortgage was intended to act merely as a lien on the Property, as required by Fla. Stat. § 697.01, yet it also read like a contract, requiring payment of property taxes and insurance.

5.      Shortly after closing on the Monteiro loan, MIT sold the Note to the depositor, MortgageIT Holding, Inc. ("MortgageIT" or "the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") and conveyed the Notes to Deutsche Bank National Trust Company ("DBNTC"), as Trustee, to a trust named MortgageIT Trust 2005-2 ("the Trust").

6.      The purpose of the conveyance was to convert the Notes into securities, enabling MortgageIT to sell the cash flows from the Notes in the form of certificates ("the Certificates") to certificateholders ("the Certificateholders").  The Certificateholders had no ownership interest in the Notes, but merely collected cash flows from the Notes when the borrowers on the Loans ("the Borrowers") made their monthly mortgage payments.

7.      The Trust did not own or hold any of the Notes, either.  It was merely a real estate mortgage investment conduit (REMIC, for short) for the payment of cash flows, with the Notes used as collateral.

8.      As Trustee, DBNTC did not own or hold the Notes, either.  Rather, it owed fiduciary duties to the Certificateholders, including:  (i) the obligation to review each loan and verify that it qualified for inclusion in the Trust; and (ii) in the event the Certificateholders stopped collecting the cash flows for which they bargained, *e.g.* because the Warranties were false, the obligation to ask MortgageIT to buy back the Notes.

9.     In 2015, Monteiro stopped making payments under the Note – one of many Borrowers who did so.  Thereafter, a lawsuit was filed against her, Orange County Case No. 2016-CA-4184 ("the First Lawsuit"), purportedly in the name of Defendant.

10.     After succeeding in getting the First Lawsuit involuntarily dismissed, Monteiro transferred title to the Property to Plaintiff via a Deed to Trustee recorded in the Orange County Official Records on July 25, 2017 at Instrument # 20170411414.

11.     With title to the Property in Plaintiff's name, another foreclosure lawsuit was initiated in Defendant's name, Orange County Case No. 2019-CA-5198 ("the Second Lawsuit"). The genesis of the Second Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

12.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

13.     First, with the Note having been converted into a security, Defendant was neither the owner nor the holder of the Note by operation of law.  In fact, it was illegal for Defendant to own or hold the Note.  Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

14.     Second, DBNTC was not authorized to be a trustee at the time the Second Lawsuit was initiated or at any point thereafter.  Simply put, DBNTC does not exist as a trustee.  Defendant knew this, yet it intentionally represented otherwise in the Second Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

15.     Third, at no point during the Second Lawsuit did MortgageIT Trust 2005-2 exist, and at no point in the Second Lawsuit was the Note an asset within that trust.  Defendant knew these facts, yet it intentionally represented otherwise, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

16.     In essence, the Second Lawsuit was prosecuted in the name of a non-existent trustee for a non-existent trust – with those key facts concealed both from this Court and Plaintiff – in a fraudulent attempt to divest ownership of the Property from Plaintiff.

17.     At the heart of these fraudulent and illegal acts was Specialized Loan Servicing, LLC ("SLS").  Acting as Defendant's purported agent, SLS engaged in a series of fraudulent and illegal acts separate and apart from those listed above.

18.     First, SLS verified the Complaint in the Second Lawsuit, purportedly as servicer and attorney in fact for Defendant, despite knowing that it was neither.  After all, it was impossible for SLS to be servicer for a non-existent trustee of a non-existent trust.  In this same vein, SLS was neither the attorney in fact for Defendant nor its authorized agent.  In fact, it was illegal for SLS to act as an agent for DBNTC, as Trustee, at all, particularly since SLS lacks trust powers.

19.     Second, SLS caused the Second Lawsuit to be prosecuted in Defendant's name so it could pocket the proceeds from a foreclosure sale for itself and avoid any attendant tax consequences.  Though SLS engaged in these acts under the auspices of being Defendant's agent, SLS knew the very notion of an agency relationship was a farce.  SLS was the only party who stood to gain if the Second Lawsuit were to succeed.  It had no intention of sharing any ill-gotten gains with anyone else.  It represented otherwise throughout the course of the Second Lawsuit in a fraudulent, illegal, and perjurious attempt to divest Plaintiff of ownership of the Property and pocket the proceeds for itself – without paying any taxes on the gains.

20.     Third, SLS caused to be recorded in the Official Records of Orange County, Florida at Book 11002, Page 4239, an Assignment of Mortgage ("the Assignment"), from Mortgage Electronic Registration Systems, Inc. ("MERS"), as Nominee for MIT Lending, to Defendant. This Assignment purported to reflect a conveyance that never happened.  That is why it was prepared not in the ordinary course of business, but by Albertelli Law, the attorneys who prosecuted the First Lawsuit on behalf of SLS.  That's also why the Assignment purports to show a conveyance from MERS to Defendant when, in reality, the Note was sold to MortgageIT before being collateralized.

21.     Despite these false, fictitious, and fraudulent statements and representations, SLS used the Assignment in the Second Lawsuit, purporting to affect Plaintiff's interest in the Property. Indeed, the Assignment was attached to the Complaint and used to support Defendant's standing to foreclose the Mortgage.  Given these facts, SLS's recording of the Assignment violated Fla. Stat. § 817.535(2)(a) and constituted a criminal infraction – a felony under Florida law.

22.     Fourth, SLS – purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Second Lawsuit to be prosecuted in Defendant's name, repeatedly representing, under oath, that Defendant was the owner and holder of the Note.  Yet SLS knew that Defendant could not be the owner or holder of the Note by operation of law.  The purported agency relationship that SLS used to support a holder theory was likewise a farce.  SLS may have possessed the Note, but it did not do so for Defendant – a nonexistent trustee of a nonexistent trust.

23.     While these fraudulent, illegal, and perjurious acts were undertaken by SLS, DBNTC, as Trustee, is liable for all of them.  After all, SLS was acting with actual and apparent authority to bind DBNTC.

24.     For many years, DBNTC conspired with SLS to enable, facilitate, and encourage these acts.  Though it simultaneously attempted to feign ignorance of SLS's misconduct to avoid liability, its purported ignorance was a rouse, and DBNTC ratified the misconduct after being specifically apprised of it.

25.     To illustrate, in its capacity as Trustee, DBNTC has executed many limited powers of attorney ("LPOA" in the singular, or "LPOAs" in the plural).  Its purpose in conveying the LPOAs was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like SLS to go to court and create the impression they were an agent of DBNTC and authorized to prosecute a foreclosure in DBNTC's name and otherwise act on its behalf even if actual authority were lacking.

26.     At the same time, though, DBNTC knew that servicers like SLS were using DBNTC's name to perpetuate fraudulent, illegal, and perjurious acts.  If this misconduct ever came to light, DBNTC wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent."  That is why:  (i) DBNTC insisted that the LPOAs include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) DBNTC insisted that the servicers indemnify DBNTC for all actions taken on its behalf; and (iii) when high-ranking officers within DBNTC, *e.g.* Ronaldo Reyes ("Reyes"), its Vice President, and Timothy Patrick ("Patrick"), its CEO, were confronted with the illegal acts described herein by Plaintiff's agent, Cyndee Rae Estrada ("Estrada"), they disclaimed knowledge of the servicers' misconduct, denied that the servicers were their agents, and even went so far as to disclaim knowledge that servicers were prosecuting foreclosure lawsuits in Florida in DBNTC's

6

name at all.  Those denials, however, were belied by the LPOAs, particularly since many of the LPOAs were signed by Reyes.

27.    Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like SLS – perpetuated in the name of DBNTC, as Trustee – Reyes and Patrick, within the course and scope of their employment with DBNTC, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with these servicers to conceal these acts from Plaintiff and the public at large.

28.    Despite its feigned ignorance, DBNTC knew full well what was happening.  In fact, even after Estrada addressed the details of the misconduct with Reyes, Patrick, and other, high-ranking officers of DBNTC in detail, DBNTC failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name.

29.    Further proof that DBNTC's "ignorance" of the servicers' illegality was feigned, and that DBNTC knew full well what the servicers were doing, is seen in the indemnification agreements between it and the servicers.  After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship.  Here, conversely, DBNTC, *i.e.* the principal, wanted servicers like SLS, *i.e.* the agent, to indemnify DBNTC for all actions the servicers took in their name.  The obvious reason for such an unusual indemnification is that DBNTC knew that servicers like SLS were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and SLS wanted someone else to pay in the event the fraud scheme ever came to light.

30.     Defendant is subject to the court's personal jurisdiction because Defendant holds a mortgage or other lien on real property within the State.

## COUNT ONE

31.     This is an action for declaratory relief within the jurisdiction of this Court.

32.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

33.     Plaintiff realleges and incorporates by reference paragraphs 1-30 above.

34.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4).  To wit, through a pattern of criminal activity, a series of fraudulent misrepresentations, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

35.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of the Property, interest on that amount, and the attorney's fees and costs incurred defending the Lawsuit.

36.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

## COUNT TWO

37.     Plaintiff realleges and incorporates by reference paragraphs 1-30 above.

38.     This is an action for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

39.     Plaintiff realleges and incorporates by reference paragraphs 1-30 above.

40.     Through a series of fraudulent misrepresentations, as set forth above, Defendant slandered Plaintiff's title to the Property and prevented Plaintiff from selling the Property without regard for the Mortgage.

41.     As a result of Defendant's actions, Plaintiff has been damaged.  Those damages include, but are not limited to, the value of the Property, interest on that money, and attorney's fees and costs arising from having to defend the Lawsuit.

WHEREFORE Plaintiff demands judgment against Defendant for damages, general and special, interest, attorney's fees, and costs.  Plaintiff further demands a trial by jury and such other and further relief that this Court deems proper.

This 19th day of August, 2020

Respectfully submitted,

_/s/ Lee Segal, Esquire_
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

9

# EXHIBIT 2

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR CHARLOTTE COUNTY, FLORIDA                                    CIVIL ACTION


**ZIFERRYN VENTURES LLC AS TRUSTEE**,
            **Plaintiff.**            **CASE NO. 20000747CA**

**VS.**

DEUTSCHE BANK NATIONAL TRUST COMPANY,
            **Defendant.**
_____/


<u>**Order**</u>

**THIS CAUSE** came before the court on December 2, 2020 on Plaintiff's Motion for Final Judgment (noticed as summary judgment) and the court having heard argument and being otherwise fully advised in the premises, finds as follows:

1) The court has reviewed all filings in the case and heard argument of counsel.

2) The court specifically finds that the affidavit of service filed on November 11, 2020 (prior filings were illegible) does not reflect valid service of process. The agent serving process followed the directions of security or messengers in an attempt to gain service and this is insufficient under Florida law. There is no proof or allegation that the Defendant is attempting to avoid service.

3) In light of the above, the clerk's default filed on October 6, 2020 is of no legal effect.

4) The allegations of the Complaint fail to allege any facts that would make Charlotte County a proper venue for this case.

5) The allegations of the two counts fail to state a cause of action under the Civil Remedy statute or for common law fraud.

6) The affidavit of damages is insufficient under Florida law.

7) This case appears to be an improper collateral attack on two other actions in Orange County Florida.

8) The Plaintiff demanded a jury trial and the damages in this case are unliquidated so any trial must be noticed as a jury trial.

**<u>Ordered and Adjudged:</u>**

For those reasons the Plaintiff's Motion for Judgment is denied. Plaintiff shall perfect service on the Defendant within 60 days. In light of the rulings above, Plaintiff is hereby authorized, but not ordered, to file an amended complaint within 15 days.

Ordered in Charlotte County, Florida, this 2nd day of December, 2020.

eSigned by GENTILE, GEOFFREY H in 20000747CA
on 12/02/2020 10:19:14 1cX4mZJl

Lee Segal <lee@segalschuh.com>, <marie@segalschuh.com>
Megan Lazenby <lazenbylaw@gmail.com>, <eserve@lazenbylawllc.com>

# EXHIBIT 3

Filing # 117581432 E-Filed 12/03/2020 10:55:10 AM

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT,
IN AND FOR CLAY COUNTY, FLORIDA

8172 VIA ROSA LAND TRUST,
By:  ZIFERRYN VENTURES, LLC, as Trustee,

       Plaintiff,

v.

                                              Case No.:

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Indenture Trustee for MortgageIT Trust 2005-2,

       Defendant.

_____/

## **COMPLAINT**

       Plaintiff, 8172 VIA ROSA LAND TRUST, By Ziferryn Ventures, LLC, as Trustee

("Plaintiff"), by and through its undersigned counsel, sues Defendant, Deutsche Bank National

Trust Company, as Indenture Trustee for MortgageIT Trust 2005-2 ("Defendant"), and would

show:

       1.     All conditions precedent to the filing of this action have been met, waived, or

otherwise satisfied.

       2.     Venue is proper in Clay County, Florida, as the cause of action accrued here.

       3.     For many years, Rosana Monteiro-Kamel ("Monteiro") was the owner of the

property at 8172 Via Rosa, Orlando, FL 32836 ("the Property").

       4.     On March 21, 2005, Monteiro executed a promissory note ("the Note") and

mortgage ("the Mortgage") in favor of MIT Lending ("MIT"), as recorded in the Orange County

Official Records at Book 7892, Page 1503.  The Mortgage was intended to act merely as a lien on

the Property, as required by Fla. Stat. § 697.01, yet it also read like a contract, requiring payment

of property taxes and insurance.

1

5.     Shortly after closing on the Monteiro loan, MIT sold the Note to the depositor, MortgageIT Holding, Inc. ("MortgageIT" or "the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") and conveyed the Notes to Deutsche Bank National Trust Company ("DBNTC"), as Trustee, to a trust named MortgageIT Trust 2005-2 ("the Trust").

6.     The purpose of the conveyance was to convert the Notes into securities, enabling MortgageIT to sell the cash flows from the Notes in the form of certificates ("the Certificates") to certificateholders ("the Certificateholders").  The Certificateholders had no ownership interest in the Notes, but merely collected cash flows from the Notes when the borrowers on the Loans ("the Borrowers") made their monthly mortgage payments.

7.     The Trust did not own or hold any of the Notes, either.  It was merely a real estate mortgage investment conduit (REMIC, for short) for the payment of cash flows, with the Notes used as collateral.

8.     As Trustee, DBNTC did not own or hold the Notes, either.   Rather, it owed fiduciary duties to the Certificateholders, including:  (i) the obligation to review each loan and verify that it qualified for inclusion in the Trust; and (ii) in the event the Certificateholders stopped collecting the cash flows for which they bargained, *e.g.* because the Warranties were false, the obligation to ask MortgageIT to buy back the Notes.

9.     In 2015, Monteiro stopped making payments under the Note – one of many Borrowers who did so.  Thereafter, a lawsuit was filed against her, Orange County Case No. 2016-CA-4184 ("the First Lawsuit"), purportedly in the name of Defendant.

10.     After succeeding in getting the First Lawsuit involuntarily dismissed, Monteiro transferred title to the Property to Plaintiff via a Deed to Trustee recorded in the Orange County Official Records on July 25, 2017 at Instrument # 20170411414.

11.     With title to the Property in Plaintiff's name, another foreclosure lawsuit was initiated in Defendant's name, Orange County Case No. 2019-CA-5198 ("the Second Lawsuit"). The genesis of the Second Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

12.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

13.     First, with the Note having been converted into a security, Defendant was neither the owner nor the holder of the Note by operation of law.  In fact, it was illegal for Defendant to own or hold the Note.  Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

14.     Second, DBNTC was not licensed or authorized to be a trustee at the time the Second Lawsuit was initiated or at any point thereafter.  Simply put, DBNTC does not exist as a trustee.  Defendant knew this, yet it intentionally represented otherwise in the Second Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

15.     Third, at no point during the Second Lawsuit did MortgageIT Trust 2005-2 exist, and at no point in the Second Lawsuit was the Note an asset within that trust.  Defendant knew

these facts, yet it intentionally represented otherwise, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

16.     In essence, the Second Lawsuit was prosecuted in the name of a non-existent trustee for a non-existent trust – with those key facts concealed both from this Court and Plaintiff – in a fraudulent attempt to divest ownership of the Property from Plaintiff.

17.     At the heart of these fraudulent and illegal acts was Specialized Loan Servicing, LLC ("SLS").  Acting as Defendant's purported agent, SLS engaged in a series of fraudulent and illegal acts separate and apart from those listed above.

18.     First, SLS verified the Complaint in the Second Lawsuit, purportedly as servicer and attorney in fact for Defendant, despite knowing that it was neither.  After all, it was impossible for SLS to be servicer for a non-existent trustee of a non-existent trust.  In this same vein, SLS was neither the attorney in fact for Defendant nor its authorized agent.  In fact, it was illegal for SLS to act as an agent for DBNTC, as Trustee, at all, particularly since SLS lacks trust powers.

19.     Second, SLS caused the Second Lawsuit to be prosecuted in Defendant's name so it could pocket the proceeds from a foreclosure sale for itself and avoid any attendant tax consequences.  Though SLS engaged in these acts under the auspices of being Defendant's agent, SLS knew the very notion of an agency relationship was a farce.  SLS was the only party who stood to gain if the Second Lawsuit were to succeed.  It had no intention of sharing any ill-gotten gains with anyone else.  It represented otherwise throughout the course of the Second Lawsuit in a fraudulent, illegal, and perjurious attempt to divest Plaintiff of ownership of the Property and pocket the proceeds for itself – without paying any taxes on the gains.

20.     Third, SLS caused to be recorded in the Official Records of Orange County, Florida at Book 11002, Page 4239, an Assignment of Mortgage ("the Assignment"), from Mortgage

4

Electronic Registration Systems, Inc. ("MERS"), as Nominee for MIT Lending, to Defendant. This Assignment purported to reflect a conveyance that never happened.  That is why it was prepared not in the ordinary course of business, but by Albertelli Law, the attorneys who prosecuted the First Lawsuit on behalf of SLS.  That's also why the Assignment purports to show a conveyance from MERS to Defendant when, in reality, the Note was sold to MortgageIT before being collateralized.

21.     Despite these false, fictitious, and fraudulent statements and representations, SLS used the Assignment in the Second Lawsuit, purporting to affect Plaintiff's interest in the Property. Indeed, the Assignment was attached to the Complaint and used to support Defendant's standing to foreclose the Mortgage.  Given these facts, SLS's recording of the Assignment violated Fla. Stat. § 817.535(2)(a) and constituted a criminal infraction – a felony under Florida law.

22.     Fourth, SLS – purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Second Lawsuit to be prosecuted in Defendant's name, repeatedly representing, under oath, that Defendant was the owner and holder of the Note.  Yet SLS knew that Defendant could not be the owner or holder of the Note by operation of law.  The purported agency relationship that SLS used to support a holder theory was likewise a farce.  SLS may have possessed the Note, but it did not do so for Defendant – a nonexistent trustee of a nonexistent trust.

23.     Fifth, SLS – purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused to be recorded a Notice of Lis Pendens in connection with the Second Lawsuit, then made the fraudulent misrepresentations described herein as part and parcel of that action.

24.     While these fraudulent, illegal, and perjurious acts were undertaken by SLS, DBNTC, as Trustee, is liable for all of them.  After all, SLS was acting with actual and apparent authority to bind DBNTC.

25.     For many years, DBNTC conspired with SLS to enable, facilitate, and encourage these acts.  Though it simultaneously attempted to feign ignorance of SLS's misconduct to avoid liability, its purported ignorance was a rouse, and DBNTC ratified the misconduct after being specifically apprised of it.

26.     To illustrate, in its capacity as Trustee, DBNTC has executed many limited powers of attorney ("LPOA" in the singular, or "LPOAs" in the plural).  Its purpose in conveying the LPOAs was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like SLS to go to court and create the impression they were an agent of DBNTC and authorized to prosecute a foreclosure in DBNTC's name and otherwise act on its behalf even if actual authority were lacking.

27.     At the same time, though, DBNTC knew that servicers like SLS were using DBNTC's name to perpetuate fraudulent, illegal, and perjurious acts.  If this misconduct ever came to light, DBNTC wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent."  That is why:  (i) DBNTC insisted that the LPOAs include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) DBNTC insisted that the servicers indemnify DBNTC for all actions taken on its behalf; and (iii) when high-ranking officers within DBNTC, *e.g.* Ronaldo Reyes ("Reyes"), its Vice President, and Timothy Patrick ("Patrick"), its CEO, were confronted with the illegal acts described herein by Plaintiff's agent, Cyndee Rae Estrada ("Estrada"), they disclaimed knowledge

of the servicers' misconduct, denied that the servicers were their agents, and even went so far as to disclaim knowledge that servicers were prosecuting foreclosure lawsuits in Florida in DBNTC's name at all.  Those denials, however, were belied by the LPOAs, particularly since many of the LPOAs were signed by Reyes.

28.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like SLS – perpetuated in the name of DBNTC, as Trustee – Reyes and Patrick, within the course and scope of their employment with DBNTC, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with these servicers to conceal these acts from Plaintiff and the public at large.

29.     Despite its feigned ignorance, DBNTC knew full well what was happening.  In fact, even after Reyes, Patrick, and other, high-ranking officers of DBNTC were apprised of this misconduct, in detail, DBNTC failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name.

30.     Further proof that DBNTC's "ignorance" of the servicers' illegality was feigned, and that DBNTC knew full well what the servicers were doing, is seen in the indemnification agreements between it and the servicers.  After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship.  Here, conversely, DBNTC, *i.e.* the principal, wanted servicers like SLS, *i.e.* the agent, to indemnify DBNTC for all actions the servicers took in their name.  The obvious reason for such an unusual indemnification is that DBNTC knew that servicers like SLS were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and SLS wanted someone else to pay in the event the fraud scheme ever came to light.

7

31.     Defendant is subject to the court's personal jurisdiction because Defendant holds a mortgage or other lien on real property within the State.

## COUNT ONE

32.     This is an action for damages arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

33.     Plaintiff re-alleges and incorporates by reference paragraphs 1-31 above.

34.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535, 817.54, and 773.103(1)-(4).   To wit, through a pattern of criminal activity, a series of fraudulent misrepresentations, the recording of the Assignment, the recording of the Notice of Lis Pendens, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

35.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of the Property, interest on that amount, and the attorney's fees and costs incurred in defending the Second Lawsuit.

36.     Under the terms of Fla. Stat. § 772.104, Plaintiff is entitled to treble damages.

WHEREFORE Plaintiff demands judgment for damages, general and special, treble damages, interest, attorney's fees, a jury trial, and such other and further relief that this Court deems proper.

This 3rd day of December, 2020          */s/ MLL*_____
                                        MEGAN LAZENBY, Esquire
                                        Lazenby Law, LLC
                                        4927 Southfork Drive
                                        Lakeland, FL 33813
                                        Telephone: 863.698.6844
                                        Florida Bar No. 0014285
                                        Lazenbylaw@gmail.com

8

# EXHIBIT 4

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT,
IN AND FOR PASCO COUNTY, FLORIDA

INLAND ASSETS, LLC, as Trustee of the
4417 Rudder Way Land Trust,

     Plaintiff,

                                  Case No.

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-
Through Certificates, Series 2006-NC2,

     Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff, INLAND ASSETS, LLC, as Trustee of the 4417 Way Land Trust, by and through

its undersigned counsel, sues Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY,

as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2

("Defendant"), and would show:

## BACKGROUND

1.      On or about March 27, 2006, Ronald Pownall ("Pownall") acquired title to the

following property ("the Property") in Pasco County, Florida:

> All of Lot 58, Block 1, FLOR-A-MAR SUBDIVISION, Section 17-B, according
> to the map or plat thereof as recorded in Plat Book 10, Page 131 of the Public
> Records of Pasco County, Florida

> More commonly known as 4417 Rudder Way, New Port Richey, FL 34652

2.      On that same date, Pownall entered a promissory note ("the Note") with New

Century Mortgage Corporation ("New Century") in the amount of $328,500.00 and a mortgage

("the Mortgage") for which the Note purported to act as security, as recorded in the Pasco County

1

Official Records at Book 6911, Page 542. Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring Pownall to remit monetary payments, including payments of property taxes and insurance.

3.       Shortly after closing on Pownall's loan, New Century sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

4.       Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust. The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was called GSAMP Trust 2006-NC2 ("the Trust").

5.       Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities. The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

6.       Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default. Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code

2

860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

7.      Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

8.      Deutsche Bank National Trust Company ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

3

9.      Deutsche's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders.  Notably, this duty is not contingent upon any other condition.

10.     Notwithstanding the Warranties, the Loans were not high-quality loans.  In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference.  As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

11.     After falling on hard times financially, Pownall caused the Property to be deeded to Plaintiff.  The deed reflecting this transaction is recorded in the Pasco County Official Records at Book 9492, Page 511.  Plaintiff has been the owner of the Property since that time.

12.     By 2010, the Depositor was no longer in business.  As Trustee of the Trust, Deutsche was still responsible for collecting cash flows on behalf of the Certificateholders.  Yet it was failing to do so.  Pownall, for example, stopped making payments under the Note in 2008, one of many Borrowers who did so.  Thereafter, a lawsuit was filed against Pownall and Plaintiff – by that point the Property owner – Pasco County Case No. 2018-CA-1565 ("the Lawsuit"), with Defendant named as the plaintiff.  The genesis of the Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

13.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

4

14.     First, Defendant was neither the owner nor the holder of the Note by operation of law. In fact, it was illegal for Defendant to own or hold the Notes. Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

15.     Second, the Lawsuit was purportedly brought on behalf of the Certificateholders, who were identified in the style of the Lawsuit as the party prosecuting the case ("as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2..."). However, the Certificateholders did not authorize the Lawsuit, benefit from it, or even know it had been filed. Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet it purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff. Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

16.     Third, Defendant was purporting to prosecute the Lawsuit in its capacity as Trustee, yet it was illegal for it to act as Trustee, as its trust license had been revoked. Quite simply, it was illegal for Deutsche to conduct trust business. Defendant knew this, yet it continued falsely representing to the Court that it was prosecuting the Lawsuit as Trustee of the Trust.

17.     Despite the foregoing, Ocwen Loan Servicing, LLC ("Ocwen"), purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Lawsuit to be prosecuted in Defendant's name and represented, under oath, that Defendant was the owner and holder of the Note. As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

18.     To support its position in the Lawsuit, various servicers, including Ocwen ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal. (At any one time, only one servicer was assigned to the Loan. However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein. As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

19.     First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome. Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make them the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

20.     Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law. Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit, under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs.

21.     Third, the Servicer caused to be recorded in the Official Records of Pasco County, Florida at Book 7800, Page 846, an Assignment of Mortgage ("the Assignment"), which purported to assign the Mortgage from New Century to Defendant. By the time the Assignment was created, however, New Century ceased to exist. Rather than acknowledging its inability to procure an assignment, the Servicer's attorney (purporting to represent Defendant) drafted the Assignment and caused it to be executed by Ocwen Loan Servicing, LLC, purportedly as attorney in fact for New Century. Yet Ocwen was not actually the attorney in fact for New Century or authorized to

6

sign on its behalf. The Servicer nonetheless recorded the Assignment on behalf of Defendant, in violation of Fla. § 817.535(2)(a) and a criminal infraction under Florida law, then used it in the Lawsuit as a (fraudulent and illegal) basis for standing to foreclose.

22.   Fourth, the Servicers repeatedly represented, in the Lawsuit, that Defendant had been damaged as a result of Plaintiffs' non-payment of the installment payments due under the Note. These representations were knowingly false, fraudulent, and perjurious at all times relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether Plaintiffs paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trust. Suffice it to say Servicer's repeated representations in the Lawsuit that Defendant was not damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

23.   Fifth, the Servicer filed in the Lawsuit a Limited Power of Attorney from Deutsche ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuit as an agent of the Trust. These representations, however, were entirely fraudulent – and known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit. Moreover, the Servicer was never a T-1 license holder, so Deutsche could not delegate its authority to act as trustee to it (any more than an attorney can delegate another to practice law with his/her law license).

7

24.     Sixth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit. In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the holder of the Note and was damaged by Plaintiffs' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendant, the entity for which they were counsel of record in the Lawsuit.

25.     At all times relevant, Deutsche knew that the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, Deutsche has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers like Ocwen on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

26.     For instance, in its capacity as Trustee, Deutsche has executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like Ocwen to go to court and create the impression they were an agent of Ocwen and authorized to prosecute a foreclosure in Ocwen's name and otherwise act on its behalf even if actual authority were lacking.

8

27.     At the same time, though, Deutsche knew that servicers like Ocwen were using Deutsche's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts.  If this misconduct ever came to light, Deutsche wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent."  That is why: (i) Deutsche insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) Deutsche insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within Deutsche, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of Deutsche, and conceded that Deutsche never owned or held any promissory notes.

28.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like SPS – perpetuated in the name of Deutsche, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment with Deutsche, did nothing.  Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

29.     Despite its feigned ignorance, Deutsche knew full well what was happening.  In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, Deutsche failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name.  In fact, Deutsche continues to execute LPOAs for these Servicers,

9

knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

30.     Further proof that Deutsche's "ignorance" of the Servicers' illegality was feigned, and that Deutsche knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the Servicers. After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here, conversely, Deutsche, *i.e.* the principal, wanted Servicers like Ocwen, *i.e.* the agent, to indemnify Deutsche for all actions the servicers took in their name. The obvious reason for such an unusual indemnification is that Deutsche knew that servicers like Ocwen were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and Deutsche wanted someone else to pay in the event the fraud scheme ever came to light.

31.     Deutsche's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to Deutsche for those payments.    Facilitating and encouraging the foregoing misconduct hence enabled Deutsche to avoid significant payments out of its own pocket.

32.     Based on the fraudulent and illegal acts of Defendant, Ocwen, and the Servicers, as described herein, Defendant succeeded in obtaining a Final Judgment of Foreclosure in the Lawsuit and, ultimately divesting Plaintiff of title to the Property.

33.     All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

34.     Venue is proper in Pasco County, as the Property is located here.

10

## COUNT ONE

35.   This is an action for declaratory relief.

36.   Plaintiff realleges and incorporates by reference paragraphs 1-34 above.

37.   Plaintiff contends the Assignment was fraudulent, void, and illegal and that its recording in the Pasco County Official Records violated Fla. Stat. § 817.535(2)(a). Defendant, ostensibly, contends otherwise.

38.   Plaintiff contends that exclusive jurisdiction for any claims against it was New York, as a CPL Article 77 derivative lawsuit by shareholders, rendering the Lawsuit, any rulings therein, and any title emanating therefrom void for lack of jurisdiction. Defendant, ostensibly, contends otherwise.

39.   Plaintiff contends the Mortgage is being used as a contract for payment and not a lien on the Property because it imparts payment obligations, e.g. for taxes and insurance, defeating its ability to operate as a lien. Defendant, ostensibly, contends otherwise.

40.   Plaintiff contends that Defendant has never owned or held the Note yet represented otherwise in the Lawsuit in a fraudulent, perjurious, and illegal attempt to create the impression in the Lawsuit that it had standing, convince the court in the Lawsuit to foreclose the Mortgage, and steal the Property from them. Defendant, ostensibly, contends otherwise.

41.   Plaintiff contends that Defendant suffered no damages as a result of the non-payment of the Note, and Defendant's representations otherwise in the Lawsuit were false, fraudulent, and perjurious effort to foreclose the Mortgage and steal the Property from it. Defendant, ostensibly, contends otherwise.

11

42.    Plaintiff contends that the Servicers committed a series of false, fraudulent, illegal, and perjurious acts in the Lawsuit in an attempt to foreclose the Mortgage in Defendant's name. Defendant, ostensibly, contends otherwise.

43.    Plaintiff contends the Servicers were the agents of Deutsche at the time of the false, fraudulent, contemptuous and illegal acts described herein, acting with acting with actual and apparent authority. Plaintiffs further contend Deutsche ratified all misconduct of the Servicers, adopting it as its own. Defendant, ostensibly, contends otherwise.

44.    Plaintiff contends that Deutsche is no longer a Securities Administrator and a Trustee for this Trust and it has been illegal for it to serve as Trustee of the Trust since 2019, so any rulings in the Lawsuit, including any Final Judgment or title emanating therefrom, are a byproduct of illegality and hence void. Defendant, ostensibly, contends otherwise.

45.    Plaintiff contends that Deutsche and the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Certificateholders, yet they represented otherwise throughout the Lawsuit to conceal that the Servicers (and, to a lesser extent, Deutsche) were the parties who stood to benefit if the foreclosure was successful and to fraudulently shift adverse tax consequences in the event of a foreclosure from the Servicers (and, to a lesser extent, Deutsche) to the Certificateholders. Defendant, ostensibly, contends otherwise.

46.    Plaintiff contends, as a result of the foregoing, that any rulings in the Lawsuit, including any Final Judgment, Certificate of Title, and deeds subsequent to the Certificate of Title are void. Defendant, ostensibly, contends otherwise.

47.    There is a present, actual need for a declaration regarding a present, ascertainable set of facts, as set forth above.

12

48.    The rights of the parties are dependent upon the law applicable to these facts, and the antagonistic and adverse interests are all before this Court.

WHEREFORE Plaintiffs demand that this Court enter an Order declaring:

A.    Defendant has never been the owner or holder of the Note, and its representations otherwise in the Lawsuit were false, fraudulent, and perjurious;

B.    The Trust has never been the owner or holder of the Note, and its representations otherwise in the Lawsuit were false, fraudulent, and perjurious;

C.    The Certificateholders have never been the owner or holder of the Note, did not authorize the Lawsuit, and did not stand to gain if the Lawsuit were successful and the Property were foreclosed, and its representations otherwise in the Lawsuit were false, fraudulent, and perjurious;

D.    The Mortgage is not a lien on the Property;

E.    Deutsche, as Trustee, and the Servicers conspired to conceal that they were the parties who stood to gain if the Lawsuit were successful and the Property were foreclosed, with the Servicers using Defendant's name as the plaintiff in the Lawsuit to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders;

F.    Deutsche ceased being a Securities Administrator in 2019, and its continued prosecution of the Lawsuit, as Trustee, was illegal, rendering any subsequent rulings in the Lawsuit, including a final judgment and any certificate of title emanating therefrom, void;

G.    Deutsche ratified the fraud of the Servicers in the Lawsuit, as described herein;

H.    Having been converted into a security, the Note no longer exists;

13

I.      Exclusive jurisdiction for the claims brought in the Lawsuit lied in New York, so any rulings issued in the Lawsuit, including any final judgment and any title emanating therefrom, are void;

J.      Any rulings in the Lawsuit, including any final judgment and certificate of title emanating therefrom, are void.  Likewise, any deeds subsequent to the certificate of title are void.

Plaintiffs further demand trial by jury, all attorney's fees and costs incurred in prosecuting this lawsuit, and any other relief that this Court deems proper.

## COUNT TWO

49.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

50.     Plaintiff realleges and incorporates by reference paragraphs 1-35 above.

51.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4).  To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

52.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of the Property and the attorney's fees and costs incurred defending the Lawsuit.

53.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

14

This 10th day of August, 2020.

Respectfully submitted,

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)



# EXHIBIT 5

IN THE CIRCUIT COURT, SIXTH JUDICIAL CIRCUIT IN AND FOR
PASCO COUNTY, FLORIDA
CASE NO. 2020-CA-1794

INLAND ASSETS, LLC, as Trustee of the
4417 Rudder Way Land Trust,
    Plaintiff,

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee for GSAMP Trust 2006-NC2, Mortgage
Pass-Through Certificates, Series 2006-NC2,
    Defendant,

## ORDER DENYING PLAINTIFF'S MOTION FOR FINAL SUMMARY JUDGMENT AFTER DEFAULT AND ORDER ON COURT'S OWN MOTION TO CONSOLIDATE CASES

**THIS MATTER** having come before the Court on October 13, 2020 upon Plaintiff's Motion for Final Summary Judgment after Default. The Court having reviewed the motion and having heard the arguments of counsel, it is hereby:

**ORDERED AND ADJUDGED** that

1. Plaintiff's Motion for Final Summary Judgment after Default is DENIED. This matter will require a trial as the damages in question are unliquidated.

2. Upon the Court's own Motion, this case shall be consolidated with the related foreclosure case.

3. The Clerk of Court is directed to consolidate Case No. 2020-CA-1794 into Case No. 2018-CA-1565.

**DONE AND ORDERED** in Chambers, New Port Richey, Pasco County, Florida, this 20th day of October, 2020.

Honorable Kimberly Sharpe Byrd
Circuit Court Judge

## Certificate of Service

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via U.S. Mail or Email (as indicated) on this 20th day of October, 2020.

Amanda Driscole, Esq.
Via Email at
Amanda_Driscole @brockandscott.com
Via U.S. Mail at
Brock & Scott, PLLC
2001 NW 64th Street
Suite 130
Fort Lauderdale, FL 33309

Inland Assets, LLC, as Trustee for the
4417 Rudder Way Trust
c/o Lee Segal, Esq.
Via Email at
Lee@segalschuh.com
marie@segalschuh.com
Via U.S. Mail at
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North
Ste 100
Clearwater, FL 33764

Eric D. Jacobs, Esq.
BK Trustee Attorney
Via Email at ejacobs@gjb-law.com
Via U.S. Mail at
100 N Tampa St.
STE. 1645
Tampa, FL 33602

Lisa M. Castellano
BK Trustee Attorney
Via Email at
lcastellano@gjb-law.com
btraina@gjb-law.com
Via U.S. Mail at
100 N Tampa St.
STE. 1645
Tampa, FL 33602

Via U.S. Mail:
Ronald Pownall
8349 Monarch Circle
Seminole, FL 33772

Via U.S. Mail:
Deutsche Bank National Trust Company,
As Trustee for GSAMP Trust 2006-2,
Mortgage Pass-Through Certificates,
Series 2006-2,
28 Liberty Street
New York City, New York, 10005

Via U.S. Mail:
Deutsche Bank National Trust Company,
As Trustee for GSAMP Trust 2006-2,
Mortgage Pass-Through Certificates,
Series 2006-2,
60 Wall Street
New York City, New York 10005

Shannon McGrady, Judicial Assistant

# EXHIBIT 6

Filing # 115305858 E-Filed 10/20/2020 04:23:05 PM

IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT,
IN AND FOR COLUMBIA COUNTY, FLORIDA

4417 RUDDER WAY LAND TRUST,
By:  Inland Assets, LLC, Trustee

      Plaintiff,

                                      Case No.  20-245-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-
Through Certificates, Series 2006-NC2,

      Defendant.
_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

      Plaintiff, 4417 Way Land Trust, by Inland Assets, LLC, Trustee ("Plaintiff"), by and

through its undersigned counsel, sues Defendant, DEUTSCHE BANK NATIONAL TRUST

COMPANY, as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series

2006-NC2 ("Defendant"), and would show:

## BACKGROUND

      1.     All conditions precedent to the filing of this action have been met, waived, or

otherwise satisfied.

      2.     Venue is proper in Columbia County, Florida, as the cause of action accrued here.

      3.     On or about March 27, 2006, Ronald Pownall ("Pownall") acquired title to the

following property ("the Property") in Pasco County, Florida:

      All of Lot 58, Block 1, FLOR-A-MAR SUBDIVISION, Section 17-B, according
      to the map or plat thereof as recorded in Plat Book 10, Page 131 of the Public
      Records of Pasco County, Florida

      More commonly known as 4417 Rudder Way, New Port Richey, FL 34652

1

4.      On that same date, Pownall entered a promissory note ("the Note") with New Century Mortgage Corporation ("New Century") in the amount of $328,500.00 and a mortgage ("the Mortgage") for which the Note purported to act as security, as recorded in the Pasco County Official Records at Book 6911, Page 542. Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring Pownall to remit monetary payments, including payments of property taxes and insurance.

5.      Shortly after closing on Pownall's loan, New Century sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

6.      Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust. The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was called GSAMP Trust 2006-NC2 ("the Trust").

7.      Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities. The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

8.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the

2

Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default. Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

9.      Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

10.      Deutsche Bank National Trust Company ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties

3

to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

11. Deutsche's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

12. Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

13. After falling on hard times financially, Pownall caused the Property to be deeded to Plaintiff. The deed reflecting this transaction is recorded in the Pasco County Official Records at Book 9492, Page 511. Plaintiff has been the owner of the Property since that time.

14. By 2010, the Depositor was no longer in business. As Trustee of the Trust, Deutsche was still responsible for collecting cash flows on behalf of the Certificateholders. Yet it was failing to do so. Pownall, for example, stopped making payments under the Note in 2008, one of many Borrowers who did so. Thereafter, a lawsuit was filed against Pownall and Plaintiff – by that point the Property owner – Pasco County Case No. 2018-CA-1565 ("the Lawsuit"), with Defendant named as the plaintiff. The genesis of the Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

4

15.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

16.     First, Defendant was neither the owner nor the holder of the Note by operation of law.  In fact, it was illegal for Defendant to own or hold the Notes.  Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.     Second, the Lawsuit was purportedly brought on behalf of the Certificateholders, who were identified in the style of the Lawsuit as the party prosecuting the case ("as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2…").  However, the Certificateholders did not authorize the Lawsuit, benefit from it, or even know it had been filed. Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet it purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.  Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18.     Third, Defendant was purporting to prosecute the Lawsuit in its capacity as Trustee, yet it was illegal for it to act as Trustee, as its trust license had been revoked.  Quite simply, it was illegal for Deutsche to conduct trust business.  Defendant knew this, yet it continued falsely representing to the Court that it was prosecuting the Lawsuit as Trustee of the Trust.

19.     Despite the foregoing, Ocwen Loan Servicing, LLC ("Ocwen"), purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Lawsuit to be

prosecuted in Defendant's name and represented, under oath, that Defendant was the owner and holder of the Note. As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

20.    To support its position in the Lawsuit, various servicers, including Ocwen ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal. (At any one time, only one servicer was assigned to the Loan. However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein. As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

21.    First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome. Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make them the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

22.    Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law. Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit, under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs.

23.    Third, the Servicer caused to be recorded in the Official Records of Pasco County, Florida at Book 7800, Page 846, an Assignment of Mortgage ("the Assignment"), which purported to assign the Mortgage from New Century to Defendant. By the time the Assignment was created, however, New Century ceased to exist. Rather than acknowledging its inability to procure an

assignment, the Servicer's attorney (purporting to represent Defendant) drafted the Assignment and caused it to be executed by Ocwen Loan Servicing, LLC, purportedly as attorney in fact for New Century. Yet Ocwen was not actually the attorney in fact for New Century or authorized to sign on its behalf. The Servicer nonetheless recorded the Assignment on behalf of Defendant, in violation of Fla. § 817.535(2)(a) and a criminal infraction under Florida law, then used it in the Lawsuit as a (fraudulent and illegal) basis for standing to foreclose.

24.     Fourth, the Servicers repeatedly represented, in the Lawsuit, that Defendant had been damaged as a result of Plaintiffs' non-payment of the installment payments due under the Note. These representations were knowingly false, fraudulent, and perjurious at all times relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, i.e. the cash flows, regardless of whether Plaintiffs paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trust. Suffice it to say Servicer's repeated representations in the Lawsuit that Defendant was not damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

25.     Fifth, the Servicer filed in the Lawsuit a Limited Power of Attorney from Deutsche ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuit as an agent of the Trust. These representations, however, were entirely fraudulent – and known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it

7

expressly violated by prosecuting the Lawsuit. Moreover, the Servicer was never a T-1 license holder, so Deutsche could not delegate its authority to act as trustee to it (any more than an attorney can delegate another to practice law with his/her law license).

26.     Sixth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit. In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the holder of the Note and was damaged by Plaintiffs' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendant, the entity for which they were counsel of record in the Lawsuit.

27.     At all times relevant, Deutsche knew that the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, Deutsche has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers like Ocwen on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

28.     For instance, in its capacity as Trustee, Deutsche has executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like Ocwen to go to court and create the impression

they were an agent of Ocwen and authorized to prosecute a foreclosure in Ocwen's name and otherwise act on its behalf even if actual authority were lacking.

29.     At the same time, though, Deutsche knew that servicers like Ocwen were using Deutsche's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts.  If this misconduct ever came to light, Deutsche wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent."  That is why:  (i) Deutsche insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) Deutsche insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within Deutsche, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of Deutsche, and conceded that Deutsche never owned or held any promissory notes.

30.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like SPS – perpetuated in the name of Deutsche, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment with Deutsche, did nothing.  Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

31.     Despite its feigned ignorance, Deutsche knew full well what was happening.  In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, Deutsche failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting

foreclosures in its name.  In fact, Deutsche continues to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

32.    Further proof that Deutsche's "ignorance" of the Servicers' illegality was feigned, and that Deutsche knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the Servicers.  After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship.  Here, conversely, Deutsche, *i.e.* the principal, wanted Servicers like Ocwen, *i.e.* the agent, to indemnify Deutsche for all actions the servicers took in their name.  The obvious reason for such an unusual indemnification is that Deutsche knew that servicers like Ocwen were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and Deutsche wanted someone else to pay in the event the fraud scheme ever came to light.

33.    Deutsche's motive for participating in the foregoing was clear – money.  After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to Deutsche for those payments.  Facilitating and encouraging the foregoing misconduct hence enabled Deutsche to avoid significant payments out of its own pocket.

34.    Based on the fraudulent and illegal acts of Defendant, Ocwen, and the Servicers, as described herein, Defendant succeeded in obtaining a Final Judgment of Foreclosure in the Lawsuit and, ultimately divesting Plaintiff of title to the Property.

35.    All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

36.    Venue is proper in Pasco County, as the Property is located here.

## COUNT ONE

37.    This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

38.    Plaintiff realleges and incorporates by reference paragraphs 1-35 above.

39.    Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535, 817.54, and 772.103(1)-(4). To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

40.    As a result of these violations, Plaintiff has been damaged. These damages include, but are not limited to, the value of the Property and the attorney's fees and costs incurred defending the Lawsuit.

41.    Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper. Plaintiff further demands trial by jury.

This 20th day of October, 2020.

/s/ *Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

11

# EXHIBIT 7

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT,
IN AND FOR BRADFORD COUNTY, FLORIDA

ANNA LOFGREN,

     Plaintiff,

                                      Case No.:

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee for WaMu Mortgage Pass-Thru
Certificates, Series 2006-AR1 Trust, and
DEUTSCHE BANK TRUST COMPANY AMERICAS,
*f.k.a.* Bankers Trust Company, as Trustee and Custodian
for IXIS 2005-HE4,

     Defendants.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff, ANNA LOFGREN ("Plaintiff" or "Lofgren"), hereby files this lawsuit against

Defendants, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee for WaMu

Mortgage Pass-Thru Certificates, Series 2006-AR1 Trust ("Defendant One"), and DEUTSCHE

BANK TRUST COMPANY AMERICAS, *f.k.a.* Bankers Trust Company, as Trustee and

Custodian for IXIS 2005-HE4 ("Defendant Two"), would show:

     1.     All conditions precedent to the filing of this action have been met, waived, or

otherwise satisfied.

     2.     Venue is proper in Bradford County, Florida, as the cause of action alleged herein

accrued here.

     3.     On or about November 22, 2005, Plaintiff entered a promissory note ("Note One")

and mortgage ("Mortgage One") with Washington Mutual Bank, FA ("WaMu"), which mortgage

was recorded in the Pinellas County Official Records at Book 14836, Page 2495, in connection

with her purchase of the property at 26-28 Evevrgreen Ave N., Clearwater, FL 33756 ("Property One").

4.      On May 24, 2005, Plaintiff entered a promissory note ("Note Two") and mortgage ("Mortgage Two") with First Bank ("FB"), which Mortgage was recorded in the Pinellas County Official Records at Book 14466, Page 2304, in connection with her purchase of the property at 22-24c N Evergreen Ave., Clearwater, FL 33756 ("Property Two").

5.      Instead of operating merely as a lien on Property One, as required by Florida Statute § 697.01, Mortgage One read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance.  Likewise, instead of merely operating as a lien on Property Two, Mortgage Two read like a contract, requiring the remittance of monetary payments, including property taxes and insurance.

6.      Shortly after closing on these Loans, WaMu sold Note One and FB sold Note Two to a third-party depositor ("the Depositor"), which bundled them together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

7.      Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust.  The Depositor then assigned the cash flows from the Loans to the Trust.  For Note One, this trust was called WaMu Mortgage Pass-Thru Certificates, Series 2006-AR1 ("Trust One").  For Note Two, this Trust was called IXIS 2005-HE4 ("Trust Two").

8.      Pursuant to the terms of each prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities.  The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers

2

on the Loans ("the Borrowers") made their monthly Loan payments.  Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

9.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, Trust One and Trust Two did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages").  In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant One and Defendant Two (collectively "Defendants") to own or hold the Notes, regardless of whether they were in default.  Rather, Trust One and Trust Two were merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral.  This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates.  As such, the tax liability "passed through the trust" directly to investors to avoid double taxation.  Of course, Deutsche Bank National Trust Company ("DBNTC") and Deutsche Bank Trust Company Americas ("DBTCA") knew of these restrictions, as they were T-1 license holders, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

10.     Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties").  The purpose of the Warranties was to induce the Certificateholders to buy the

3

Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

11.     DBNTC and DBTCA never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

12.     DBNTC and DBTCA's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

13.     Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

14.     By 2008, however, the Depositors were no longer in business. As Trustee of the Trusts, DBNTC and DBTCA were still responsible for collecting cash flows on behalf of the

4

Certificateholders. Yet they was failing to do so. Plaintiff, for example, stopped making payments under Note One and Note Two in 2008 – one of many Borrowers who did so. As a result, multiple different lawsuits were filed against Plaintiff, including Pinellas County Case 09-8237-CI ("Lawsuit One"), 08-12065-CI ("Lawsuit Two"), with Defendant One named as plaintiff in the former, and Defendant Two named as plaintiff in the latter (collectively "the Lawsuits"). The genesis of each lawsuit was DBNTC and DBTCA's attempt to foreclose Mortgage One and Mortgage Two, respectively, and divest Plaintiff of ownership.

15.     For several reasons, DBNTC and DBTCA's prosecution of Lawsuit One and Lawsuit Two, respectively, were fraudulent, illegal, and perjurious, rendering the entire proceedings, and any rulings emanating from them, void.

16.     First, Defendants were neither the owner nor the holder of Note One or Note Two by operation of law. In fact, it was illegal for Defendants to own or hold these Notes. Defendants knew this, yet they intentionally represented otherwise in the Lawsuits, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal Property One and Property Two from Plaintiff, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.     Second, the Lawsuits were brought in the names of Trust One and Trust Two, which were identified in the style of the respective Lawsuits ("WaMu Mortgage Pass-Thru Certificates, Series 2006-AR1 Trust" and "IXIS 2005-HE4"). However, the beneficiaries of Trust One and Trust Two, *i.e.* the Certificateholders, did not authorize the Lawsuits, benefit from them, or even know they had been filed. Defendants knew the Certificateholders had no knowledge of the Lawsuits, yet it purported to prosecute them anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose Mortgage One and Mortgage Two and steal Property One and Property Two from Plaintiff. Defendants undertook these actions in its capacity

5

as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18.     Third, Defendants were purporting to prosecute the Lawsuits in its capacity as Trustee, yet it was illegal for it to act as Trustee, as its trust license had been revoked.  Quite simply, it was illegal for DBNTC or DBTCA to conduct trust business.  Defendants knew this, yet they continued falsely representing to the Court that it was prosecuting the Lawsuits as Trustee of the Trust.

19.     Despite the foregoing, the Servicers, purporting to act as Defendants' servicer and agent with authority to bind Defendants -- caused the Lawsuits to be prosecuted in the name of DBNTC and DBTCA, respectively, and represented, under oath, that Defendants were the owner and holder of Note One and Note Two, respectively.  As Defendants are not the principals of Trust One or Trust Two, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

20.     To support its position in the Lawsuits, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal.  (At any one time, only one servicer was assigned to the Loan.  However, the servicer changed several times during the duration of the Lawsuits, and each of them contributed to the frauds and illegalities described herein.  As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

21.     First, the Servicers knew the Lawsuits were not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuits, know they had been filed, or stand to benefit upon a successful outcome.  Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make Trust One and Trust Two the plaintiffs in the

6

respective Lawsuits, to conceal that the Servicers were the parties who stood to benefit from the Lawsuits and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

22.     Second, the Servicers knew that Defendants was not the owner or holder of the Note by operation of law. Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuits, under oath, in a fraudulent and perjurious attempt to foreclose Mortgage One and Mortgage Two and steal Property One and Property Two from Plaintiff.

23.     Third, the Servicer and its attorneys caused to be recorded in the Official Records of Pinellas Florida at Book 3185, Page 2964, an Assignment of Mortgage Two ("the Assignment"), then used the Assignment in the Lawsuits as a basis to foreclose. The Assignment, though, did not depict a transaction in the ordinary course of business, but was a fraudulent and illegal effort to convey standing where none otherwise existed. To illustrate, it was not prepared and executed by FB in the ordinary course of business, but by the Servicer's attorneys. Additionally, the purported assignor, MERS, never had any basis to assign the Note, as its own website depicts that it never owns a note. Also, FB had already sold the Note years earlier to the Depositor under the securitization process described above.

24.     Fourth, the Servicer and its attorneys caused to be recorded in the Official Records a Notice of Lis Pendens, accompanying the filing of each of the Lawsuits. These Notices of Lis Pendens were recorded fraudulently and used to recount the misrepresentations described herein with the intent of divesting Plaintiff of title.

25.     Fourth, the Servicers repeatedly represented, in the Lawsuits, that Defendants had been damaged as a result of Plaintiff's non-payment of the installment payments due under the Notes. These representations were knowingly false, fraudulent, and perjurious at all times

relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trusts. Suffice it to say Servicer's repeated representations in the Lawsuits that Defendants was damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant One and Defendant Two's name where no basis to do so existed.

26.     Fifth, the Servicer filed in the Lawsuits a Limited Power of Attorney from DBNTC and DBTCA, respectively ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuits as an agent of the Trusts. These representations, however, were entirely fraudulent – and known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit. Moreover, the Servicer was never a T-1 license holder, so DBNTC and DBTCA could not delegate its authority to act as trustee to it (any more than an attorney can delegate another to practice law with his/her law license).

27.     Sixth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendants and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendants in the Lawsuits. In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendants were the holder of the Note and was damaged by the Borrowers' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to

8

facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendants, the entity for which they were counsel of record in the Lawsuits.

28.    At all times relevant, DBNTC and DBTCA knew that the actions of the Servicers in the Lawsuits were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, DBNTC and DBTCA have intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

29.    For instance, in its capacity as Trustee, DBNTC and DBTCA have executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers to go to court and create the impression they were an agent of DBNTC and DBTCA and authorized to prosecute a foreclosure in their name and otherwise act on its behalf even if actual authority were lacking.

30.    At the same time, though, DBNTC and DBTCA knew that servicers were using its name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, DBNTC and DBTCA wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) DBNTC and DBTCA insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) DBNTC and DBTCA insisted that the

9

servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within DBNTC and DBTCA, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of DBNTC/DBTCA, and conceded that it never owned or held any promissory notes.

31.    Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers – perpetuated in the name of DBNTC and DBTCA, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

32.    Despite its feigned ignorance, DBNTC and DBTCA knew full well what was happening. In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, DBNTC and DBTCA failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name. In fact, DBNTC and DBTCA continue to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

33.    Further proof that DBNTC and DBTCA's "ignorance" of the Servicers' illegality was feigned, and that they knew full well what the Servicers were doing, is seen in the indemnification agreements between them and the Servicers. After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here, conversely, DBNTC/DBTCA, *i.e.* the principal, wanted Servicers, *i.e.* the agent, to indemnify it

10

for all actions the servicers took in its name. The obvious reason for such an unusual indemnification is that DBNTC/DBTCA knew that servicers were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and DBNTC/DBTCA wanted someone else to pay in the event the fraud scheme ever came to light.

34.   DBNTC/DBTCA's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to it for those payments. Facilitating and encouraging the foregoing misconduct hence enabled DBNTC/DBTCA to avoid significant payments out of its own pocket.

35.   Based on the fraudulent and illegal acts of Defendants and the Servicers, as described here, Defendants divested Plaintiff of title to Property One and Property Two, depriving Plaintiff of the value thereof.

36.   As a result of the extensive efforts of Defendants and the Servicers to conceal these fraudulent schemes, Plaintiff only learned of these facts in September 2020

COUNT ONE

37.   This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, et. seq., for damages against Defendant One in excess of $30,000, exclusive of interest, attorney's fees, and costs.

38.   Plaintiff realleges and incorporates by reference paragraphs 1-36 above.

39.   Defendant One's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4). To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the

11

foregoing acts, Defendant One divested Plaintiff of possession and ownership of Property One when it had no lawful basis to do so.

40.     As a result of these violations, Plaintiff has been damaged. These damages include, but are not limited to, the value of Property One, all attorney's fees incurred in defending the Lawsuits, all attorney's fees incurred in prosecuting this case, and interest on all of that money.

41.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant One for damages, general and special, treble damages, costs, interest, attorney's fees, and such other and further relief that this Court deems proper. Plaintiff further demands trial by jury.

## COUNT TWO

42.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, et. seq., for damages against Defendant Two in excess of $30,000, exclusive of interest, attorney's fees, and costs.

43.     Plaintiff realleges and incorporates by reference paragraphs 1-36 above.

44.     Defendant Two's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4). To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant Two divested Plaintiff of ownership of Property Two when it had no lawful basis to do so.

45.     As a result of these violations, Plaintiff has been damaged. These damages include, but are not limited to, the value of Property Two, all attorney's fees incurred in defending the Lawsuits, all attorney's fees incurred in prosecuting this case, and interest on all of that money.

46.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

12

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant Two for damages, general and special, treble damages, costs, interest, attorney's fees, and such other and further relief that this Court deems proper. Plaintiff further demands trial by jury.

Dated: September 9, 2020

/s/ Lee Segal, Esquire
Lee Segal, Esquire (FBN: 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@segalschuh.com – Attorney
marie@segalschuh.com – Florida Registered Paralegal

13

$20.50

Prepared by and return to:
Shapiro & Fishman, LLP/KIMBERLY ANNE HUMPHREY
10004 N. Dale Mabry Highway, Suite 112
Tampa, FL 33618
S&F No.: 08-105700

This area above this line is for the use of recording official

## ASSIGNMENT OF MORTGAGE

**Mortgage Electronic Registration Systems, Inc., as Nominee for First Bank d/b/a First Bank Mortgage,** ("Assignor"), C/O Shapiro & Fishman, LLP, 10004 N. Dale Mabry Highway, Suite 112, Tampa, FL 33618, in consideration from **Deutsche Bank Trust Company Americas formerly known as Banker's Trust Company, as Trustee and Custodian for IXIS 2005-HE4,** ("Assignee"), C/O Shapiro & Fishman, LLP, 10004 N. Dale Mabry Highway, Suite 112, Tampa, FL 33618, has granted, bargained, sold, assigned, transferred and set over, and by these presents does grant, bargain, sell, transfer and set over unto Assignee the following described Mortgage(s) recorded in the Public Records of Pinellas County, State of Florida, together with the note of obligation described in said Mortgage(s), and the money due and to become, due thereon, with interest as therein provided.

Date of Mortgage: May 24, 2005
Mortgage Recording Date: July 20, 2005
Clerk's File Number: 2005-283345
Book Number: 14466
Page Number: 2304ᴬ

Legal Description:

LOT 12, TOGETHER WITH THE SOUTH 16.67 FEET OF LOT 11, BLOCK A, FAIRVIEW ADDITION ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN PLAT BOOK 5, PAGE 85, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, AKA 22 GREENWOOD NORTH, CLEARWATER, FLORIDA.

Original Mortgagors: Anna Lofgren, a Single Woman

This Assignment of Mortgage is made without recourse against Assignor.

IN WITNESS WHEREOF, Assignor has caused these presents to be executed this 28 day of October , 2008.

Mortgage Electronic Registration Systems, Inc., as Nominee for First Bank d/b/a First Bank Mortgage

By: _____  By: _____
Topako Love - VP                Christina Allen - VP

(CORPORATE SEAL)

STATE OF Mn ]
COUNTY OF Dakota ]SS.

I HEREBY CERTIFY, That on this day personally appeared before me, an officer duly authorized to administer oaths and take acknowledgements of the above referenced duly authorized signatories of Topako Love a Christina who are personally known to me and did take an oath and who are to me well known to be the persons described herein and who executed the foregoing Assignment of Mortgage and duly acknowledged before me and executed the same for the purposes therein expressed as the act and deed of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, said County and State, this 28 day of October, 2008

*NOTARY PUBLIC
Name of Notary: _____
Commission NO. _____
My Commission Expires: _____

JAMES C. MORRIS
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2009

(SEAL)

$214.00   M DOC STAMP COLLECTION: $1102.50 INTANGIBLE TAX $630.00 KEN BURKE, CLERK OF COURT PINELLAS COUNTY, FL BY DEPUTY CLERK: CLKPR13

Return To:
First Bank d/b/a First Bank Mortgage
1 Technology Dr    Bldg A
Irvine, CA
92618

This document was prepared by:
Adriana Weant
1 Technology Dr    Bldg A
IRVINE, CA92618

WHEN RECORDED RETURN TO:
RAE BODONYI
28111 COUNTRY CLUB BLVD., STE 275
NORTH OLMSTED, OH 44070
(440) 777-8288

[Space Above This Line For Recording Data]

9048
URM43778

# MORTGAGE

MIN 100312000002862523

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   May 24, 2005
together with all Riders to this document.
(B) "Borrower" is  Anna Lofgren, a single woman

22-24 C North Evergreen Avenue
Clearwater , Florida  33756

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is First Bank d/b/a First Bank Mortgage

DOC  #:322051                           APPL #:0000465487           LOAN #:0000465487
FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3010  1/01

-6A(FL) (0008).01
LMS1 0005.10
Page 1 of 18                          Initials:
VMP MORTGAGE FORMS - (800)521-7291

BROKERS TITLE
3644 MADACA LANE
TAMPA, FL 33618
(813) 962-6004

AFTER RECORDING RETURN TO:

Washington Mutual Bank, FA
C/O ACS IMAGE SOLUTIONS
12691 PALA DRIVE MS156DPCA
GARDEN GROVE, CA 92841

PREPARED BY:

CARLA T STEDMAN
8100 SW 10TH ST STE #3000
PLANTATION, FL 33324

———————————— [Space Above This Line For Recording Data] ————————————

BROKERS TITLE OF TAMPA, LLC 01-2929

# MORTGAGE

03-2324-069374315-5

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated _November 22, 2005_, together with all Riders to this document.
**(B) "Borrower"** is ANNA LOFGREN A SINGLE WOMAN
_____ CHRISTOPHER G LOFGREN a single man _____

_____ .

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is _Washington Mutual Bank, FA, a federal association_ .
Lender is a _____ Bank _____ organized and existing under the laws of
_United States of America_ _____ . Lender's address is:
_____ 400 East Main Street Stockton, CA 95290 _____
Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated _November 22, 2005_ .
The Note states that Borrower owes Lender _One Hundred Sixty-Four Thousand Five_
_Hundred & 00/100_ _____
Dollars (U.S. $ _164,500.00_ ) plus interest. Borrower has promised to pay this debt
in regular Periodic Payments and to pay the debt in full not later than _December 1, 2035_ .
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights
in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA
73213 (06-03)                    Page 1 of 16

# EXHIBIT 8

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT,
IN AND FOR OKEECHOBEE COUNTY, FLORIDA

ANNA LOFGREN,

      Plaintiff,

                                        Case No.:

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

      Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

      Plaintiff, ANNA LOFGREN ("Plaintiff" or "Lofgren"), hereby files this lawsuit against Defendant, Deutsche Bank National Trust Company, as Trustee, and would show:

      1.      All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

      2.      Venue is proper in Okeechobee County, Florida, as the cause of action alleged herein accrued here.

      3.      On or about November 22, 2005, Plaintiff entered a promissory note ("Note One") and mortgage ("Mortgage One") with Washington Mutual Bank, FA ("WaMu"), which mortgage was recorded in the Pinellas County Official Records at Book 14836, Page 2495, in connection with her purchase of the property at 26-28 Evevrgreen Ave N., Clearwater, FL 33756 ("Property One").

      4.      On May 24, 2005, Plaintiff entered a promissory note ("Note Two") and mortgage ("Mortgage Two") with First Bank ("FB"), which Mortgage was recorded in the Pinellas County

Official Records at Book 14466, Page 2304, in connection with her purchase of the property at 22-24c N Evergreen Ave., Clearwater, FL 33756 ("Property Two").

5.      Instead of operating merely as a lien on Property One, as required by Florida Statute § 697.01, Mortgage One read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance. Likewise, instead of merely operating as a lien on Property Two, Mortgage Two read like a contract, requiring the remittance of monetary payments, including property taxes and insurance.

6.      Shortly after closing on these Loans, WaMu sold Note One and FB sold Note Two to a third-party depositor ("the Depositor"), which bundled them together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

7.      Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust. The Depositor then assigned the cash flows from the Loans to the Trust. For Note One, this trust was called WaMu Mortgage Pass-Thru Certificates, Series 2006-AR1 ("Trust One"). For Note Two, this Trust was called IXIS 2005-HE4 ("Trust Two").

8.      Pursuant to the terms of each prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities. The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

9.    Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, Trust One and Trust Two did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages").  In fact, Section 310(b)(3) 211.01 states that it was illegal for Deutsche Bank National Trust Company, as Trustee for WaMu Mortgage Pass-Thru Certificates, Series 2006-AR1 Trust ("D One"), and Deutsche Bank Trust Company Americas, *f.k.a.* Bankers Trust Company, as Trustee and Custodian for IXIS 2005-HE4 ("D Two") (collectively "Ds") to own or hold the Notes, regardless of whether they were in default.  Rather, Trust One and Trust Two were merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates.  As such, the tax liability "passed through the trust" directly to investors to avoid double taxation.  Of course, Deutsche Bank National Trust Company ("DBNTC") and Deutsche Bank Trust Company Americas ("DBTCA") knew of these restrictions, as they were T-1 license holders, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

10.    Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties").  The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make

3

their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

11.     DBNTC and DBTCA never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

12.     DBNTC and DBTCA's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77OOO - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

13.     Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

14.     By 2008, however, the Depositors were no longer in business. As Trustee of the Trusts, DBNTC and DBTCA were still responsible for collecting cash flows on behalf of the Certificateholders. Yet they was failing to do so. Plaintiff, for example, stopped making payments

4

under Note One and Note Two in 2008 – one of many Borrowers who did so. As a result, multiple different lawsuits were filed against Plaintiff, including Pinellas County Case 09-8237-CI ("Lawsuit One"), 08-12065-CI ("Lawsuit Two"), with D One named as plaintiff in the former, and D Two named as plaintiff in the latter (collectively "the Lawsuits"). The genesis of each lawsuit was DBNTC and DBTCA's attempt to foreclose Mortgage One and Mortgage Two, respectively, and divest Plaintiff of ownership.

15.     For several reasons, DBNTC and DBTCA's prosecution of Lawsuit One and Lawsuit Two, respectively, were fraudulent, illegal, and perjurious, rendering the entire proceedings, and any rulings emanating from them, void.

16.     First, D One and D Two were neither the owner nor the holder of Note One or Note Two by operation of law. In fact, it was illegal for D One and D Two to own or hold these Notes. D One and D Two knew this, yet they intentionally represented otherwise in the Lawsuits, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal Property One and Property Two from Plaintiff, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.     Second, the Lawsuits were brought in the names of Trust One and Trust Two, which were identified in the style of the respective Lawsuits ("WaMu Mortgage Pass-Thru Certificates, Series 2006-AR1 Trust" and "IXIS 2005-HE4"). However, the beneficiaries of Trust One and Trust Two, *i.e.* the Certificateholders, did not authorize the Lawsuits, benefit from them, or even know they had been filed. D One and D Two knew the Certificateholders had no knowledge of the Lawsuits, yet it purported to prosecute them anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose Mortgage One and Mortgage Two and steal Property One and Property Two from Plaintiff. D One and D Two undertook these actions in its

5

capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18.     Third, D One and D Two were purporting to prosecute the Lawsuits in its capacity as Trustee, yet it was illegal for it to act as Trustee, as its trust license had been revoked.  Quite simply, it was illegal for DBNTC or DBTCA to conduct trust business.  D One and D Two knew this, yet they continued falsely representing to the Court that it was prosecuting the Lawsuits as Trustee of the Trust.

19.     Despite the foregoing, the Servicers, purporting to act as servicer and agent with authority to bind D One and D Two – caused the Lawsuits to be prosecuted in the name of DBNTC and DBTCA, respectively, and represented, under oath, that D One and D Two were the owner and holder of Note One and Note Two, respectively.  As D One and D Two are not the principals of Trust One or Trust Two, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

20.     To support its position in the Lawsuits, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal.  (At any one time, only one servicer was assigned to the Loan.  However, the servicer changed several times during the duration of the Lawsuits, and each of them contributed to the frauds and illegalities described herein.  As such, the Servicers may sometimes be identified in the singular, i.e. "the Servicer" and sometimes the plural, i.e. "the Servicers").

21.     First, the Servicers knew the Lawsuits were not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuits, know they had been filed, or stand to benefit upon a successful outcome.  Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make Trust One and Trust Two the plaintiffs in the

respective Lawsuits, to conceal that the Servicers were the parties who stood to benefit from the Lawsuits and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

22.     Second, the Servicers knew that D One and D Two were not the owner or holder of the Notes by operation of law.  Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuits, under oath, in a fraudulent and perjurious attempt to foreclose Mortgage One and Mortgage Two and steal Property One and Property Two from Plaintiff.

23.     Third, the Servicer and its attorneys caused to be recorded in the Official Records of Pinellas Florida at Book 3185, Page 2964, an Assignment of Mortgage Two ("the Assignment"), then used the Assignment in the Lawsuits as a basis to foreclose.  The Assignment, though, did not depict a transaction in the ordinary course of business, but was a fraudulent and illegal effort to convey standing where none otherwise existed.  To illustrate, it was not prepared and executed by FB in the ordinary course of business, but by the Servicer's attorneys.  Additionally, the purported assignor, MERS, never had any basis to assign the Note, as its own website depicts that it never owns a note.  Also, FB had already sold the Note years earlier to the Depositor under the securitization process described above.

24.     Fourth, the Servicer and its attorneys caused to be recorded in the Official Records a Notice of Lis Pendens, accompanying the filing of each of the Lawsuits.  These Notices of Lis Pendens were recorded fraudulently and used to recount the misrepresentations described herein with the intent of divesting Plaintiff of title.

25.     Fourth, the Servicers repeatedly represented, in the Lawsuits, that D One and D Two had been damaged as a result of Plaintiff's non-payment of the installment payments due under the Notes.  These representations were knowingly false, fraudulent, and perjurious at all

7

times relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trusts. Suffice it to say Servicer's repeated representations in the Lawsuits that D One and D Two were damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in D One and D Two's name where no basis to do so existed.

26.    Fifth, the Servicer filed in the Lawsuits a Limited Power of Attorney from DBNTC and DBTCA, respectively ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuits as an agent of the Trusts. These representations, however, were entirely fraudulent – and known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit. Moreover, the Servicer was never a T-1 license holder, so DBNTC and DBTCA could not delegate its authority to act as trustee to it (any more than an attorney can delegate another to practice law with his/her law license).

27.    Sixth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of D One and D Two and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for D One and D Two in the Lawsuits. In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that D One and D Two were the holder of the Note and was damaged by the Borrowers' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the

8

Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and D One and D Two, the entity for which they were counsel of record in the Lawsuits.

28.     At all times relevant, DBNTC and DBTCA knew that the actions of the Servicers in the Lawsuits were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, DBNTC and DBTCA have intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

29.     For instance, in its capacity as Trustee, DBNTC and DBTCA have executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers to go to court and create the impression they were an agent of DBNTC and DBTCA and authorized to prosecute a foreclosure in their name and otherwise act on its behalf even if actual authority were lacking.

30.     At the same time, though, DBNTC and DBTCA knew that servicers were using its name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, DBNTC and DBTCA wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) DBNTC and DBTCA insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression

of an agency relationship, conveyed no power at all; (ii) DBNTC and DBTCA insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within DBNTC and DBTCA, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of DBNTC/DBTCA, and conceded that it never owned or held any promissory notes.

31.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers – perpetuated in the name of DBNTC and DBTCA, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

32.     Despite its feigned ignorance, DBNTC and DBTCA knew full well what was happening. In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, DBNTC and DBTCA failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name. In fact, DBNTC and DBTCA continue to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

33.     Further proof that DBNTC and DBTCA's "ignorance" of the Servicers' illegality was feigned, and that they knew full well what the Servicers were doing, is seen in the indemnification agreements between them and the Servicers. After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here,

10

conversely, DBNTC/DBTCA, *i.e.* the principal, wanted Servicers, *i.e.* the agent, to indemnify it for all actions the servicers took in its name. The obvious reason for such an unusual indemnification is that DBNTC/DBTCA knew that servicers were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and DBNTC/DBTCA wanted someone else to pay in the event the fraud scheme ever came to light.

34.     DBNTC/DBTCA's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to it for those payments. Facilitating and encouraging the foregoing misconduct hence enabled DBNTC/DBTCA to avoid significant payments out of its own pocket.

35.     Based on the fraudulent and illegal acts of D One, D Two, and the Servicers, as described here, D One and D Two divested Plaintiff of title to Property One and Property Two, depriving Plaintiff of the value thereof.

36.     As a result of the extensive efforts of D One, D Two and the Servicers to conceal these fraudulent schemes, Plaintiff only learned of these facts in September, 2020.

37.     At all times relevant, Deutsche Bank National Trust Company, as Trustee was the alter ego of D One and D Two. The corporate veil is hence able to be pierced, and Deutsche Bank National Trust Company, as Trustee is liable for the acts described herein to the same extent as Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed, Pass-Through Certificates, Series 2007-QH4.

11

## COUNT ONE

38.    This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages against Defendant in excess of $30,000, exclusive of interest, attorney's fees, and costs.

39.    Plaintiff realleges and incorporates by reference paragraphs 1-37 above.

40.    D One's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535, 817.54, and 772.103(1)-(4).  To wit, through a pattern of criminal activity, the recording of the Lis Pendens, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, D One divested Plaintiff of possession and ownership of Property One when it had no lawful basis to do so.

41.    As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of Property One, all attorney's fees incurred in defending the Lawsuits, all attorney's fees incurred in prosecuting this case, and interest on all of that money.

42.    Defendant is liable to the same extent as D One.

43.    Under the terms of Fla. Stat. § 772.104, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, treble damages, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

## COUNT TWO

44.    This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages against Defendant in excess of $30,000, exclusive of interest, attorney's fees, and costs.

45.    Plaintiff realleges and incorporates by reference paragraphs 1-37 above.

46.     D Two's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535, 817.54, and 772.103(1)-(4).  To wit, through a pattern of criminal activity, the recording of the Lis Pendens and the Assignment, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, D Two divested Plaintiff of ownership of Property Two when it had no lawful basis to do so.

47.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of Property Two, all attorney's fees incurred in defending the Lawsuits, all attorney's fees incurred in prosecuting this case, and interest on all of that money.

48.     Defendant is liable to the same extent as D Two.

49.     Under the terms of Fla. Stat. § 772.104, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, treble damages, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

Dated:  December 13, 2020

*/s/ MLL*
MEGAN LAZENBY, Esquire
Lazenby Law, LLC.
4927 Southfork Drive
Lakeland, FL 33813
Telephone: 863.698.6844
Florida Bar No. 0014285
Lazenbylaw@gmail.com

13

# EXHIBIT 9

# U.S. District Court
## Middle District of Florida (Tampa)
## CIVIL DOCKET FOR CASE #: 8:20-cv-02410-TPB-SPF

Haulsee et al v. Deutsche Bank Trust Company Americas
Assigned to: Judge Thomas P. Barber
Referred to: Magistrate Judge Sean P. Flynn
Demand: $1,000,000
Case in other court: Florida Northern, 3:20-cv-05820
Cause: 28:1441 Notice of Removal-Foreclosure

Date Filed: 10/15/2020
Jury Demand: Both
Nature of Suit: 220 Real Property:
Foreclosure
Jurisdiction: Federal Question

### Plaintiff

**Michael Haulsee**

represented by **Lee Segal**
Segal & Schuh Law Group, PL
18167 US Hwy 19 N Ste 100
Clearwater, FL 33764
727-824-5775
Fax: 888-672-7347
Email: lee@segalschuh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Marcia Haulsee**

represented by **Lee Segal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Deutsche Bank Trust Company
America's**
*as Trustee for Residential Accredit Loans
Inc. Mortgage Asset-Backed Passthrough
Certificate Series 2007-QSA*

represented by **Jason H. Okleshen**
Greenberg Traurig, LLP
777 S Flagler Dr Ste 300E
West Palm Beach, FL 33401-6167
561/650-7900
Fax: 561/655-6222
Email: okleshenj@gtlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Beth Ann Norrow**
Greenberg Traurig, LLP
450 S Orange Ave, Suite 650
Orlando, FL 32801
248/670-0353
Email: norrowb@gtlaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| | | |
|---|---|---|
| 09/15/2020 | 1 | NOTICE OF REMOVAL by Deutsche Bank Trust Company Americas from Okaloosa Circuit Court, case number 2020-CA-002507-F. ( Filing fee $ 400 receipt number AFLNDC-5650987.), filed by Deutsche Bank Trust Company Americas. (Attachments: # 1 Exhibit State Court Complaint, # 2 Exhibit State Court Notice of Removal, # 3 Exhibit Uniform Final Judgment, # 4 Exhibit Docket, # 5 Civil Cover Sheet) (NORROW, BETH) [Transferred from flnd on 10/15/2020.] (Entered: 09/15/2020) |
| 09/16/2020 | 2 | DOCKET ANNOTATION BY COURT: Re 1 Notice of Removal, filed by DEUTSCHE BANK TRUST COMPANY AMERICAS. A reminder that party names are to be added using all caps and no punctuation. (See "Style Guide for Electronic Case Filing" available on Clerk's website.) The party names will be corrected by the clerk. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/16/2020) |
| 09/16/2020 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 1 Notice of Removal. (See proposed ISO). (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/16/2020) |
| 09/22/2020 | 3 | MOTION for Extension of Time to File Answer *to Complaint* by DEUTSCHE BANK TRUST COMPANY AMERICAS. (NORROW, BETH) [Transferred from flnd on 10/15/2020.] (Entered: 09/22/2020) |
| 09/23/2020 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 3 MOTION for Extension of Time to File Answer *to Complaint* (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/23/2020) |
| 09/24/2020 | 4 | REFERRAL AND ORDER granting 3 Motion for Extension of Time to Answer. For good cause shown, the motion is GRANTED, as requested. (Answer due 09/30/2020.) Signed by JUDGE M CASEY RODGERS on 9/24/2020. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/24/2020) |
| 09/29/2020 | 5 | ORDER - Accordingly, within ten (10) days (**10/9/2020**) of this Order, the parties are directed to file a response indicating whether they have any objection to transferring this case to the Middle District of Florida, and if so, stating the reasons underlying that objection. Signed by JUDGE M CASEY RODGERS on 9/29/2020. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/30/2020) |
| 09/30/2020 | 6 | Second MOTION for Extension of Time to File Answer */Response to Complaint* by DEUTSCHE BANK TRUST COMPANY AMERICAS. (NORROW, BETH) [Transferred from flnd on 10/15/2020.] (Entered: 09/30/2020) |
| 09/30/2020 | 7 | REFERRAL AND ORDER granting 6 Motion for Extension of Time to Answer. (DEUTSCHE BANK TRUST COMPANY AMERICAS answer due 10/7/2020.) Signed by JUDGE M CASEY RODGERS on 9/30/2020. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/30/2020) |
| 10/07/2020 | 8 | MOTION to Dismiss by DEUTSCHE BANK TRUST COMPANY AMERICAS. (Internal deadline for referral to judge if response not filed earlier: **10/21/2020**). (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (NORROW, BETH) [Transferred from flnd on 10/15/2020.] (Entered: 10/07/2020) |
| 10/09/2020 | 9 | RESPONSE by DEUTSCHE BANK TRUST COMPANY AMERICAS re 5 Order to Show Cause, . (NORROW, BETH) [Transferred from flnd on 10/15/2020.] (Entered: 10/09/2020) |
| 10/09/2020 | 10 | DEFENDANT DEUTSCHE BANKS REQUEST FOR JUDICIAL NOTICE OF RELATED APPEAL AND PUBLIC RECORDS re 8 MOTION to Dismiss by DEUTSCHE BANK TRUST COMPANY AMERICAS. (Attachments: # 1 Exhibit A-C) |

| | | |
|---|---|---|
| | | (NORROW, BETH) Modified on 10/13/2020 to correct title (jcw). [Transferred from flnd on 10/15/2020.] (Entered: 10/09/2020) |
| 10/13/2020 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 9 Response to Order to Show Cause, 5 Order to Show Cause - No response filed by Plaintiffs, 10 Request for Judicial Notice. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 10/13/2020) |
| 10/15/2020 | 11 | ORDER - Accordingly, because venue is proper in the Middle District of Florida and no party has objected to transfer there, the Clerk is directed to transfer this case to the Middle District of Florida and close the file. Signed by JUDGE M CASEY RODGERS on 10/15/2020. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 10/15/2020) |
| 10/15/2020 | 12 | Case transferred in from District of Florida Northern; Case Number 3:20-cv-05820. File received electronically (Entered: 10/15/2020) |
| 10/15/2020 | 13 | TRANSFER IN from the Nothern District of Florida (Pensacola Division). Case assigned to District Judge Thomas P. Barber and Magistrate Judge Sean P. Flynn. New Case Number: 8:20-cv-2410-T-60SPF. (AG) (Entered: 10/15/2020) |
| 10/20/2020 | 14 | **RELATED CASE ORDER AND NOTICE of designation under Local Rule 3.05 - track 2. Signed by Judge Thomas P. Barber on 10/20/2020. (SRC)** (Entered: 10/20/2020) |
| 11/04/2020 | 15 | NOTICE of pendency of related cases re 14 Related case order and track 2 notice per Local Rule 1.04(d) by Deutsche Bank Trust Company America's. Related case(s): yes (Norrow, Beth) (Entered: 11/04/2020) |
| 11/04/2020 | 16 | CERTIFICATE of interested persons and corporate disclosure statement re 14 Related case order and track 2 notice by Deutsche Bank Trust Company America's. (Norrow, Beth) (Entered: 11/04/2020) |
| 11/30/2020 | 17 | CASE MANAGEMENT REPORT. (Norrow, Beth) (Entered: 11/30/2020) |
| 11/30/2020 | 18 | NOTICE of pendency of related cases per Local Rule 1.04(d) by Michael Haulsee. Related case(s): No (Segal, Lee) (Entered: 11/30/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/17/2020 12:26:58 | | | |
| **PACER Login:** | norrowblane:3662846:0 | **Client Code:** | 023223.245400 |
| **Description:** | Docket Report | **Search Criteria:** | 8:20-cv-02410-TPB-SPF |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

Filing # 111916694 E-Filed 08/17/2020 02:36:23 PM

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT,
IN AND FOR OKALOOSA COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

      Plaintiffs,

                                                  Case No.:    2020 CA 002507 F

v.

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Trustee for Residential Accredit Loans, Inc.
Mortgage Asset-Backed Pass-Through Certificates,
Series 2007-QS4,

      Defendant.
_____/

### COMPLAINT
### AND DEMAND FOR JURY TRIAL

      Plaintiffs, MICHAEL HAULSEE and MARCIA HAULSEE, by and through their undersigned counsel, sue Defendant, DEUTSCHE BANK TRUST COMPANY AMERICAS, as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4 ("Defendant"), and would show:

### BACKGROUND

      1.    All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

      2.    Venue is proper in Okaloosa County, Florida, as the cause of action accrued here.

      3.    On or about November 30, 2006, Plaintiff, MICHAEL HAULSEE, entered a promissory note ("the Note") and mortgage ("the Mortgage") with LoanCity, a California Corporation ("LC"), which Mortgage was recorded in the Pinellas County Official Records at Instrument 2006457100, connection with their purchase of the following property ("the Property"):

AUG 2 7 2020

Parcel 1:

Lot 40, Jungle Shores, Subdivision No. 6, according to the Plat thereof as recorded in Plat Book 12, Page 27 of the Public Records of Pinellas County, Florida

AND

Parcel 2:

Begin at the Southwest Corner of Lot Forty (40) of Jungle Shores, Subdivision No. 6, Run Thence West into the Waters of Boca Ciega Bay, in extension of the South line of Lot Forty (40), 330 feet more or less to the quarter section line of Section 12, Township 31 South, Range 15 East, thence North along the quarter section line to a point of intersection of the South boundary line of Lot Forty one (41) extended to the intersection of the water of Boca Ciega Bay and the upland; thence Southeasterly meandering the shoreline of Boca Ciega Bay to the point of beginning.

More commonly known as 2900 Pelham Road North, St. Petersburg, FL 33710

4.      Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance.

5.      Shortly after closing on this loan, LC sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

6.      Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust. The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was called Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates Series 2007-QS4 ("the Trust").

7.      Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities. The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

8.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default. Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

9.      Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the

3

Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

10.     Deutsche Bank Trust Company Americas ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

11.     Deutsche's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

12.     Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

4

13.     By 2012, however, the Depositor was no longer in business. As Trustee of the Trust, Deutsche was still responsible for collecting cash flows on behalf of the Certificateholders. Yet it was failing to do so. Plaintiffs, for example, stopped making payments under the Note in June, 2013 – one of many Borrowers who did so. As a result, a lawsuit was filed against them, Pinellas County Case No. 15-2225-CI ("the Lawsuit"), with Defendant named as the plaintiff. The genesis of the Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiffs of ownership of the Property.

14.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

15.     First, Defendant was neither the owner nor the holder of the Note by operation of law. In fact, it was illegal for Defendant to own or hold the Notes. Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

16.     Second, the Lawsuit was brought in the name of the Trust, which was identified in the style of the Lawsuit as the party prosecuting the case ("as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4"). However, the beneficiaries of the Trust, *i.e.* the Certificateholders, did not authorize the Lawsuit, benefit from it, or even know it had been filed. Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet it purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

5

Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.     Despite the foregoing, the Servicers, including but not limited to Ocwen Loan Servicing, LLC ("Ocwen"), purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Lawsuit to be prosecuted in Defendant's name and represented, under oath, that Defendant was the owner and holder of the Note. As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

18.     To support its position in the Lawsuit, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal. (At any one time, only one servicer was assigned to the Loan. However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein. As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

19.     First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Trust beneficiaries, *i.e.* the Certificateholders, as they did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome. Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make the Trust the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

20.     Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law. Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit,

under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

21.     Third, the Servicer caused to be recorded in the Official Records of Pinellas County, Florida at Instrument 2015110323, an Assignment of Mortgage ("the First Assignment"), which purported to assign the Mortgage from Mortgage Electronic Registration Systems, Inc. ("MERS"), as Nominee for LC, to Residential Funding Corporation ("RFC"), Defendant, and a second Assignment of Mortgage ("the Second Assignment"), at OR Instrument 2015110324, which purported to assign the Mortgage from RFC to Defendant.

22.     In truth, MERS had no ability to convey the First Assignment, either as Nominee for RFC or otherwise.  After all, the Trust was created in 2007 by the sale of the cash flows from the Loans, so by the time of the First Assignment, MERS had no interest in the Mortgage, as it had already been sold to the Depositor.  The Servicer nonetheless prepared and caused to be recorded the First Assignment – a violation of Fla. § 817.535(2)(a) and a criminal infraction, a felony under Florida law.

23.     For these same reasons, RFC has no authority to convey the Second Assignment, as the Loan had already been sold to the Depositor.  In fact, as of the date of the Second Assignment, RFC ceased to exist.  To create the appearance of a conveyance in the official records, the Servicer nonetheless prepared and caused to be recorded the Second Assignment, representing itself to be the attorney in fact for RFC and authorized to sign on its behalf when it was not.  These were additional violations of Fla. Stat. § 817.535(a)(a), felony infractions under Florida law, yet the Servicers committed them anyway to impair Plaintiffs' title to the Property and further their scheme to steal it from him.

7

24.     Fourth, the Servicer relied on a chain/series of endorsements on the Note, including one by RFC ("the First Endorsement") and another by Deutsche Bank Trust Company Americas, as Trustee ("DB") ("the Second Endorsement"), and used them as a basis to claim standing in the Lawsuit. In truth, however, the First Endorsement was stamped onto the Note long after RFC ceased to exist in a fraudulent effort to procure standing where none otherwise existed, and the Second Endorsement was not actually executed by DB, but Ocwen Loan Servicing, LLC ("Ocwen"), purportedly as attorney in fact for DB. Yet Ocwen was not actually attorney in fact for DB and lacked the authority to execute the Second Endorsement. It fraudulently represented otherwise in a fraudulent, perjurious, and illegal attempt to convey standing where none otherwise existed.

25.     Fifth, the Servicers repeatedly represented, in the Lawsuit, that Defendant had been damaged as a result of Plaintiffs' non-payment of the installment payments due under the Note. These representations were knowingly false, fraudulent, and perjurious at all times relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trust. Suffice it to say Servicer's repeated representations in the Lawsuit that Defendant was not damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

26.     Sixth, the Servicer filed in the Lawsuit a Limited Power of Attorney from Deutsche ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuit as an agent of the Trust. These representations, however, were entirely fraudulent – and

8

known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit.

27. Seventh, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit. In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the holder of the Note and was damaged by Plaintiffs' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendant, the entity for which they were counsel of record in the Lawsuit.

28. At all times relevant, Deutsche knew that the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, Deutsche has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers like Ocwen on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

9

29.     For instance, in its capacity as Trustee, Deutsche has executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like Ocwen to go to court and create the impression they were an agent of Ocwen and authorized to prosecute a foreclosure in Ocwen's name and otherwise act on its behalf even if actual authority were lacking.

30.     At the same time, though, Deutsche knew that servicers like Ocwen were using Deutsche's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, Deutsche wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) Deutsche insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) Deutsche insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within Deutsche, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of Deutsche, and conceded that Deutsche never owned or held any promissory notes.

31.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like Ocwen – perpetuated in the name of Deutsche, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment with Deutsche, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

10

32.     Despite its feigned ignorance, Deutsche knew full well what was happening. In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, Deutsche failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name. In fact, Deutsche continues to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

33.     Further proof that Deutsche's "ignorance" of the Servicers' illegality was feigned, and that Deutsche knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the Servicers. After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here, conversely, Deutsche, *i.e.* the principal, wanted Servicers like Ocwen, *i.e.* the agent, to indemnify Deutsche for all actions the servicers took in their name. The obvious reason for such an unusual indemnification is that Deutsche knew that servicers like Ocwen were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and Deutsche wanted someone else to pay in the event the fraud scheme ever came to light.

34.     Deutsche's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to Deutsche for those payments. Facilitating and encouraging the foregoing misconduct hence enabled Deutsche to avoid significant payments out of its own pocket.

11

35.     Based on the fraudulent and illegal acts of Defendant, Ocwen, and the Servicers, as described here, Defendant succeeded in obtaining a Final Judgment of Foreclosure and, ultimately, divesting Plaintiff of title to the Property.  Yet Plaintiff did not discover the fraudulent nature of Defendant's actions until 2020, after extensive investigation, the delay in discovery being attributed largely to Defendant's ongoing scheme to conceal its misconduct from Plaintiff, this Court, its own attorneys, and the public.

## COUNT ONE

36.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

37.     Plaintiff realleges and incorporates by reference paragraphs 1-35 above.

38.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4).  To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

39.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of the Property and the attorney's fees and costs incurred defending the Lawsuit.

40.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

12

## COUNT TWO

41.     This is an action for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

42.     Plaintiff realleges and incorporates by reference paragraphs 1-34 above.

43.     Through a series of fraudulent misrepresentations, as set forth above, Defendant slandered Plaintiff's title to the Property, then divested (or purported to divest) Plaintiff of ownership.

44.     As a result of Defendant's actions, Plaintiff has been damaged.  Those damages include, but are not limited to, the value of the Property, interest on that money, lost rents for the duration of time that Plaintiff has been dispossessed, and attorney's fees and costs arising from having to defend the Lawsuit.

WHEREFORE Plaintiff demands judgment against Defendant for damages, general and special, interest, attorney's fees, and costs.  Plaintiff further demands a trial by jury and such other and further relief that this Court deems proper.

This 14th day of August, 2020.

Respectfully submitted,

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

13

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

MICHAEL HAULSEE AND
MARCIA HAULSEE,

      Plaintiff,          Case No: 8:20-cv-2410-T-60SPF

vs.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, AS TRUSTEE FOR RESIDENTIAL
ACCREDIT LOANS, INC. MORTGAGE
ASSET-BACKED PASS-THROUGH
CERTIFICATES, SERIES 2007-QS4,

      Defendant.

_____/

## PLAINTIFF'S NOTICE OF PENDENCY OF OTHER ACTIONS

      In accordance with Local Rule 1.04(d), I certify that the instant action:

_____ IS related to pending or closed civil or criminal case(s) previously filed in this Court, or any other Federal or State court, or administrative agency as indicated below:
_____

__X__ IS NOT related to any pending or closed civil or criminal case filed with this Court, or any other Federal or State court, or administrative agency.

      Dated this 30th day of November, 2020.

                    Respectfully submitted by,

                    /s/ Lior Segal, Esq_____

                    Lior Segal, Esquire (FBN: 37837))
                    Segal & Schuh Law Group, P.L.
                    18167 U.S. Hwy. 19 N., Suite 100
                    Clearwater, Florida 33764
                    Tel: (727) 824-5775 Fax: (888) 672-7347
                    Attorney for Plaintiff

lee@segalschuh.com - Attorney
lisa@segalschuh.com - Paralegal

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 30th day of November, 2020, the foregoing was electronically filed using the Florida Courts E-filing Portal, and electronically served upon all counsel of record through the eportal.

/s/ Lior Segal, Esquire

Lior Segal, Esquire (FBN: 37837)
Segal & Schuh Law Group, P.L.
18167 U.S. Hwy. 19 N., Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
Attorney for Plaintiff
lee@segalschuh.com – Attorney
lisa@segalschuh.com – Paralegal

2

# EXHIBIT 11

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

     Plaintiffs,

                                                   Case No.:   **20001663CA**

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

     Plaintiffs, MICHAEL HAULSEE and MARCIA HAULSEE, by and through their undersigned counsel, sue Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee ("Defendant"), and would show:

### BACKGROUND

     1.     All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

     2.     Venue is proper in Bay County, Florida, as the cause of action accrued here.

     3.     On or about November 30, 2006, Plaintiff, MICHAEL HAULSEE, entered a promissory note ("the Note") and mortgage ("the Mortgage") with LoanCity, a California Corporation ("LC") in connection with their purchase of the property located at 2900 Pelham Road North, St. Petersburg, FL 33710 ("the Property").

     4.     Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance.

5.     Shortly after closing on this loan, LC sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

6.     Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust. The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was called Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates Series 2007-QS4 ("the Trust").

7.     Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities. The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

8.     Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default. Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the

2

purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

9.      Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors -- essentially, that they were all high-quality loans ("the Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

10.      Deutsche Bank Trust Company Americas ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

11.      Deutsche's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of

impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

12.     Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

13.     By 2012, however, the Depositor was no longer in business. As Trustee of the Trust, Deutsche was still responsible for collecting cash flows on behalf of the Certificateholders. Yet it was failing to do so. Plaintiffs, for example, stopped making payments under the Note in June, 2013 – one of many Borrowers who did so. As a result, a lawsuit was filed against them, Pinellas County Case No. 15-2225-CI ("the Lawsuit"), with Deutsche, as Trustee for the Trust, named as the plaintiff. The genesis of the Lawsuit was Deutsche's attempt to foreclose the Mortgage and divest Plaintiffs of ownership of the Property.

14.     At all times relevant, Deutsche Bank National Trust Company, as Trustee was the alter ego of Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4. The corporate veil is hence able to be pierced, and Deutsche Bank National Trust Company, as Trustee is liable for the acts described herein to the same extent as Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed, Pass-Through Certificates, Series 2007-QS4. As such, while the latter was technically the named plaintiff in the lawsuit, the former, as its alter ego, is treated synonymously with it, as one and the same, for all purposes herein.

4

15.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

16.     First, Defendant was neither the owner nor the holder of the Note by operation of law.  In fact, it was illegal for Defendant to own or hold the Notes.  Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.     Second, the Lawsuit was brought in the name of the Trust, which was identified in the style of the Lawsuit as the party prosecuting the case ("as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4").  However, the beneficiaries of the Trust, *i.e.* the Certificateholders, did not authorize the Lawsuit, benefit from it, or even know it had been filed.  Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff. Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18.     Despite the foregoing, the Servicers, including but not limited to Ocwen Loan Servicing, LLC ("Ocwen"), purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Lawsuit to be prosecuted in Defendant's name and represented, under oath, that Defendant was the owner and holder of the Note.  As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

19.     To support its position in the Lawsuit, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal. (At any one time, only one servicer was assigned to the Loan. However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein. As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

20.     First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Trust beneficiaries, *i.e.* the Certificateholders, as they did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome. Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make the Trust the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

21.     Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law. Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit, under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

22.     Third, the Servicer caused to be recorded in the Official Records of Pinellas County, Florida at Instrument 2015110323, an Assignment of Mortgage ("the First Assignment"), which purported to assign the Mortgage from Mortgage Electronic Registration Systems, Inc. ("MERS"), as Nominee for LC, to Residential Funding Corporation ("RFC"). Defendant, and a second Assignment of Mortgage ("the Second Assignment"), at OR Instrument 2015110324, which purported to assign the Mortgage from RFC to Defendant.

23.     In truth, MERS had no ability to convey the First Assignment, either as Nominee for RFC or otherwise. After all, the Trust was created in 2007 by the sale of the cash flows from the Loans, so by the time of the First Assignment, MERS had no interest in the Mortgage, as it had already been sold to the Depositor. The Servicer nonetheless prepared and caused to be recorded the First Assignment – a violation of Fla. § 817.535(2)(a) and a criminal infraction, a felony under Florida law.

24.     For these same reasons, RFC has no authority to convey the Second Assignment, as the Loan had already been sold to the Depositor. In fact, as of the date of the Second Assignment, RFC ceased to exist. To create the appearance of a conveyance in the official records, the Servicer nonetheless prepared and caused to be recorded the Second Assignment, representing itself to be the attorney in fact for RFC and authorized to sign on its behalf when it was not. These were additional violations of Fla. Stat. § 817.535(a)(a), felony infractions under Florida law, yet the Servicers committed them anyway to impair Plaintiffs' title to the Property and further their scheme to steal it from him.

25.     Fourth, the Servicer relied on a chain/series of endorsements on the Note, including one by RFC ("the First Endorsement") and another by Deutsche Bank Trust Company Americas, as Trustee ("DB") ("the Second Endorsement"), and used them as a basis to claim standing in the Lawsuit. In truth, however, the First Endorsement was stamped onto the Note long after RFC ceased to exist in a fraudulent effort to procure standing where none otherwise existed, and the Second Endorsement was not actually executed by DB, but Ocwen Loan Servicing, LLC ("Ocwen"), purportedly as attorney in fact for DB. Yet Ocwen was not actually attorney in fact for DB and lacked the authority to execute the Second Endorsement. It fraudulently represented

7

otherwise in a fraudulent, perjurious, and illegal attempt to convey standing where none otherwise existed.

26.     Fifth, the Servicers repeatedly represented, in the Lawsuit, that Defendant had been damaged as a result of Plaintiffs' non-payment of the installment payments due under the Note. These representations were knowingly false, fraudulent, and perjurious at all times relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trust. Suffice it to say Servicer's repeated representations in the Lawsuit that Defendant was not damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

27.     Sixth, the Servicer filed in the Lawsuit a Limited Power of Attorney from Deutsche ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuit as an agent of the Trust. These representations, however, were entirely fraudulent – and known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit.

28.     Seventh, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit. In the process, the

Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the holder of the Note and was damaged by Plaintiffs' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendant, the entity for which they were counsel of record in the Lawsuit.

29.     At all times relevant, Deutsche knew that the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, Deutsche has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers like Ocwen on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

30.     For instance, in its capacity as Trustee, Deutsche has executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like Ocwen to go to court and create the impression they were an agent of Ocwen and authorized to prosecute a foreclosure in Ocwen's name and otherwise act on its behalf even if actual authority were lacking.

31.     At the same time, though, Deutsche knew that servicers like Ocwen were using Deutsche's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, Deutsche wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) Deutsche insisted that all limited powers of

9

attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements -- meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) Deutsche insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within Deutsche, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of Deutsche, and conceded that Deutsche never owned or held any promissory notes.

32.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like Ocwen – perpetuated in the name of Deutsche, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment with Deutsche, did nothing.  Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

33.     Despite its feigned ignorance, Deutsche knew full well what was happening.  In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, Deutsche failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name.  In fact, Deutsche continues to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

34.     Further proof that Deutsche's "ignorance" of the Servicers' illegality was feigned, and that Deutsche knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the Servicers.  After all, when an indemnification agreement exists

10

between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here, conversely, Deutsche, *i.e.* the principal, wanted Servicers like Ocwen, *i.e.* the agent, to indemnify Deutsche for all actions the servicers took in their name. The obvious reason for such an unusual indemnification is that Deutsche knew that servicers like Ocwen were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and Deutsche wanted someone else to pay in the event the fraud scheme ever came to light.

35.     Deutsche's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to Deutsche for those payments. Facilitating and encouraging the foregoing misconduct hence enabled Deutsche to avoid significant payments out of its own pocket.

36.     Based on the fraudulent and illegal acts of Defendant, Ocwen, and the Servicers, as described here, Defendant succeeded in obtaining a Final Judgment of Foreclosure and, ultimately, divesting Plaintiff of title to the Property. Yet Plaintiff did not discover the fraudulent nature of Defendant's actions until 2020, after extensive investigation, the delay in discovery being attributed largely to Defendant's ongoing scheme to conceal its misconduct from Plaintiff, this Court, its own attorneys, and the public.

### COUNT ONE

37.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

38.     Plaintiff realleges and incorporates by reference paragraphs 1-36 above.

39.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4).  To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

40.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of the Property and the attorney's fees and costs incurred defending the Lawsuit.

41.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

## COUNT TWO

42.     This is an action for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

43.     Plaintiff realleges and incorporates by reference paragraphs 1-35 above.

44.     Through a series of fraudulent misrepresentations, as set forth above, Defendant slandered Plaintiff's title to the Property, then divested (or purported to divest) Plaintiff of ownership.

45.     As a result of Defendant's actions, Plaintiff has been damaged.  Those damages include, but are not limited to, the value of the Property, interest on that money, lost rents for the duration of time that Plaintiff has been dispossessed, and attorney's fees and costs arising from having to defend the Lawsuit.

WHEREFORE Plaintiff demands judgment against Defendant for damages, general and special, interest, attorney's fees, and costs. Plaintiff further demands a trial by jury and such other and further relief that this Court deems proper.

This 23rd day of September, 2020.

/s/ Carla Turner-Hahn, Esquire
Carla Turner-Hahn, Esquire
Carla Turner-Hahn, P.A.
Attorney for Plaintiff
615 Whisper Woods Drive
Lakeland, Florida 33813
Ph: 727-433-1624
FBN: 0390658
Email: carlathahn@gmail.com

IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

      **Plaintiff,**

vs.

                         **CASE NO.: 20-CA-001724**

DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee,

      **Defendant.**

_____/

### REQUEST FOR JUDICIAL NOTICE
### OF PINELLAS COUNTY FORECLOSURE CASE

      Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee ("DBNTC") by and through its undersigned counsel and pursuant to Fla. Stat. §§ 90.202(11), (12), hereby files this Request for Judicial Notice in support of Defendant's Motion to Vacate Default and Motion to Quash Service of Process and for all other purposes applicable in this matter, and states:

      1.      Section 90.202(6) of the Florida Evidence Code specifically provides that a court may take judicial notice of the "[r]ecords of any court of this state." § 90.202(6), Fla. Stat. (2017); *see also Hunt v. State*, 613 So. 2d 893, 898 n.5 (Fla. 1992) (recognizing that the Supreme Court took judicial notice of the record in another case on the basis of section 90.202(6) of the Florida Statutes); *Martin v. Garrison*, 658 So. 2d 1019, 1021 (Fla. 4th DCA 1995) (taking judicial notice of court records). In interpreting this provision, Florida appellate courts have also taken judicial notice of deeds recorded in the Official Records of a Florida County. *See Gonzalez v. Chase Home Fin. LLC*, 37 So. 3d 955, 958 (Fla. 3d DCA 2010) (taking judicial notice of a deed and mortgage recorded in Miami-Dade County's official records); *see also Beggi v. Ocean Bank*, 91 So. 3d 193,

195 n. 3 (Fla. 3d DCA 2012) (recognizing quitclaim deeds that were recorded in the official records of Miami-Dade County when the appellee requested taking of judicial notice of same).  Indeed, the Florida Supreme Court has stated that "[c]ourts may take judicial cognizance of all public documents and public records." *Conyers v. State*, 123 So. 817, 818 (Fla. 1929).

2.      Further, Sections 90.202(11) and 90.202(12) of the Florida Statutes also permit the Court to take judicial notice of "[f]acts that are not subject to dispute because they are generally known within the territorial jurisdiction of the court" and/or "[f]acts that are not subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned."  *See* Fla. Stat. §§ 90.202(11), (12).

3.      Pursuant to this statute, DBNTC requests that the Court take judicial notice of the court filings in the following case, which fall squarely within the above-referenced sections:

i.      **Pinellas Foreclosure Action** – *Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6 v. Richard DeCoursy, et.al.*; Pinellas County Circuit Court Case No. 2018-CA-002703[1], which includes, but is not limited to:

- Pinellas County Court Docket; **Exhibit 12;**
- Complaint filed on April 27, 2018; **Exhibit 13;**
- Notice of Lis Pendens filed on April 27, 2018, **Exhibit 14;**
- Answer and Affirmative Defenses filed October 23, 2018, **Exhibit 15;**
- Notice of Voluntary Dismissal and Release of Lis Pendens, **Exhibit 16.**

4.      Judicial notice of these documents will allow this Court "to arrive at the best decision[] on the merits."  Dorothy F. Easley, *Judicial Notice on Appeal: A History Lesson in Recent Trends*, 84 Fla. B.J. 45, 46 (Dec. 2010) (noting that courts consider additional sources

---

[1] Property address 2861 Thaxton Dr. Unit 46, Palm Harbor, Florida. (Identified as "the Property" in the Complaint).

referred to in briefs or conduct their own independent research to arrive at the best decisions on the merits).

**WHEREFORE**, DBNTC respectfully request that the Court take judicial notice of the documents filed in the above-referenced foreclosure case, together with such other relief this Court deems just and necessary.

Dated: December 30, 2020

Jason H. Okleshen, Esq.
Florida Bar No. 496170
Okleshenj@gtlaw.com
**Greenberg Traurig, P.A.**
777 S. Flagler Dr., Ste. 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222

Respectfully submitted,

Beth A. Norrow (FBN 061497)
norrowb@gtlaw.com
**Greenberg Traurig, P.A.**
450 S. Orange Ave., Suite 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: /s/ *Beth A. Norrow*
      Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company, as Trustee*

## CERTIFICATE OF SERVICE

I CERTIFY that on December 30, 2020, I electronically filed the foregoing with the Clerk of Court via the Florida E-Filing Portal, which shall cause a copy to be served via email to the following:

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste. 100
Clearwater, FL 33764
lee@segalschuh.com
marie@segalschuh.com

/s/ Beth A. Norrow
Beth A. Norrow

3

# EXHIBIT 12

# REGISTER OF ACTIONS
## CASE NO. 18-002703-CI



Order Documents!   *Click Here!*

*Request Now!*   Including Certified!

| | | | |
|---|---|---|---|
| **DEUTSCHE BANK TRUST COMPANY AMERICAS Vs. RICHARD DECOURSY, et al** | §§§§§§§§§ | Case Type: | **REAL PROP - NON-HOMESTEAD RES FORECLOSURE2 $50,001-$249,999** |
| | | Date Filed: | **04/27/2018** |
| | | Location: | **Section 15** |
| | | Judicial Officer: | **JIROTKA, GEORGE M** |
| | | UNIFORM CASE NUMBER: | **522018CA002703XXCICI** |

---

## PARTY INFORMATION

| | | Attorneys |
|---|---|---|
| DEFENDANT | DECOURSY, RICHARD *ALSO KNOWN AS* DECOURSY, RICHARD D | ~~RICHARD J MOCKLER~~ ~~MOCKLER LEINER LAW P A~~ ~~600 N WILLOW AVE STE 101~~ ~~TAMPA, FL 33606~~ ~~813-331-5699(W)~~ |
| | 2879 THAXTON DR APT 55 PALM HARBOR, FL 34684 | ~~SCOTT D STAMATAKIS, ESQ~~ ~~STAMATAKIS THALJI BONANNO~~ ~~P O BOX 341499~~ ~~TAMPA, FL 33694~~ ~~813-282-9330(W)~~ |
| DEFENDANT | HOMEOWNERS ASSOCIATION OF TOWNHOMES OF COUNTRYSIDE INC | ~~DANIEL J GREENBERG~~ ~~LAW OFFICES OF GIANFRONE NIKOLOFF et al PA~~ ~~1964 BAYSHORE BLVD SUITE A~~ ~~DUNEDIN, FL 34698-2576~~ ~~727-738-1100(W)~~ |
| | 1964 BAYSHORE BLVD., STE. A DUNEDIN, FL 34698 | |
| DEFENDANT | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC *AS NOMINEE FOR* FREEDOM MORTGAGE CORPORATION | |
| | 1200 SOUTH PINE ISLAND ROAD PLANTATION, FL 33324 | |
| DEFENDANT | UNKNOWN SPOUSE OF RICHARD DECOURSY *ALSO KNOWN AS* DECOURSY, RICHARD D | ~~RICHARD J MOCKLER~~ ~~MOCKLER LEINER LAW P A~~ ~~600 N WILLOW AVE STE 101~~ ~~TAMPA, FL 33606~~ ~~813-331-5699(W)~~ |
| | 2879 THAXTON DR APT 55 PALM HARBOR, FL 34684 | ~~SCOTT D STAMATAKIS, ESQ~~ ~~STAMATAKIS THALJI BONANNO~~ |

P O BOX 341409
TAMPA, FL 33694

813-282-9330(W)

| PLAINTIFF | DEUTSCHE BANK TRUST COMPANY AMERICAS *AS TRUSTEE FOR* RESIDENTIAL ACCREDIT LOANS INC MORTGAGE ASSET BACKED PASS THROUGH CERTIFICATES SERIES 2007 QS6 |
|---|---|

JARRET I BERFOND

BROCK & SCOTT PLLC
2001 NW 64 ST STE 130
FT LAUDERDALE, FL 33309

954-618-6955 x6121(W)


JESSICA J FAGEN

RAUSCH STURM
100 SECOND AVE S STE 306-
S
ST PETERSBURG, FL 33701

855-560-6866(W)

1501 NW 49TH STREET, SUITE 200
FT. LAUDERDALE, FL 33309

---

## EVENTS & ORDERS OF THE COURT

### OTHER EVENTS AND HEARINGS

| Date | Event |
|---|---|
| 05/14/2019 | DISMISSED-SETTLEMENT AFTER HRG (SRS DISPO)   Doc # 69 |
| 05/14/2019 | NOTICE OF VOLUNTARY DISMISSAL   Doc # 70 |
| | *WITHOUT PREJUDICE AND RELEASE OF LIS PENDENS* |
| 05/14/2019 | FINAL DISPOSITION FORM   Doc # 71 |
| 05/13/2019 | NOTICE FINAL DISPOSITION OF REFERRAL   Doc # 68 |
| | *CONCLUDED BY ARBITRATION* |
| 04/10/2019 | DEF-RESP'S MOTION   Doc # 67 |
| | *TO DISPENSE WITH MEDIATION* |
| 04/08/2019 | NOTICE OF CANCELLATION   Doc # 66 |
| | *OF MEDIATION FOR 041119* |
| 04/03/2019 | PLAINTIFF'S CERTIFICATION OF SETTLEMENT AUTHORITY   Doc # 65 |
| 03/06/2019 | NOTICE OF MEDIATION CONFERENCE   Doc # 64 |
| | *041119 12:30* |
| 02/27/2019 | NOTICE OF SERVICE OF   Doc # 63 |
| | *EXHIBITS* |
| 02/05/2019 | ORDER OF REFERRAL TO MEDIATION   Doc # 62 |
| 01/31/2019 | ATTORNEY COVER LETTER   Doc # 60 |
| 01/31/2019 | ORDER GRANTING   Doc # 61 |
| | *DEFTS MOTON TO COMPEL MEDIATION* |
| 01/30/2019 | NOTICE   Doc # 59 |
| | *OF NON-OBJECTION* |
| 01/18/2019 | NOTICE OF TAKING DEPOSITION   Doc # 57 |
| 01/18/2019 | DEF-RESP'S MOTION TO COMPEL   Doc # 58 |
| | *MEDIATION* |
| 01/11/2019 | NOTICE CAUSE IS AT ISSUE READY FOR TRIAL   Doc # 56 |
| | *NON-JURY* |
| 12/24/2018 | PLTF-PET'S MOTION FOR DEFAULT   Doc # 54 |
| 12/24/2018 | DEFAULT ENTERED   Doc # 55 |
| | Party:  MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC |
| 12/21/2018 | NOTICE OF SERVICE OF   Doc # 53 |
| | *PLAINTIFFS RESPONSES TO DEFENDANT'S FIRST REQUEST FOR ANSWERS TO INTERROGATORIES* |
| 12/14/2018 | RESPONSE TO REQUEST FOR PRODUCTION   Doc # 52 |
| 11/29/2018 | NOTICE   Doc # 51 |
| | *OF CHANGE OF PHYSICAL ADDRESS ONLY* |
| 11/27/2018 | RESPONSE   Doc # 49 |
| | *TO ANSWER AND AFFIRMATIVE DEFENSES* |
| 11/27/2018 | ATTACHMENT   Doc # 50 |
| | *NOTICE OF DEFAULT* |
| 11/21/2018 | CERTIFICATE   Doc # 47 |
| | *OF MAILING COPY OF ORDER ON MOTION TO EXTEND TIME* |
| 11/21/2018 | ATTACHMENT   Doc # 48 |
| | *COPY OF ORDER ON MOTION FOR EXTENSION OF TIME* |
| 11/14/2018 | ORDER GRANTING EXTENSION OF TIME   Doc # 44 |
| | *FOR PLTF TO RESPOND TO REQUEST FOR PRODUCTION AND INTERROGATORIES* |
| 11/14/2018 | PLTF-PET'S MOTION FOR EXTENSION OF TIME   Doc # 45 |
| 11/14/2018 | CORRESPONDENCE TO COURT RE   Doc # 46 |
| | *PROPOSED ORDER* |
| 10/30/2018 | RESPONSE TO REQUEST FOR ADMISSIONS   Doc # 43 |
| 10/24/2018 | PLTF-PET'S MOTION FOR EXTENSION OF TIME   Doc # 42 |
| 10/23/2018 | DEMAND FOR JURY TRIAL   Doc # 40 |
| 10/23/2018 | ANSWER-AFFIRMATIVE DEFENSES OF   Doc # 41 |
| | Party:  DECOURSY, RICHARD |
| | Party:  UNKNOWN SPOUSE OF RICHARD DECOURSY |
| 10/18/2018 | REQUEST FOR ADMISSIONS   Doc # 37 |

| Date | Entry | |
|---|---|---|
| 10/18/2018 | NOTICE OF SERVICE OF INTERROGATORIES | Doc # 38 |
| 10/18/2018 | REQUEST FOR PRODUCTION | Doc # 39 |
| 10/09/2018 | ORDER    Doc # 36 | |
| | *ON DEFT AMENDED MOTN TO DISMISS* | |
| 10/03/2018 | STIPULATION FOR SUBSTITUTION OF COUNSEL    Doc # 34 | |
| | *FOR DEFTS W/CLIENT CONSENT* | |
| 10/03/2018 | CORRESPONDENCE TO COURT RE    Doc # 35 | |
| | *PROPOSED ORDER RCVD BY COURT 100218* | |
| 09/25/2018 | NOTICE OF APPEARANCE    Doc # 32 | |
| | Party: DECOURSY, RICHARD | |
| | Party: UNKNOWN SPOUSE OF RICHARD DECOURSY | |
| 09/25/2018 | DEF-RESP'S MOTION TO DISMISS    Doc # 33 | |
| | *(AMENDED)* | |
| 09/14/2018 | CERTIFICATE OF MAILING    Doc # 31 | |
| | *W/ ATTACHMENT* | |
| | Party: DECOURSY, RICHARD | |
| | Party: HOMEOWNERS ASSOCIATION OF TOWNHOMES OF COUNTRYSIDE INC | |
| | Party: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC | |
| | Party: UNKNOWN SPOUSE OF RICHARD DECOURSY | |
| 08/30/2018 | ATTORNEY COVER LETTER    Doc # 29 | |
| | *--- COURT RECEIVED 082918* | |
| 08/30/2018 | ORDER GRANTING EXTENSION OF TIME    Doc # 30 | |
| | *FOR DEFT TO RESPOND TO COMPLAINT WITHIN 30 DAYS OF SIGNED ORDER* | |
| 08/20/2018 | NOTICE OF APPEARANCE    Doc # 27 | |
| | *AND DESIGNATION OF E-MAIL ADDRESS* | |
| | Party: DECOURSY, RICHARD | |
| | Party: UNKNOWN SPOUSE OF RICHARD DECOURSY | |
| 08/20/2018 | DEF-RESP'S MOTION FOR EXTENSION OF TIME    Doc # 28 | |
| | *TO RESPOND TO COMPLAINT* | |
| 07/13/2018 | PUBLISHER'S AFFIDAVIT    Doc # 26 | |
| | *(30 DAYS)* | |
| 06/29/2018 | NOTICE OF ACTION    Doc # 22 | |
| | *ISSUED* | |
| | Party: DECOURSY, RICHARD | |
| | Party: UNKNOWN SPOUSE OF RICHARD DECOURSY | |
| 06/29/2018 | NOTICE OF ACTION EMAILED - BUSINESS OBSERVER    Doc # 23 | |
| | *AND ATTORNEY* | |
| | Party: BERFOND, JARRET I | |
| 06/29/2018 | CERTIFICATE OF MAILING    Doc # 24 | |
| | *NOTICE OF ACTION* | |
| | Party: DECOURSY, RICHARD | |
| 06/29/2018 | CERTIFICATE OF MAILING    Doc # 25 | |
| | *NOTICE OF ACTION* | |
| | Party: UNKNOWN SPOUSE OF RICHARD DECOURSY | |
| 06/25/2018 | AFFIDAVIT FOR CONSTRUCTIVE SERVICE    Doc # 21 | |
| | *W/ATTACHMENT* | |
| | Party: DECOURSY, RICHARD | |
| | Party: UNKNOWN SPOUSE OF RICHARD DECOURSY | |
| 06/11/2018 | SUMMONS - SERVED    Doc # 15 | |
| | *050318* | |
| | Party: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC | |
| 06/11/2018 | SUMMONS - SERVED    Doc # 16 | |
| | *050418* | |
| | Party: HOMEOWNERS ASSOCIATION OF TOWNHOMES OF COUNTRYSIDE INC | |
| 06/11/2018 | SUMMONS - NOT SERVED    Doc # 17 | |
| | Party: UNKNOWN SPOUSE OF RICHARD DECOURSY | |
| 06/11/2018 | SUMMONS - NOT SERVED    Doc # 18 | |
| | Party: DECOURSY, RICHARD | |
| 06/11/2018 | AFFIDAVIT OF NON-SERVICE    Doc # 19 | |
| | */ AVOIDANCE* | |
| | Party: UNKNOWN SPOUSE OF RICHARD DECOURSY | |
| 06/11/2018 | AFFIDAVIT OF NON-SERVICE    Doc # 20 | |
| | */ AVOIDANCE* | |
| | Party: DECOURSY, RICHARD | |
| 05/22/2018 | ANSWER OF    Doc # 14 | |
| | Party: HOMEOWNERS ASSOCIATION OF TOWNHOMES OF COUNTRYSIDE INC | |
| 04/27/2018 | CIVIL COVER SHEET    Doc # 1 | |
| 04/27/2018 | COMPLAINT    Doc # 2 | |
| | *WITH ATTACHMENTS* | |
| 04/27/2018 | VALUE OF REAL PROP-MORTGAGE FORECLOSURE CLAIM    Doc # 3 | |
| 04/27/2018 | CIVIL COVER SHEET - E-FILED    Doc # 4 | |
| 04/27/2018 | LIS PENDENS    Doc # 5 | |
| | Vol./Book 20033, Page 8, 2 pages | |
| 04/27/2018 | FORM A-PLAINTIFF CERTIFICATE    Doc # 6 | |
| 04/27/2018 | NOTICE TO HOMEOWNER    Doc # 7 | |
| | *FORM C* | |
| 04/27/2018 | PLAINTIFF-LENDER CONTACT INFORMATION SHEET    Doc # 8 | |
| | *FORM D* | |
| 04/27/2018 | NOTICE OF FILING    Doc # 9 | |
| | *CERIFICATE OF POSSESSION OF ORIGINAL NOTE* | |
| 04/27/2018 | SUMMONS TO BE ISSUED    Doc # 10 | |
| | *ISSUED* | |
| | Party: DECOURSY, RICHARD | |
| 04/27/2018 | SUMMONS TO BE ISSUED    Doc # 11 | |

*ISSUED*
Party: UNKNOWN SPOUSE OF RICHARD DECOURSY

04/27/2018 | <u>SUMMONS TO BE ISSUED</u>    **Doc # 12**
*ISSUED*
Party: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC

04/27/2018 | <u>SUMMONS TO BE ISSUED</u>    **Doc # 13**
*ISSUED*
Party: HOMEOWNERS ASSOCIATION OF TOWNHOMES OF COUNTRYSIDE INC

---

## FINANCIAL INFORMATION

---

**PLAINTIFF** DEUTSCHE BANK TRUST COMPANY AMERICAS

Court Ordered    *Click Here!*

*Pay Now!*    Fines, Fees, Costs?

| | |
|---|---:|
| Total Financial Assessment | 1,006.00 |
| Total Payments and Credits | 1,006.00 |
| Balance Due as of 12/29/2020 | 0.00 |

| | | | |
|---|---|---|---:|
| 04/30/2018 | Transaction Assessment | | 1,006.00 |
| 04/30/2018 | E-FILE PAYMENT | Receipt # EF-2018-15228      DEUTSCHE BANK TRUST COMPANY AMERICAS | (1,006.00) |
| 04/30/2018 | Transaction Assessment | | (1.00) |

# EXHIBIT 13

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

Deutsche Bank Trust Company Americas, as Trustee     GENERAL JURISDICTION DIVISION
for Residential Accredit Loans, Inc., Mortgage Asset-
Backed Pass-Through Certificates, Series 2007-QS6,     Case No.
       Plaintiff,

vs.

Richard DeCoursy a/k/a Richard D. DeCoursy;
Unknown Spouse of Richard DeCoursy a/k/a Richard
D. DeCoursy; Mortgage Electronic Registration
Systems, Inc., as Nominee for Freedom Mortgage
Corporation; The Homeowners Association of
Townhomes of Countryside, Inc. a/k/a Homeowners
Association of Townhomes of Countryside, Inc.,
       Defendants.

_____

## VERIFIED COMPLAINT FOR FORECLOSURE OF MORTGAGE

Plaintiff, Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans,
Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6 (hereinafter referred to as
("Plaintiff"), sues Richard DeCoursy a/k/a Richard D. DeCoursy; Unknown Spouse of Richard
DeCoursy a/k/a Richard D. DeCoursy; Mortgage Electronic Registration Systems, Inc., as Nominee
for Freedom Mortgage Corporation; The Homeowners Association of Townhomes of Countryside,
Inc. a/k/a Homeowners Association of Townhomes of Countryside, Inc. (hereinafter referred to as
"Defendants"), and alleges:

### COUNT I
### MORTGAGE FORECLOSURE

1.     This is an action to foreclose a mortgage on real property in Pinellas County, Florida.

2.     The Court has jurisdiction over the subject matter.

3.     On or about November 22, 2006, Richard DeCoursy a/k/a Richard D. DeCoursy
executed and delivered a promissory note ("Note"). A copy of the Note is attached hereto as **Exhibit
"A"**.

4.     On or about November 22, 2006, Richard DeCoursy a/k/a Richard D. DeCoursy
executed and delivered a Mortgage securing payment of the Note to Freedom Mortgage Corporation.
The Mortgage was recorded on December 22, 2006, in Official Records, Book 15548 at Page 2692 of
the Public Records of Pinellas County, Florida, and encumbered the property described in the Mortgage

then owned by and in possession of the mortgagor.  A copy of the Mortgage is attached hereto as **Exhibit "B"**.

5.      The Mortgage of Plaintiff is a lien superior in dignity to any prior or subsequent right, title, claim, lien or interest arising out of mortgagor(s) or the mortgagor(s) predecessor(s) in interest.

6.      Plaintiff is the holder of the Original Note secured by the Mortgage and is entitled to foreclose pursuant to Florida Statute 673.3011(1).

7.      Ocwen Loan Servicing, LLC ("Ocwen") is the loan servicer for this particular loan. Plaintiff has delegated Ocwen the authority to service the loan on its behalf pursuant to a Limited Power of Attorney.

8.      Defendant has defaulted under the Note and Mortgage by failing to pay the payment due as of May 1, 2013, and all subsequent payments.

9.      Plaintiff declares the full amount payable under the Note and Mortgage to be due, except to the extent any part of that amount is or would be subject to a statute of limitations defense.

10.      Defendant owes Plaintiff $120,236.66 that is due and owing on principal on the Note and Mortgage plus interest from and after April 1, 2013, and title search expenses for ascertaining necessary parties to this action, pursuant to the documents attached, except for those defendants who have been discharged in bankruptcy.

11.      In order to protect its security, Plaintiff may have advanced and paid Ad Valorem Taxes, premiums on insurance required by the Mortgage and other necessary costs, or may be required to make such advances during the pendency of this action. Any such sum so paid will be due and owing to Plaintiff.

12.      The Property is now owned by Defendant, Richard DeCoursy a/k/a Richard D. DeCoursy, and the record legal title to said mortgage property is now vested in Defendant, Richard DeCoursy a/k/a Richard D. DeCoursy.

13.      All conditions precedent to the acceleration of this mortgage note and to foreclosure of the mortgage have occurred.

14.      Plaintiff is obligated to pay Plaintiff's attorneys a reasonable fee for their services. Plaintiff is entitled to recover its attorneys' fees pursuant to the express terms of the Note and Mortgage.

15.      Plaintiff alleges that the claims of the remaining defendants are secondary, junior, inferior and subject to the prior claim of Plaintiff.

16.      Defendant, Unknown Spouse of Richard DeCoursy a/k/a Richard D. DeCoursy, if any, may claim some right, title or interest in the property here sought to be foreclosed by virtue of

homestead rights, possession or some other unknown interest the exact nature of which is unknown to Plaintiff and not a matter of public record. However, said interest, if any, is subordinate, junior and inferior to the lien of Plaintiff's mortgage.

17.    Any interest in the property inuring to the Defendant, Mortgage Electronic Registration Systems, Inc., as nominee for Freedom Mortgage Corporation, is subordinate and inferior to the lien of Plaintiff's mortgage, including, but not limited to, a Mortgage recorded on December 22, 2006 in Official Records Book 15549 at Page 1 of the Public Records of Pinellas County, Florida. Said interest is subject, subordinate, and inferior to the lien of Plaintiff's Mortgage.

18.    Any interest in the property inuring to the Defendant, The Homeowners Association of Townhomes of Countryside, Inc. a/k/a Homeowners Association of Townhomes of Countryside, Inc., is subordinate and inferior to the lien of Plaintiff's mortgage, including, but not limited to, a possible lien pursuant to the Declaration of Covenants and Restrictions or Declaration of Condominium and any amendments thereto recorded in the Public Records of Pinellas County, Florida. Said interest is subject, subordinate, and inferior to the lien of Plaintiff's Mortgage.

19.    Any and all unknown parties claiming by, through, under and against the herein named individual defendant(s) who are not known to be dead or alive, whether said unknown parties may claim an interest as spouses, heirs, devisees, grantees, or other claimants are joined as defendants herein. The claims of said defendants are subordinate, junior, and inferior to the interest of Plaintiff.

**WHEREFORE**, Plaintiff demands judgment foreclosing the Mortgage for costs (and, when applicable, for attorneys' fees), and, if the proceeds of the sale are insufficient to pay Plaintiff's claim, a deficiency judgment. Plaintiff requests, subject to any applicable statute of limitations, that the Court ascertain the amount due to Plaintiff, for principal and interest on the Mortgage and Note and for late charges, abstracting, taxes, expenses and costs, including attorneys' fees, plus interest thereon; that if the sums due Plaintiff under the Mortgage and Note are not paid immediately, the Court foreclose the Mortgage and Clerk of the Court sell the property securing the indebtedness to satisfy Plaintiff's mortgage lien in accordance with the provisions of Florida Statutes §45.031 (2011); that the rights, title and interest of any Defendant, or any party claiming by, through, under or against any Defendant named herein or hereinafter made a Defendant be forever barred and foreclosed; that the Court appoint a receiver of the Property and of the rents, issues, income and profits thereof, or in alternative, order sequestration of rents, issues, income and profits pursuant to Florida Statutes §697.07 (2006); and that the Court retain jurisdiction of this action to make any and all further orders and judgments as may be necessary and proper, including the issuance of a writ of possession and the entry

of a deficiency judgment decree, when and if such deficiency decree shall appear proper, if borrower(s) has not been discharged in bankruptcy and such other relief as the Court may deem just and proper.

### FLA. R. CIV. P. 1.115(e) VERIFICATION

Under penalty of perjury, I declare that I have read the foregoing, and the facts alleged therein are true and correct to the best of my knowledge and belief.

Executed on this 25 day of _____April_____, 2018.

By: _____

Print Name: ___Donealla Wilson___

Title: ___Contract Management Coordinator___

Company:

Ocwen Loan Servicing, LLC as Attorney-in-Fact for Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6

RE:   Borrower:   Richard DeCoursy a/k/a Richard D. DeCoursy
      Address:    2861 Thaxton Drive 46, Palm Harbor, FL 34684
      File #:     14-F03459

### DESIGNATION OF PRIMARY E-MAIL ADDRESS

In accordance with Fla. R. Jud. Admin. 2.516(b)(1)(A), the undersigned attorney for the Plaintiff hereby designates FLCourtDocs@brockandscott.com as their primary e-mail address.

BROCK & SCOTT, PLLC
Attorney for Plaintiff
1501 N.W. 49th Street, Suite 200
Ft. Lauderdale, FL 33309
Phone: (954) 618-6955, ext. 6121
Fax: (954) 618-6954
FLCourtDocs@brockandscott.com

By /s/ Robert A. Mclain For Bar No.: 0145121 for
_____
Jarret Berfond, Esq.
Florida Bar No. 28816

**Exhibit A**

NOTE

MIN

MERS Telephone: (888) 679-6377

November 22, 2006         Largo         FL
[Date]         [City]         [State]

2861 Thaxton Dr, 46
Palm Harbor, FL 34684
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 130,200.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Freedom Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.125 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on January 1, 2007 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on December 1, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 8068, Virginia Beach, VA 23450-8068 or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 877.18

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

FLORIDA FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

VMP -5N(FL) (0005)
VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3

Form 3218 1/01

Initials: 

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    **15**    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.


Form 3210 1/01

Initials:

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 11. DOCUMENTARY TAX

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
Richard D DeCoursy                -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

Pay to the order of _____ without
recourse this ___ day of __ 20__
Freedom Mortgage Corporation
_____
Stan Moskowitz/cpa
Treasurer/Chief Financial Officer

RESIDENTIAL FUNDING COMPANY, LLC

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Company, LLC

BY _____    [Sign Original Only]
Judy Faber, Vice President

Loan# 

## ALLONGE TO NOTE

This endorsement is a permanent part of the Note, in the amount of $130,200.00

NOTE DATE:                  11/22/2006

BORROWER NAME:              Richard D Decoursy

PROPERTY:                   2861 Thaxton Drive #46
                            Palm Harbor, FL 34684

PAY TO THE ORDER OF:

**DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE FOR RESIDENTIAL ACCREDIT LOANS, INC., MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-QS6**
WITHOUT RECOURSE

**DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE
BY ITS ATTORNEY IN FACT
OCWEN LOAN SERVICING, LLC**

Demiah Bascombe
_____
Authorized Signer

# PREPAYMENT NOTE ADDENDUM
## (Multi-State)

This Prepayment Note Addendum is made this 22nd day of November, 2006 and is incorporated into and shall be deemed to amend and supplement the Note of the same date (the "Note") made by the undersigned (the "Borrower") to evidence indebtedness to Freedom Mortgage Corporation (the "Lender"), which debt is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") of the same date and covering the property described in the Security Instrument and located at 2861 Thaxton Dr, 46, Palm Harbor, FL 34684 (the "Property").

Additional Covenants.  Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender covenant, and agree that, the provisions of the section of the Note entitled "BORROWER'S RIGHT TO PREPAY" are amended to read as follows:

Subject to the Prepayment penalty provided below, I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  A "Full Prepayment" is the prepayment of the entire unpaid Principal due under the Note.  A payment of only part of the unpaid Principal is known as a "Partial Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

If, within the 36 -month period beginning with the date I execute the Note (the "Penalty Period"), I make a Full Prepayment, or Partial Prepayment in any twelve (12)-month period that exceeds 20% of the original Principal loan amount, I will pay a Prepayment charge as consideration for the Note Holder's acceptance of such Prepayment.  The Prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original Principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of the Prepayment, unless otherwise prohibited by applicable law or regulation.  No Prepayment charge will be assessed for any prepayment occurring after the Penalty Period.

Notwithstanding the foregoing, in the event of a Full Prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first 0 months of the term of the Note, no Prepayment penalty will be assessed.  In that event, I agree to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

The Note Holder will apply all Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note.  If I make a Partial Prepayment, there will be no change in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If my Note is an Adjustable Rate Note, Partial Prepayments may reduce the amount of my monthly payment after the first interest rate Change Date following the Partial Prepayment.  However, any reduction due to my Partial Prepayment may be offset by an interest rate increase.

The Note Holder's failure to collect a Prepayment charge at the time a Prepayment is received shall not be deemed a waiver of such charge. Any Prepayment charge not collected at the time the Prepayment is received shall be payable on demand.

All other provisions of the Note are unchanged and remain in full force and effect.

## NOTICE TO BORROWER

Do not sign this Addendum before you read it. This Addendum provides for the payment of a Prepayment charge if you wish to repay the loan prior to the date provided for repayment in the Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED:

_____ (Seal)
Richard D DeCoursy            -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

**Exhibit B**




Return To:
Freedom Mortgage Corporation
Attn: Final Documents
P.O. Box 8001
Fishers, IN 46038-8001

KEN BURKE, CLERK OF COURT
PINELLAS COUNTY FLORIDA
INST# 2006466083 12/22/2006 at 04:12 PM
OFF REC BK: 15548 PG: 2692-2715
DocType:MTG RECORDING: $205.50

M DOC STAMP: $455.70 INT TAX: $260.40

RFC

This document was prepared by:
Freedom Mortgage Corporation



———————————— [Space Above This Line For Recording Data] ————————————

**RETURN TO:**
**PROFESSIONAL TITLE & ESCROW**
**2480 EAST BAY DRIVE, SUITE 14**
**LARGO, FL 33771**
**(727) 536-5950**

# MORTGAGE

MIN 

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated November 22, 2006
together with all Riders to this document.

**(B) "Borrower"** is Richard D DeCoursy a married person.

Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is Freedom Mortgage Corporation

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS                Form 3010  1/01

-6A(FL) (0005).01

Page 1 of 16           Initials

VMP MORTGAGE FORMS - (800)521-7291



Lender is a Corporation
organized and existing under the laws of The State of New Jersey
Lender's address is 10500 Kincaid Drive, Suite 300, Fishers, IN  46037

(E) "Note" means the promissory note signed by Borrower and dated November 22, 2006
The Note states that Borrower owes Lender One Hundred Thirty Thousand Two Hundred
and 00/100                                                                Dollars
(U.S. $130,200.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than December 1, 2036
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
|---|---|---|
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☒ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |
| | | Prepayment Penalty Rider |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials 

-6A(FL) (0005).01                    Page 2 of 16                    Form 3010  1/01

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the County          [Type of Recording Jurisdiction]
of Pinellas                                                                              [Name of Recording Jurisdiction]:

Lot 46, of Townhomes of Countryside, according to the map or plat thereof, as recorded in Plat Book 97, Pages 39 and 40 of the Public Records of Pinellas County, Florida.

Parcel ID Number: 172816915400000460                      which currently has the address of
2861 Thaxton Dr, 46                                                                          [Street]
Palm Harbor                                          [City], Florida  34684            [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

-6A(FL) (0005).01                      Page 3 of 16                      Form 3010  1/01

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

Initials:

-6A(FL) (0005).01                     Page 4 of 16                                  Form 3010   1/01

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

Initials: _____

-6A(FL) (0005).01                        Page 6 of 16                        Form 3010   1/01

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.



Initials

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender; but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

Initials

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.



Initials

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**



(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Initials: _____

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

Initials:



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____                _____ (Seal)
                                                                                    -Borrower
                                          Richard D DeCoursy

                                          _____ (Address)

_____                _____ (Seal)
                                                                                    -Borrower

                                          _____ (Address)

_____ (Seal)         _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Address)      _____ (Address)

_____ (Seal)         _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Address)      _____ (Address)

_____ (Seal)         _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Address)      _____ (Address)

-6A(FL) (0005).01                         Page 15 of 16                    Form 3010   1/01

**STATE OF FLORIDA,**      County ss: Pinellas

The foregoing instrument was acknowledged before me this 22 NOV 2006 by

RICHARD DECAURSY

who is personally known to me or who has produced _____ as identification.

_____
Notary Public

NOTARY PUBLIC-STATE OF FLORIDA
Reta M. Brown
Commission # DD476403
Expires: SEP 27, 2009
Bonded Thru Atlantic Bonding Co., Inc.

-8A(FL) (0005).01      Page 18 of 18      Form 3010  1/01

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 22nd day of November, 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to Freedom Mortgage Corporation

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

2861 Thaxton Dr, 46
Palm Harbor, FL 34684

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Initials:
Page 1 of 4    Form 3170 1/01
VMP-57R (0008)    VMP MORTGAGE FORMS - (800)521-7291

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

-57R (0008)                           Page 3 of 4                    Initials _____        Form 3170  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this
1-4 Family Rider.

_____ (Seal)        _____ (Seal)
Richard D DeCoursy                -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                  -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                  -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                  -Borrower                                        -Borrower

VMP®-57R (0008)                   Page 4 of 4                      Form 3170 1/01

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 22nd                 day of November, 2006                 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to Freedom Mortgage Corporation

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

2861 Thaxton Dr, 46
Palm Harbor, FL 34684
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in covenants, conditions and restrictions

(the "Declaration"). The Property is a part of a planned unit development known as

Townhomes of Countryside
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3150 1/01
Page 1 of 3
Initials: _____

VMP-7R (0008)     VMP MORTGAGE FORMS - (800)521-7291

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)          _____ (Seal)
Richard D DeCoursy              -Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                              -Borrower

VMP-7R (0008)                    Page 3 of 3                    Form 3150 1/01

# PREPAYMENT RIDER
## (Multi-State)

This Prepayment Rider is made this 22nd day of November, 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to

Freedom Mortgage Corporation (the "Lender") of the same date and covering the property described in the Security Instrument and located at

2861 Thaxton Dr, 46, Palm Harbor, FL 34684 (the "Property").

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." A "full prepayment" is the prepayment of the entire unpaid principal due under the Note. A payment of only part of the unpaid principal is known as a "partial prepayment."

If, within the 36 -month period beginning with the date Borrower executes the Note (the "Penalty Period"), Borrower makes a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds 20% of the original principal loan amount, Borrower will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of the prepayment, unless otherwise prohibited by applicable law or regulation. No prepayment charge will be assessed for any prepayment occurring after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first 0 months of the term of the Note, no prepayment penalty will be assessed. In that event, Borrower agrees to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____ (Seal)          _____ (Seal)
Richard D DeCoursy                -Borrower                                           -Borrower

_____ (Seal)          _____ (Seal)
                                  -Borrower                                           -Borrower

_____ (Seal)          _____ (Seal)
                                  -Borrower                                           -Borrower

PREPAYMENT RIDER - 6038B2 Multi-State
11/15/99

DocMagic 800-649-1362
www.docmagic.com

# EXHIBIT 14

Case Number:18-002703-CI

Filing # 71374771 E-Filed 04/27/2018 05:06:12 PM

This space is for recording purposes only

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

Deutsche Bank Trust Company Americas, as Trustee   GENERAL JURISDICTION DIVISION
for Residential Accredit Loans, Inc., Mortgage
Asset-Backed Pass-Through Certificates, Series   Case No.
2007-QS6,
        Plaintiff,

vs.

Richard DeCoursy a/k/a Richard D. DeCoursy;
Unknown Spouse of Richard DeCoursy a/k/a
Richard D. DeCoursy; Mortgage Electronic
Registration Systems, Inc., as Nominee for Freedom
Mortgage Corporation; The Homeowners
Association of Townhomes of Countryside, Inc.
a/k/a Homeowners Association of Townhomes of
Countryside, Inc.,
        Defendants.
_____/

## NOTICE OF LIS PENDENS

TO THE ABOVE NAMED DEFENDANTS, AND ALL OTHERS WHOM IT MAY
CONCERN:

YOU ARE NOTIFIED OF THE FOLLOWING:

The Plaintiff has instituted this action against you seeking to foreclose a Mortgage,
recorded in Official Records Book 15548 at Page 2692 of the Public Records of Pinellas County,
Florida, encumbering the following described property in Pinellas County, Florida:

File # 14-F03459

LOT 46, OF TOWNHOMES OF COUNTRYSIDE, ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN PLAT BOOK 97, PAGES 39 AND 40 OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA

DATED on ___4/27/2018___, 2017

BROCK & SCOTT, PLLC
Attorney for Plaintiff
1501 N.W. 49th Street, Suite 200
Ft. Lauderdale, FL 33309
Phone: (954) 618-6955, ext. 6121
Fax: (954) 618-6954
FLCourtDocs@brockandscott.com

By /s/ Robert A. McLain Fl Bar No.: 095121 for
Jarret Berfond, Esq.
Florida Bar No. 28816

File # 14-F03459

# EXHIBIT 15

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA
CIVIL ACTION

DEUTSCHE BANK TRUST COMPANY AMERICAS
AS TRUSTEE FOR RESIDENTIAL
ACCREDIT LOANS, INC., MORTGAGE
ASSET BACKED PASS THROUGH
CERTIFICATES SERIES 2007-QS6,
    Plaintiff,

                     CASE NO.: 18-002703-CI
vs.                    DIVISION:

RICHARD DECOURSY; UNKNOWN SPOUSE
OF RICHARD DECOURSY ,
    Defendant(s).
_____/

### DEFENDANT(S) ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT

COMES NOW Defendant(s), RICHARD DECOURSY; UNKNOWN SPOUSE OF RICHARD DECOURSY ("Defendant"), by and through the undersigned counsel, and hereby files this Answer and Affirmative Defenses to the Complaint served by Plaintiff, and states as follows:

### ANSWER

1-2.    Admit.

3.    Admit except as to whether or not copies of the original Mortgage Note is attached to the Plaintiff's Complaint as an exhibit, without knowledge so therefore denied.

4.    Admit except as to whether or not copies of the original Mortgage is attached to the Plaintiff's Complaint as an exhibit, without knowledge so therefore denied.

5-11.    Defendant is without knowledge and therefore denies the same and demands strict proof thereof.

12.    Admit.

13.    Denied for the reasons stated in Defendant's Second Affirmative Defense.

14-19.    Defendant is without knowledge and therefore denies the same and demands strict proof thereof.

### FIRST AFFIRMATIVE DEFENSE

20.    Pursuant to Florida Statute Section 95.11(2)(c), at least a portion of Plaintiff's Complaint is time-barred by the Statute of Limitations.

### SECOND AFFIRMATIVE DEFENSE

21.    Plaintiff did not properly accelerated the mortgage it seeks to foreclose under Florida and/or Federal law.

22.    Plaintiff failed to properly accelerate the mortgage and note by failing to

L18-1183

give the proper notice prior to bringing this action as required by the Note and Mortgage, 121 and/or 24 C.F.R. §203.500-203.558 and §203.600-203.681.

23.     As a result, Plaintiff failed to comply with all conditions precedent to bring this action, and is estopped or waived its right to foreclose based on its failure to properly accelerate according to the terms of the mortgage and is otherwise before this Court with unclean hands.

### THIRD AFFIRMATIVE DEFENSE

24.     Pursuant to Florida Rules of Civil Procedure Rule 1.140 (b)(7) and (h)(2),  Plaintiff and/or its named Trustee failed to join indispensable parties; to wit, the person who actually owns and holds the underlying promissory note and mortgage sued upon, and/or did so at the time of the filing of this suit and said unnamed party is the proper party to bring the action. In the instant case, the Complaint and attached exhibits identify an inconsistency between the Plaintiff's allegations of material fact as to who the real party in interest is. When exhibits are attached to a Complaint, the contents of the exhibits control over the allegations of the Complaint. Because the exhibit(s) to Plaintiff's Complaint conflicts with its allegations concerning standing and the exhibit(s) does not show that Plaintiff has standing to foreclose the mortgage, Plaintiff has not establish its entitlement to foreclose the mortgage as a matter of law.

### FOURTH AFFIRMATIVE DEFENSE

25.     Pursuant to Florida Rules of Civil Procedure Rule 1.140 (b)(1) and (h) (2), Plaintiff and/or its named Trustee lacked standing and subject matter jurisdiction to bring this action, as Plaintiff, nor its named Trustee, did not actually owns and holds the underlying promissory note and mortgage sued upon, and/or did so at the time of the filing of this suit and said unnamed party is the proper party to bring the action. In the instant case, the Complaint and attached exhibits identify an inconsistency between the Plaintiff's allegations of material fact as to who the real party in interest is. When exhibits are attached to a Complaint, the contents of the exhibits control over the allegations of the Complaint.  Because the exhibit(s) to Plaintiff's Complaint conflicts with its allegations concerning standing and the exhibit(s) does not show that Plaintiff has standing to foreclose the mortgage, Plaintiff has not establish its entitlement to foreclose the mortgage as a matter of law.

### FIFTH AFFIRMATIVE DEFENSE

26.     Pursuant to Florida Rules of Civil Procedure Rule 1.140 (b)(6) and (h) (2), Plaintiff's and/or its named Trustee's Complaint fails to state a cause of action in relief can be granted as Plaintiff, nor its named Trustee, did not actually own and hold the underlying promissory note and mortgage sued upon at the time of the filing of this suit and said unnamed party is the proper party to bring the action. In the instant case, the Complaint and attached exhibits identify an inconsistency between the Plaintiff's allegations of material fact as to who the real party in interest is.  When exhibits are attached to a Complaint, the contents of the exhibits control over the allegations of the Complaint.  Because the exhibit(s) to Plaintiff's Complaint conflicts with its allegations concerning standing and the exhibit(s)

L18-1183

does not show that Plaintiff has standing to foreclose the mortgage, Plaintiff has not establish its entitlement to foreclose the mortgage as a matter of law.

### ENTITLEMENT AND REQUEST FOR ATTORNEYS FEES AND COSTS

27.     Defendant is (a) is entitled to collect its attorney's fees and costs pursuant to the Note and Mortgage; (b) has retained the law firm of Stamatakis + Thalji + Bonanno in this action; and (c) is obligated to pay the law firm of Stamatakis + Thalji + Bonanno a reasonable fee for its services in bringing or defending in this case, as well as all costs of collections.

WHEREFORE, Defendant prays that this Honorable Court take jurisdiction of this case; award Defendant statutory and/or actual damages in an amount to be established at trial, including prejudgment interest on all amounts, court costs and reasonable attorney fees; rescind the transaction and order Plaintiff to take all action necessary to terminate any of its security interest in Defendant's property created under the loan transaction and declare all such security interests void, including but not limited to the mortgage related to the transaction; order the return to Defendant any money or property given by Plaintiff to anyone in connection with the transaction; enjoin Defendant during this action and permanently thereafter from instituting prosecuting or maintaining foreclosure proceedings upon Defendant's property, or from recording any deeds or mortgages on the property or from otherwise taking steps to defraud Defendant's ownership of its property; order that the right to retain proceeds vests in Defendant; grant a trial by jury on all issues so triable; and grant such other relief as this Court deems just and proper under the circumstances.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25TH day of October, 2018, a true and correct copy of the foregoing has been furnished to BROCK AND SCOTT, PLLC at flcourtdocs@brockandscott.com.

STAMATAKIS + THALJI + BONANNO

By: / s / Scott D. Stamatakis
Scott D. Stamatakis, Esquire
Florida Bar No.:178454
Sami Thalji, Esquire
Florida Bar No.:165913
Nick Fowler, Esquire
Florida Bar No.:81856
P.O. Box 341499
Tampa, Florida 33694
(813) 282-9330 (telephone)
(813) 282-8648 (facsimile)
Notice of Primary Email: Service@MyInjury.com

L18-1183

# EXHIBIT 16

This space is for recording purposes only.

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6

GENERAL JURISDICTION DIVISION

522018CA002703XXCICI

        Plaintiff,

vs.

Richard DeCoursy a/k/a Richard D. DeCoursy; Unknown Spouse of Richard DeCoursy a/k/a Richard D. DeCoursy; Mortgage Electronic Registration Systems, Inc., as Nominee for Freedom Mortgage Corporation; The Homeowners Association of Townhomes of Countryside, Inc. a/k/a Homeowners Association of Townhomes of Countryside, Inc.

        Defendants.

_____/

## NOTICE OF VOLUNTARY DISMISSAL AND RELEASE OF LIS PENDENS

    Plaintiff, Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6, by and through its undersigned counsel, voluntarily dismisses its Complaint for Foreclosure and Other

14-F03459- FC02     Page **1** of **2**     522018CA002703XXCICI




Relief, without prejudice, and requests that the Notice of Lis Pendens be canceled as to the following property:

> LOT 46, OF TOWNHOMES OF COUNTRYSIDE, ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN PLAT BOOK 97, PAGES 39 AND 40 OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA

I HEREBY CERTIFY that a true and correct copy hereof was served electronically or via U.S. Mail on _____May    14_____, 2019 to all persons shown on the attached service list.

BROCK & SCOTT, PLLC

Attorney for Plaintiff
2001 NW 64th St, Suite 130
Ft. Lauderdale, FL 33309
Phone: (954) 618-6955, ext. 6121
Fax: (954) 618-6954
FLCourtDocs@brockandscott.com

By_____
    Jarret Berfond, Esq.
    Florida Bar No. 28816

## SERVICE LIST

The following persons were served by e-mail:

Richard DeCoursy a/k/a Richard D. DeCoursy
c/o Scott D. Stamatakis, Esq.
P.O. Box 341499
Tampa, FL 33694
service@myinjury.com

The Homeowners Association of Townhomes of Countryside, Inc. a/k/a Homeowners
Association of Townhomes of Countryside, Inc.
c/o Daniel J. Greenberg, Esq.
1964 Bayshore Blvd., Ste. A
Dunedin, FL 34698
lender@attorneyjoe.com

Unknown Spouse of Richard DeCoursy a/k/a Richard D. DeCoursy
c/o Scott D. Stamatakis, Esq.
P.O. Box 341499
Tampa, FL 33694
service@myinjury.com

Bankruptcy Trustee Attorney
c/o Eric Jacobs, Esq.
NO LAST KNOWN ADDRESS
A copy of the served document may be obtained, on request, from the clerk of court or from the
party serving the document.
ejacobs@gjb-law.com

Bankruptcy Trustee Attorney
c/o Lisa Castellano, Esq.
NO LAST KNOWN ADDRESS
A copy of the served document may be obtained, on request, from the clerk of court or from the
party serving the document.
lcastellano@gjb-law.com; btraina@gjb-law.com

The following persons were served by U.S. mail:

Mortgage Electronic Registration Systems, Inc., as Nominee for Freedom Mortgage Corporation
c/o CT Corporation System, Registered Agent
1200 South Pine Island Road
Plantation, FL 33324

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

      Plaintiff,

                                                    Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

      Defendant.

_____/

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION

Plaintiff, RICHARD DECOURSY, by and through his undersigned counsel and pursuant to Fla.R.Civ.P. 1.350, hereby requests that Defendant produce the following documents:

1.      All documents identified in your answers to Plaintiff's First Set of Interrogatories.

2.      All powers of attorney that purport to authorize any servicer or subservicer to take actions on behalf of Defendant (or in the name of Defendant) in this case.

3.      All powers of attorney that purported to authorize any servicer or subservicer to take any actions on behalf of Defendant (or in the name of Defendant) in Pinellas Case No. 18-2703-CI.

4.      The retainer agreement between Defendant and its counsel in this action.

5.      Documents reflecting payment towards counsel's retainer in this action.

6.      All documents reviewed in the process of drafting the Motion to Vacate in this action.

7.      All documents reviewed in the process of drafting the Affidavit in support of the Motion to Vacate in this action.

8.      All documents referenced in the Affidavit in support of the Motion to Vacate in this action.

9.      All correspondence, including letters and emails, exchanged between Deutsche Bank National Trust Company and CT Corporation within the past two years.

10.     All correspondence, including letters and emails, between any servicer for Defendant and CT Corporation within the past two years.

11.     All documents that you intend to introduce into evidence at the hearing on the Motion to Vacate.

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via EPortal to Beth Norrow, Esquire on this 31st day of December, 2020.

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

     Plaintiff,

                                      Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

### NOTICE OF SERVICE OF
### PLAINTIFF'S FIRST SET OF INTERROGATORIES

Please take notice of the service of the First Set of Interrogatories served by Plaintiff,

RICHARD DECOURSY, upon Defendant, Deutsche Bank National Trust Company, as Trustee,

to be answered in writing and under oath pursuant to Fla.R.Civ.P. 1.340.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished
via the EPortal to Beth Norrow, Esquire on this 31st day of December, 2020.

                                */s/ Lee Segal, Esquire*
                                Lee Segal, Esquire (FBN 37837)
                                **Segal & Schuh Law Group, P.L.**
                                18167 U.S. Highway 19 North, Suite 100
                                Clearwater, Florida 33764
                                Tel: (727) 824-5775 Fax: (877) 636-7408
                                lee@Segalschuh.com (Attorney)
                                marie@segalschuh.com (Florida Registered Paralegal)

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

     Plaintiff,

                                           Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

## PLAINTIFF'S FIRST SET OF INTERROGATORIES

    Interrogatory no. 1:    Please identify all persons who contributed to the answers to these interrogatories. For each such person, please provide his/her name, employer, job title, and his/her relationship with Defendant.

    Answer:


    Interrogatory no. 2:  Please identify the name of the person that retained Beth Norrow, Esq. as counsel in this proceeding. In your answer, please include that person's job title and the name of the company with whom that person is employed. (Instruction: Plaintiff is not asking for the substance of any communications between this person and counsel, merely the person's name, job title, and the name of the company with whom he/she is employed.)

    Answer:


    Interrogatory no. 3:    Please identify the date and time in which Beth Norrow, Esquire was retained as counsel in this proceeding. (Instruction: Plaintiff is not asking for the substance of any communications between this person and counsel, merely the date and time in which counsel was retained.)

    Answer:


    Interrogatory no. 4:    Please describe in detail the manner in which Defendant first became aware of the existence of this lawsuit.

    Answer:

Interrogatory no. 5:    Please identify all witnesses with knowledge of the facts set forth in the Motion to Vacate filed in this action.  For each such witness, please identify his/her name, address, job title, job description, and the facts about which he/she has knowledge.

Answer:

Interrogatory no. 6:    Please identify all documents that support or pertain to the allegations in the Motion to Vacate filed in this action.

Answer:

Interrogatory no. 7:    Please identify all documents that you intend to introduce into evidence at the hearing on the Motion to Vacate in this action.

Answer:

Interrogatory no. 8:    Do you allege that a servicer/subservicer has been authorized to act as an agent for Defendant at any point in the instant case?  If so, please describe the source of that authority, including the identity (name, job title, job position) of all persons who provided it and the identity of all servicers/subservicers which received it.  If that authority was conveyed by a document, *e.g.* a power of attorney, please attach those documents to your answer to this interrogatory or identify them with sufficient specificity that they can be identified in a request for production.

Answer:

Interrogatory no. 9:    Do you allege that a servicer/subservicer was authorized to act as an agent for Defendant at any point in Pinellas County Case No. 18-2703-CI?  If so, please describe the source of that authority, including the identity (name, job title, job position) of all persons who provided it and the identity of all servicers/subservicers which received it.  If that authority was conveyed by a document, *e.g.* a power of attorney, please attach those documents to your answer to this interrogatory or identify them with sufficient specificity that they can be identified in a request for production.

Answer:

3

_____

Deutsche Bank National Trust Company,
As Trustee
By: _____ (Print Name)
Its: _____ (Print Title)


       Before me, the undersigned authority, personally appeared _____,
as _____ of _____, who is
personally known to me and who produced _____ as
identification, and who, having been duly sworn, deposes and says the foregoing facts are true and
correct.

_____
Notary

4

IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA

**RICHARD DECOURSY,**

     **Plaintiff,**

CASE NO.: 20-CA-001724

**vs.**

**DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee,**

     **Defendant.**

_____/

### MOTION TO VACATE DEFAULT AND
### OPPOSITION TO FINAL JUDGMENT AFTER DEFAULT

Defendant, **DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee**

("DBNTC"), by and through undersigned counsel, moves this court to vacate entry of default and

responds to the Motion for Final Summary Judgment After Default filed by Plaintiff, **RICHARD**

**DECOURSY** ("DECOURSY"), as follows:

### INTRODUCTION

This case involves egregious conduct by Plaintiff and counsel that attempts to deprive

DBNTC of its fundamental, constitutional due process rights that requires this court to—at a

minimum—vacate default and quash service of process.

Contrary to the misrepresentations made to this Court by DECOURSY and his counsel,

Lee Segal, Esq., DBNTC was <u>never</u> served with process in this action.  Counsel for DECOURSY

made misrepresentation to this Court regarding purported service after having been sent written

notice by CT Corporation System ("CT Corp") that:  (1) the attempted service on DBNTC by the

process server's delivery of the Summons and Complaint to CT Corp's office located at 28 Liberty

Street, NY, NY ("CT Corp's Address"), was rejected; (2) CT Corp was not DBNTC's registered

agent for service of process; and (3) as a result, the Summons and Complaint could not be

forwarded by CT Corp to DBNTC.  *See* CT Corp Rejection Letter, attached hereto as **Exhibit "A"**.[1]

Worse, DECOURSY's counsel (Lee Segal, Esq.) knew—prior to the filing of this Complaint—that CT Corp was not DBNTC's registered agent for service of process and that the Summons and Complaint could not be forwarded to DBNTC by CT Corp.  Indeed, Mr. Segal's attempt to serve DBNTC at CT Corp was made *after* Mr. Segal was sent numerous written notices from CT Corp rejecting service of process for lack of registered agent relationship with DBNTC. *See* Affidavit of CT Corp and Additional Rejections letters attached hereto as **Composite Exhibit "B"**.  Despite this knowledge, Mr. Segal continued to use CT Corp's Address as the place for 'serving' DBNTC with the Summons, Complaint and notice of ensuing court proceedings.

Despite diligent business record searches attested to by both CT Corp and DBNTC, no records have been located showing that either was served with notice of any of the ensuing court filings done by DECOURSY in seeking and obtaining DBNTC's Clerk's Default and seeking Default Judgment that DECOURSY claims in his certificates of service to have delivered via regular U.S. mail.

## The Claim

1.      This matter is purportedly a civil remedy claim arising out of alleged violation of §817.535, Fla. Stat., which *prohibits recording false instruments in public record with intent to*

---

[1] DECOURSY's counsel, Lee Segal, Esq. and his cohorts Carla Turner-Hahn, Esq, and Megan Lazenby, Esq. are on a campaign against foreclosing lenders (such as DBNTC) to secretly obtain default judgments and improper monetary damages against successful foreclosure plaintiffs. As to DBNTC, Mr. Segal and his cohorts serve and unrelated 3rd party with the Summons and Complaint naming DBNTC. The 3rd party rejects service but Segal and his cohorts fail to disclose the reject to the Courts. Instead, they each falsely represent to the court that personal service was accomplished so that they can obtain judgment by default and treble damages against an unsuspecting party. If, by chance, the foreclosing lender discovers the case—or a save Judge reads the Complaint and discovers its pleading defects—Segal and his co-horts dismiss that action and refile in a different jurisdiction and repeat the improper service routine.  And, to ensure the foreclosing lenders do not discover their new filing, they transpose plaintiffs' names and rotate the filing attorneys name so that the filing cannot be discovered by searching the plaintiff's name or filing attorney's name. *See* Req. for Jud. Notice, Ex. 1-11.

*defraud* and §772.013 [which does not exist].   (Compl. ¶37).

2.    DECOURSY alleges that that a third-party engaged in the "collection of an unlawful debt" whereby "Defendant acquired and maintained an interest in the Property." (Compl. ¶38).

3.    However, DECOURSY fails to identify any ownership interest by DBNTC in the property at any time.

### Foreclosure Action Against Decoursy

4.    According to the Complaint, in 2018, a foreclosure action was initiated against DECOURSY for non-payment of the Note and Mortgage executed on November 22, 2006. (Compl. ¶¶3, 13-14; *see also* Foreclosure Complaint, Note and Mortgage attached to Req. for Jud. Notice, Ex. 13).[2] ("Foreclosure Action").

5.    DBNTC was not a party to the Foreclosure Action.   (Req. for Jud. Notice, Ex.13).

6.    On April 10, 2019, DECOURSY settled the Foreclosure Action and resolved his non-payment issued by loan modification.  *See* Loan Modification Agreement, attached hereto as **Exhibit "C"**).[3]

---

[2] The Complaint erroneously asserts in ¶3 that "Lillian Decoursy entered a promissory note"; however, the loan documents from the foreclosure action cited in the Complaint (Case #18-2703-CI) demonstrate Richard Decoursy was the sole borrower.  (*See* Note and Mortgage attached to Foreclosure Complaint, Req. for Jud. Notice, Ex 13).

[3] The Court can consider the Loan Modification Agreement because DECOURSY refers to the Loan Modification Agreement in Complaint ¶35, 38 & 43 as the basis for his claim, but does not attach it.  *See Posigian v. American Reliance Ins. Co. of New Jersey,* 549 So. 2d 751 (Fla. 3d DCA 1989) (trial court properly considered documents referred to in the complaint but provided by defendant on motion to dismiss); *Striton Properties, Inc. v. City of Jacksonville Beach,* 533 So. 2d 1174, 1179 (Fla. 1st DCA 1988); *see also Charles v. Deutsche Bank Nat'l Tr. Co.,* 2016 WL 950968, at *3 (S.D. Fla. Mar. 14, 2016); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F. 3d 1364, 1369 (11th Cir. 1997) (determining that "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to a motion to dismiss will not require conversion of the motion to a motion for summary judgment").

7.      Despite DECOURSY's admission that he (or his wife) stopped making payments on the loan in May 2013 (Compl. ¶13) and that the Foreclosure Action was amicably resolved between DECOURSY and his lender via Loan Modification (Compl. ¶25 )—thus resulting in dismissal of the Foreclosure Action—it is unclear from the pleadings what that has to do with DBNTC or how it gives rise to any cause of action whatsoever.

8.      For the reasons set forth below, DBNTC respectfully request the Court vacate default, deny Plaintiff's Motion for Summary Judgment After Default and dismiss this action forthwith.

## MEMORANDUM OF LAW

### I.      General Legal Standard Governing Vacating or Setting Aside Defaults

Florida has a long-standing policy that strongly favors adjudication of lawsuits on the merits.  Defaults are not favored by the courts, and all reasonable doubts should be resolved in favor of granting relief there from.  *See North Shore Hosp. Inc. v. Barber*, 143 So. 2d 849 (Fla. 1962); *Johnson v. Johnson*, 845 So. 2d 217, 220 (Fla. 2d DCA 2003); *County Sanitation, Inc. v. Jean*, 559 So. 2d 1269, 1270 (Fla. 4th DCA 1990); *B/G Amusements, Inc. v. Mystery Funhouse, Inc.*, 381 So. 2d 318, 319 (Fla. 5th DCA 1980); *McAlice v. Kirsch*, 368 So. 2d 401, 404 (Fla. 3d DCA 1979).  To that end, Florida's long-standing policy provides for great liberality in setting aside defaults.  *County Nat'l Bank of N. Miami Beach v. Sheridan, Inc.*, 403 So. 2d 502, 504 (Fla. 4th DCA 1981) (specifically reaffirming the policy of Florida's courts to set aside defaults under the standards applied in *North Shore Hosp. Inc. v. Barber*); *Kindle Trucking Co. v. Marmar Corp.*, 468 So. 2d 502 (Fla. 5th DCA 1985).

A default may be set aside when the defaulting party demonstrates excusable neglect, a meritorious defense, and due diligence in seeking relief.  *See Johnson*, 845 So. 2d at 220; *Rice v.*

*James*, 740 So. 2d 7, 8 (Fla. 1st DCA 1999); *Brandt v. Doleman*, 421 So. 2d 689, 690 (Fla. 4th DCA 1982); *B/G Amusements*, 381 So. 2d at 319.  In fact, when a defaulted party demonstrates that his inaction resulted from error, misunderstanding or other human foible, and he has meritorious defenses to the claim, it is a gross abuse of discretion for the Court *not* to set aside the default.  *Somero v. Hendry Gen. Hosp.*, 467 So. 2d 1103 (Fla. 4th DCA 1985).

### A.    Defendant's Neglect Is Excusable

As explained above, DBNTC was never properly served with the Summons or Complaint in this matter.  *See* Affidavit of Alexandre Halow of CT Corp.  As a result, DBNTC was unable to follow its normal procedures of review and assignment to counsel for preparation and handling of a timely response.

### B.    Defendant Has a Meritorious Defense

A meritorious defense may be shown by an unverified pleading or an affidavit.  *Merrill Lynch Mortg. Capital, Inc. v. Hallmark Indus., Inc.*, 627 So. 2d 12, 13 (Fla. 2d DCA 1993). Defendant has set forth a meritorious defense.  *See* **Exhibit "D"**.  Specifically, there are no allegations in the Complaint that connect the parties, property or conduct to Bay County.  Second, there are no allegations of conduct or representation by DBNTC to DECOURSY.  *Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co.*, 881 So. 2d 565, 573 (Fla. 3d DCA 2004) (citing *Allocco v. City of Coral Gables,* 221 F. Supp. 2d 1317, 1363 (S.D. Fla. 2002)) ("a plaintiff cannot base a RICO claim for fraud on misrepresentations made to third parties") (applying Florida RICO); *see Palmas* at 573 (citing *Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Capital Co., L.L.C.*, 202 F. Supp. 2d 1339, 1349 (S.D. Fla. 2002) (a plaintiff cannot base a RICO claim for fraud on misrepresentations made to third parties because the injury is not "direct").

And finally, the Complaint fails to state a valid cause of action under Florida's Civil Remedies for Criminal Practices Act because (1) the statutes cited do not exist[4], (2) the Complaint alleges wrongdoing as to Lillian DeCoursy[5]—who is not a party to this action, (3) the Complaint alleges wrongdoing by the borrower's lender and servicer[6]—who are not a parties to this action, and (4) DECOURSY admitted the existence and validity of the debt[7] thereby negating the "unlawful debt" claim.

The pleading defects demonstrate not only that DBNTC has meritorious defenses, but that the Complaint itself was not "well-pled" and cannot result in the entry of Default Judgment in any event.

### C.      Defendant Exercised Due Diligence in Moving to Set Aside Entry of Default and Default Final Judgment

The Default in this matter was entered on or about October 29, 2020.  DBNTC first became aware of the entry of Default in December 2020 when DBNTC's counsel was searching Florida Court records for similar cases and defaults due to Mr. Segal's campaign to obtain default judgments against foreclosing lenders.  *See generally*, Req. For Jud. Not. of other Segal Cases. DBNTC immediately took the necessary steps to vacate default.

Given the minimal passage of time and under these circumstances, it is unquestionable that DBNTC was diligent in seeking to vacate the Default.  Furthermore, in light of Florida's long-standing policy strongly favoring adjudication of lawsuits on the merits this Court should vacate the entry of default.

---

[4] (Compl. ¶¶38 & 40) - §772.013 and §772.014 do not exist in Florida Statutes.

[5] (Compl. ¶35).

[6] (Compl. ¶35).

[7] (Compl. ¶3); *See also* Loan Modification Agreement, Exhibit "C".

Based on the foregoing, DBNTC requests this Court enter an Order vacating the entry of Default, and for such other and further relief this Court deems just and appropriate.

WHEREFORE, the Defendant, DBNTC, requests this Court to enter and Order:

(a)      Vacating the Clerk's Default dated October 29, 2020;

(b)      Awarding DBNTC is attorney fees incurred in this matter under Florida Statutes §57.105 and /or §772.104 ; and

(c)      for such other and further relief this Court deems just and appropriate.

Dated: January 5, 2021

Jason H. Okleshen, Esq.
Florida Bar No. 496170
Okleshenj@gtlaw.com
**GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Ste. 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222

Respectfully submitted,

Beth A. Norrow (FBN 061497)
norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Suite 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: /s/ *Beth A. Norrow*
Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company, as Trustee*

## CERTIFICATE OF SERVICE

I CERTIFY that on January 5, 2021, I electronically filed the foregoing with the Clerk of Court via the Florida E-Filing Portal, which shall cause a copy to be served via email to the following:

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste. 100
Clearwater, FL 33764
lee@segalschuh.com
marie@segalschuh.com

/s/ Beth A. Norrow
Beth A. Norrow

# EXHIBIT "A"



October 09, 2020


Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764

Re:  RICHARD DECOURSY, PLTF. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, ETC., DFT.

Case No.  20001724CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538379908

Sent By Regular Mail

cc:  --


**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764

# EXHIBIT "B"

## AFFIDAVIT OF ALEXANDRE C. HALOW

STATE OF GEORGIA         )
                                )
COUNTY OF CLARKE       )

Alexandre C. Halow, being first duly sworn and on oath, deposes and states as follows:

1.      I am over the age of 18 and competent to testify as to the matters contained herein.

2.      C T Corporation System ("CT") is a commercial registered agent, and in that capacity exists to receive and forward service of process on behalf of its customers.

3.      I am a Representation Services Advisor for CT. As such, I am familiar with the records maintained by CT in the ordinary course of business for the purpose of handling and processing the service of process CT receives on behalf of its customers. All statements made in this affidavit regarding service of process received by CT are made based on my review of those records.

4.      Based on my review of CT's records, CT is not the designated registered agent for an entity named "Deutsche Bank National Trust Company" in the state of New York.

5.      On July 24, 2020, CT received a Summons and Complaint in the matter entitled: *Jacaranda, LLC, as Trustee for the Certificateholders of the Brev 1144 Land Trust v. Deutsche Bank National Trust Company, as Trustee for Soundview Home Loan Trust 2004-1, Asset-Backed Certificates, Series 2004-1,* Brevard County Circuit Court Case # 05-2020-CA-035223 (the "Matter"). Based on CT's records, the Matter was served on CT in New York.

6.      By letter dated July 27, 2020 (the "Rejection Letter) to Lee Segal, Esquire of Segal and Schuh Law Group, P.L., 18167 US Highway 19 North, Suite 100, Clearwater, FL

33764, CT Corporation rejected service of the Summons and Complaint received in the Matter

on July 24, 2020. A true and correct copy of the Rejection Letter is attached as **Exhibit A**.

       7.      CT did not forward a copy of the Summons and Complaint received in the Matter

to Deutsche Bank National Trust Company.

       8.      CT's records do not reflect receipt of any other service related to the Matter.

      **FURTHER AFFIANT SAYETH NAUGHT**.

DATED: November ᵗ⁵, 2020

Alexandre C. Halow
Representation Services Advisor for CT
Personally Known _____ OR
Produced Identification __✓__.

Type of Identification Produced: GA Driver's License

Subscribed and sworn to before me
this 25ᵗ day of November, 2020, by
Alexandre C Hallow .

_____, Notary Public

State of Georgia
My Commission expires: 05/26/2024





July 27, 2020

Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL 33764

Re: Jacaranda, LLC, etc., Pltf. vs. Deutsche Bank National Trust Company, etc., Dft.

Case No. 052020CA035223XXXXXX

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 537994646

Sent By Regular Mail

cc: --


**(Returned To)**

Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL 33764

## <u>AFFIDAVIT OF ALEXANDRE C. HALOW FOR CT CORPORATION SYSTEM</u>

STATE OF GEORGIA         )
                                 )
COUNTY OF CLARKE       )

Alexandre C. Halow, being first duly sworn on oath, deposes and states as follows:

1.      I am over the age of 18 and competent to testify as to the matters contained herein.

2.      C T Corporation System ("CT") is a commercial registered agent, and in that capacity exists to receive and forward service of process on behalf of its customers.

3.      I am a Representation Services Advisor for CT. As such, I am familiar with the records maintained by CT in the ordinary course of business for the purpose of handling and processing the service of process CT receives on behalf of its customers. All statements made in this affidavit regarding service of process received by CT are made based on my review of those records.

4.      Based on my review of CT's records, CT is not the designated registered agent for an entity named "Deutsche Bank National Trust Company" in the state of New York.

5.      On July 13, 2020, CT Corporation received a Summons and Complaint in the matter entitled: *Carla Turner-Hahn and Jeffrey M. Hahn vs. Deutsche Bank National Trust Company, As Trustee For GSAA Home Equity Trust 2006-10, Asset-Backed Certificates, Series 2006-10*, Pinellas County Circuit Court Case # 2020-3116-CI (the "Matter"). Based on CT's records, the Matter was served on CT in New York.

6.      By letter dated July 15, 2020 (the "Rejection Letter") to Lee Segal, Esquire of Segal and Schuh Law Group, P.L., 18167 US Highway 19 North, Suite 100, Clearwater, FL

33764, CT Corporation rejected service of the Summons and Complaint received in the matter on July 13, 2020. A true and correct copy of the Rejection Letter is attached as **Exhibit A**.

7.      CT did not forward the Summons and Complaint received in the Matter to Deutsche Bank National Trust Company.

8.      CT's records do not reflect receipt of any other service related to the Matter.

**FURTHER AFFIANT SAYETH NAUGHT**.

DATED: December _5_, 2020

_____
Alexandre C. Halow
Representation Services Advisor for CT

Personally Known _____ OR
Produced Identification _X_

Type of Identification Produced: GA Driver's License

Subscribed and sworn to before me
this _8th_ day of December, 2020, by
Alexandre C. Halow.

_____Notary Public

State of Georgia
My Commission expires: 08/26/2024

Page 5 of 5



July 15, 2020

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste 100,
Clearwater, FL 33764

Re: JEFFREY M. HAHN and CARLA TURNER HAHN, Pltfs. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, etc., Dft.

Case No. 20003116CI

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation
System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST
COMPANY.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 537939543

Sent By Regular Mail

cc: --
**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste 100,
Clearwater, FL 33764

# CT

November 30, 2020

LAUREN L. BRODIE
COLLIER COUNTY - 20th JUDICIAL CIRCUIT COURT
3315 TAMIAMI TRAIL EAST,
SUITE 203,
NAPLES, FL  34112

Re:  TAMMY KENNY, Pltf. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, etc., Dft.

Case No.  112020CA0033090001XX

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 538662072

Sent By Regular Mail

cc:  --

**(Returned To)**

LAUREN L. BRODIE
COLLIER COUNTY - 20th JUDICIAL CIRCUIT COURT
3315 TAMIAMI TRAIL EAST,
SUITE 203,
NAPLES, FL  34112

FILED 12/9/20 14:51 Collier Co

RECEIVED

DEC  8 2020

LAUREN L. BRODIE
CIRCUIT JUDGE



August 18, 2020

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL  33764

Re:  INLAND ASSETS, LLC, ETC., PLTF. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, ETC.,
DFT.

Case No.  2020CA001794CAAXWS

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation
System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST
COMPANY.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 538115335

Sent By Regular Mail

cc: --
 **(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL  33764



October 27, 2020


Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 1.00,
Clearwater, FL  33764

Re:  4417 RUDDER WAY LAND TRUST, ETC., PLTF. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, ETC., DFT.

Case No.  20245CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538459207

Sent By Regular Mail

cc:  --












**(Returned To)**

Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 1.00,
Clearwater, FL  33764



September 25, 2020


Carla Turner-Hahn
Carla Turner-Hahn, P.A.
615 Whisper Woods Drive,
Lakeland, FL  33813

Re:  MICHAEL HAULSEE AND MARCIA HAULSEE, PLTFS. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, ETC., DFT.

Case No.  20001663CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538305571

Sent By Regular Mail

cc:  --


**(Returned To)**

Carla Turner-Hahn
Carla Turner-Hahn, P.A.
615 Whisper Woods Drive,
Lakeland, FL  33813



September 16, 2020


Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764

Re:  ANNA LOFGREN, PLTF. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, ETC., DFT.

Case No.  042020CA0340

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538250194

Sent By Regular Mail

cc:  --

**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764



October 20, 2020


Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764

Re:  WALLACE COOK, Pltf. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, etc. and DEUTSCHE
BANK TRUST COMPANY AMERICAS, etc., Dfts.

Case No.  20CA270

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST CO.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538419381

Sent By Regular Mail

cc:  --

**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764

# EXHIBIT "C"



**Account Number:** ████6058
**Investor Account Number:** ████319
**Investor/Owner Name:** Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6

This document was prepared by Ocwen Loan Servicing, LLC

After Recording Return To:
Ocwen Loan Servicing, LLC
Attention: Modification Processing
PO Box 24737
West Palm Beach, FL 33416-9838
_____ [Space Above This Line For Recording Data] _____

## LOAN MODIFICATION AGREEMENT

The debtor(s), Richard Decoursy and Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6 through the servicer of the underlying mortgage agreement, Ocwen Loan Servicing, LLC, have agreed to modify the terms of said underlying mortgage agreement. Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6 is the owner of the account and retains all rights to collect payments as per the underlying mortgage agreement. Ocwen Loan Servicing, LLC, remains servicer for said underlying mortgage agreement.

**THIS IS A BALLOON MORTGAGE AND THE FINAL PRINCIPAL PAYMENT OR THE PRINCIPAL BALANCE DUE UPON MATURITY IS $106,256.81, TOGETHER WITH ACCRUED INTEREST, IF ANY, AND ALL ADVANCEMENTS MADE BY THE MORTGAGEE UNDER THE TERMS OF THIS MORTGAGE.**

### BALLOON PAYMENT DISCLOSURE

**THIS MODIFICATION AGREEMENT INCLUDES A BALLOON PAYMENT, WHICH MEANS EVEN IF ALL THE SCHEDULED PAYMENTS ARE MADE WHEN DUE, THE ACCOUNT WILL NOT BE PAID IN FULL AT THE END OF ITS TERM. AS A RESULT, ON THE MATURITY DATE OUTLINED WITHIN THIS AGREEMENT, IT WILL BE REQUIRED THE ENTIRE REMAINING PRINCIPAL BALANCE PLUS ALL ACCRUED BUT UNPAID INTEREST AND ALL OTHER AMOUNTS OWING ON THAT DATE (INCLUDING, BUT NOT LIMITED TO, ALL ADVANCES MADE BY LOAN SERVICER UNDER THE TERMS OF THE SECURITY INSTRUMENT) BE REPAID IN A SINGLE PAYMENT.**

*CAUTION TO BORROWER: NO OBLIGATION TO REFINANCE* – LOAN SERVICER HAS NO OBLIGATION TO REFINANCE THIS ACCOUNT OR MAKE A NEW LOAN ON THE MATURITY DATE. IF THE FUNDS TO PAY THE BALLOON PAYMENT ARE NOT

Page 1 of 11

**AVAILABLE WHEN IT COMES DUE, A NEW LOAN AGAINST THE PROPERTY MAY HAVE TO BE OBTAINED TO MAKE THE BALLOON PAYMENT. ASSUMING ANOTHER LENDER MAKES A NEW LOAN ON THE MATURITY DATE, THE ACCOUNT WILL PROBABLY BE CHARGED INTEREST AT THE MARKET RATE PREVAILING AT THAT TIME. SUCH INTEREST RATE MAY BE HIGHER THAN THE INTEREST RATE PAID ON THIS ACCOUNT. COMMISSIONS, FEES AND EXPENSES MAY HAVE TO AGAIN BE PAID FOR THE ARRANGING OF THE NEW LOAN. IN ADDITION, IF THERE IS AN INABILITY TO MAKE THE MONTHLY PAYMENTS OR THE BALLOON PAYMENT, THE PROPERTY MAY BE LOST, ALONG WITH ALL OF THE EQUITY, THROUGH FORECLOSURE. KEEP THIS IN MIND IN DECIDING WHETHER TO AGREE TO THE TERMS OF THIS MODIFICATION.**



This Modification Agreement ("Agreement"), made this 28 day of MAR, 2019, between Richard Decoursy ("Borrower") and Ocwen Loan Servicing, LLC, Lender/Servicer or Agent for Lender/Servicer ("Lender"),  amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed ("Security Instrument") dated 11/22/2006 and recorded in the Records of Pinellas County, FL and (2) the Note, bearing the same date, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at

2861 Thaxton Dr Apt 46 Palm Harbor, FL 34684-4721

The real property described being set forth as follows:

(Legal Description Attached, if Applicable, for Recording Only)

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

**Representations:**

- Borrower is experiencing a financial hardship and as a result, 1) is or will be in default under the Mortgage Documents and 2) does not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments due under the Mortgage Documents.
- Under penalty of perjury, if required by the Lender, Borrower provided Lender with full and complete information that, when provided, accurately stated borrower's income, expenses and assets. To the extent requested by Lender, Borrower provided documents that supported that information.
- Borrower has made any and all required Trial Period Plan payments or down payments.
- Borrower currently has sufficient income to support the financial obligations under the Mortgage Documents, as modified by this Agreement.
- Borrower understands property title may be reviewed as a precondition to the modification.

**Acknowledgements and Preconditions to the Modification:**

- Lender has no obligation to make any modification of the Mortgage Documents if any of the requirements under this Agreement are not met.
- Prior to the Modification Effective Date (defined as 5/1/2019), if Lender determines any of the representations above are no longer true and correct, 1) the Mortgage Documents will not be modified, 2) this Agreement will not be valid, and 3) Lender will have all of the rights and remedies provided by the Mortgage Documents.
- The Mortgage Documents will not be modified unless and until 1) Lender approves this Agreement and 2) the Modification Effective Date has occurred.

**Modified Loan Terms:**

- If all of Borrower's representations above continue to be true and correct and all preconditions to the modification set forth above have been met, the Mortgage Documents will automatically become modified on 5/1/2019. If Borrower has failed to

Page 2 of 11

make any payments that are a precondition to this modification or receipt of clear title is not received, this modification will not take effect.

The new Maturity Date will be 12/1/2036.

Borrower understands that in order to reach an affordable payment under this modification, the mortgage may have been re-amortized beyond the maturity date. This means that if all payments are made in accordance with the mortgage terms, when Borrower reaches the maturity date, there will be an outstanding balance due.

This amount includes an interest-bearing balloon payment in the amount of $20,728.37 and a non-interest bearing deferment amount of $85,528.44 making the total balloon payment of $106,256.81 ('Balloon Payment') which is due when the mortgage reaches maturity or is sold, refinanced or otherwise accepted by the Lender as paid in full. Borrower specifically acknowledges that this is a balloon modification and therefore, the Borrower will owe a balloon payment at maturity in the approximate amount of $106,256.81.



**BALLOON PAYMENT: THIS MORTGAGE LOAN CONTAINS A BALLOON PAYMENT PROVISION. A BALLOON PAYMENT IS A SCHEDULED LUMP SUM USUALLY DUE AT THE END OF THE MORTGAGE TERM THAT IS SIGNIFICANTLY LARGER THAN THE OTHER REGULARLY SCHEDULED PERIODIC PAYMENTS. IF IT IS NOT AFFORDABLE TO PAY THE BALLOON PAYMENT WHEN DUE, A NEW LOAN MAY HAVE TO BE OBTAINED TO MAKE THE BALLOON PAYMENT OR THE PROPERTY MAY BE LOST THROUGH FORECLOSURE. BEFORE DECIDING TO TAKE THIS LOAN, CAREFULLY CONSIDER THE ABILITY TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE. THE BALLOON PAYMENT ON THE MORTGAGE LOAN UNDER REVIEW IS DUE 211 MONTHS FROM THE DATE THE MORTGAGE TERM BEGINS.**

**CAUTION TO BORROWER: IF THERE ARE NO FUNDS TO PAY THE BALLOON PAYMENT WHEN DUE, IT MAY BE NECESSARY TO OBTAIN A NEW LOAN AGAINST THE PROPERTY FOR THIS PURPOSE AND IT MAY BE REQUIRED TO AGAIN PAY COMMISSION AND EXPENSES FOR ARRANGING THE LOAN. KEEP THIS IN MIND IN DECIDING UPON THE AMOUNT AND TERMS OF THE LOAN THAT IS SELECTED AT THIS TIME.**

- The current Unpaid Principal Balance is $120,236.66. The New Principal Balance of the Note will be $205,765.10 (the "New Principal Balance"). This includes all amounts and arrearages that are past due as of the Modification Effective Date (including, but not limited to, unpaid and any previously deferred principal and interest, fees, escrow advances and other costs, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to the Loan. The New Principal Balance may represent the sum of the "Deferred Principal Balance" (if applicable), the "Principal Forgiveness" (if applicable) and the "Interest Bearing Principal Balance." The Interest Bearing Principal Balance is $120,236.66. Borrower understands that by agreeing to add the Unpaid Amounts to the Unpaid Principal Balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. Borrower also understands that this means interest will now accrue on the unpaid interest that is added to the New Principal Balance, which would not happen without this Agreement.



- Borrower promises to pay the New Principal Balance, plus interest, and any future fees/costs to the order of the Lender. Interest will be charged on the Interest Bearing Principal Balance at the yearly rate of 4.41000% , beginning 5/1/2019. Borrower promises to make monthly payments of principal and interest of U.S. $754.85, beginning on 6/1/2019 and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. Borrower promises to also pay any applicable monthly escrow payments as outlined in this Agreement. The initial monthly escrow amount is $197.32. The yearly rate of 4.41000% will remain in effect until principal and interest are paid in full. If on 12/1/2036 (the 'Maturity Date'), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower agrees to pay in full all amounts still owed under the Note and the Security Instrument by the earliest of: (i) The date Borrower sells or transfers an interest in the Property, (ii) The date Borrower pays the entire Interest Bearing Principal Balance, or (iii) The Maturity Date.

- $85,528.44 of the New Principal Balance shall be deferred ('Deferred Principal Balance') and Borrower will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the 'Interest Bearing Principal Balance' and this amount is $120,236.66. Interest will be charged on the Interest Bearing Principal Balance at the yearly rate of 4.41000% , from 5/1/2019. Borrower promises to make monthly payments of

principal and interest of U.S. $754.85, beginning on 6/1/2019, and continuing thereafter on the same day of each succeeding month until the Interest Bearing Principal Balance and all accrued interest thereon have been paid in full. The yearly rate of 4.41000% will remain in effect until the Interest Bearing Principal Balance and all accrued interest thereon have been paid in full. Borrower promises to also pay any applicable monthly escrow payments as outlined in this agreement. The initial monthly escrow amount is $197.32. Upon 12/1/2036 (the 'Maturity Date'), Borrower will still owe amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. If on 12/1/2036, Borrower still owes amounts under the Note and Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower agrees to pay in full the Deferred Principal Balance and any other amounts still owed under the Note and the Security Instrument by the earliest of: (i) The date Borrower sells or transfers an interest in the Property, (ii) The date Borrower pays the entire Interest Bearing Principal Balance, or (iii) the Maturity Date. Borrower specifically acknowledges that this is a balloon modification and therefore Borrower will have a balloon payment due at maturity in the approximate amount of $106,256.81.



The initial monthly escrow amount is $197.32. The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

Borrower's payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------------------|------------------------------------------|----------------------|-------------------|----------------------------|
| '1 - Maturity' | 4.41000% | 5/1/2019 | $754.85 | $197.32, adjusts periodically | $952.17, adjusts periodically | 6/1/2019 | 211 |



*The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

## Additional Agreements:

- **Transfer of Property.** If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

- **Original Loan Document Conditions.** Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument and Note, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument and Note; however, if applicable, the following terms and provisions are forever canceled, null and void, as of 5/1/2019:

    a. all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note; and

b.  all terms and provisions of any adjustable rate rider, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

- Borrower understands and agrees that:

a.  **Default Under the Modification.** All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

b.  **Original Loan Document Conditions.** All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender. Borrower agrees that the Mortgage Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed. 

c.  **Modification Does Not Constitute Release.** Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

d.  **Costs and Expenses.** All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender or not permitted per State or federal law.

e.  **Agreement to Provide Any Additional Modification Documents.** Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower. Borrower will execute such other documents as may be reasonably necessary to correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. Borrower understands that either a corrected Agreement or a letter agreement containing the correction will be provided to Borrower for Borrower's signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If Borrower elects not to sign any such corrective documentation, the terms of the original Mortgage Documents shall continue in full force and effect, such terms will not be modified by this Agreement. Borrower agrees to deliver any such corrective documents within ten (10) days after Borrower receives the Lender's written request for such replacement. 

f.  **Agreement of Use of Non-Public Information.** Borrower authorizes Lender, and Lender's successors and assigns, to share Borrower information including, but not limited to (i) name, address, and telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, (v) payment history, (vi) account balances and activity, including information about any modification or foreclosure relief programs, with Third Parties that can assist Lender and Borrower in obtaining a foreclosure prevention alternative, or otherwise provide support services related to Borrower's loan. For purposes of this section, Third Parties include a counseling agency, state or local Housing Finance Agency or similar entity, any Insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with Borrower's loan.

g. **Consent to Contact.** Borrower consents to being contacted by Lender or Third Parties concerning mortgage assistance relating to Borrower's loan including the trial period plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Third Parties.

- **Escrow Account.** By this section, Lender is notifying Borrower that any prior waiver by Lender of Borrower's obligation to pay to Lender Funds for any or all Escrow Items is hereby revoked and Borrower has been advised of the amount needed to fully fund the Escrow Account.

Borrower will pay to Lender on the day payments are due under the Mortgage Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Mortgage Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Mortgage Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items."  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Mortgage Documents, as the phrase "covenant and agreement" is used in the Mortgage Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Mortgage Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Mortgage Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in

accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Mortgage Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

- **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement. 

- **Inclusion of Exhibits.** Borrower authorizes Lender to attach an Exhibit A to this Agreement, which may include a Legal Description, recording information of the original security instrument, and any other relevant information required by a County Clerk (or other recordation office) to allow for recording if and when Lender seeks recordation.

- **Errors and Omissions.** That if any documents related to the Mortgage Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, Borrower will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. All documents the Lender requests of Borrower under this section shall be referred to as "Documents." Borrower agrees to deliver the Documents within ten (10) days after Borrower receives the Lender's written request for such replacement. At Lender's option, this Agreement will be void and of no legal effect and the loan terms will revert to the terms prior to the approved modification.

- **Final Agreement.** This Agreement may not be supplemented, changed, modified or omitted except by written document executed by both the Lender and the Borrower. This Modification constitutes the entire agreement between the Lender and Borrower and supersedes all previous negotiations and discussions between the Borrower and the Lender and neither prior evidence nor any prior or other agreement shall be permitted to contradict or vary its terms. There are no promises, terms, conditions, or obligations other than those contained in this Agreement.

- **Additional Events of Default.** Without limiting the other events of default set forth in the Mortgage Documents, Borrower will be in default under this Agreement and under the Mortgage Documents upon the occurrence of any one or more of these events:

  a. Any material representation or warranty made by you in the Mortgage Documents, this Agreement, or any initial agreement proves to be false or misleading in any respect.

  b. Borrower fails to make the New Monthly Payments as required by this Agreement.

  c. Borrower sells or conveys any interest in the Property without Lender's prior written consent.

  d. Breach of any of the terms or provisions of this Agreement.

- **Consequences of Default.** If Borrower defaults under this Agreement or the Mortgage Documents after the Modification Effective Date (your "Default"), Lender may, in addition to the remedies provided by the Mortgage Documents, subject only to applicable law, institute any foreclosure or collection proceedings without prejudice for having accepted any payments, including but not limited to the New Monthly Payments, under this Agreement and exercise any of its rights and remedies against Borrower under the Mortgage Documents and/or this Agreement.

- **Mortgage Insurance.** Borrower understands that the mortgage insurance premiums on the Loan, if applicable, may increase as a result of the capitalization which may result in a higher total monthly payment. Furthermore, the date on which Borrower may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

- **Credit Reporting.** Lender is required to report factual information to the credit reporting agencies. Lender may report information about the account to credit bureaus. Late payments, missed payments, or other defaults on the account may be reflected in the credit report.

- **No Novation.** Borrower expressly agrees that this Agreement is not a new loan from Lender but simply the modification of the existing obligations under the Mortgage Documents. Neither Borrower nor Lender has any intention to extinguish or discharge the indebtedness or the liens evidenced by the Mortgage Documents.

**Origination Requirements:** This modification is on a mortgage on which applicable documentary stamp taxes were paid on the mortgage at the time of the recording.



## BORROWER ACKNOWLEDGEMENT

Each of the Borrower(s) and the Lender acknowledge that no representations, agreements or promises were made by the other party or any of its representatives other than those representations, agreements or promises specifically contained herein. This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

All individuals on the mortgage, note and the property title must sign this Agreement.

4-10-19

_____
Date

Richard Decoursy   4-10-19

_____
Richard Decoursy

## BORROWER ACKNOWLEDGEMENT
### (CONTINUED)

State of _Florida_

County of _Pinellas_

On this _10th_ day of _April_, _2019_ before me, the undersigned, a Notary Public in and for said county and state, personally appeared Richard Decoursy personally known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.



Witness my hand and official seal.

Notary Public

My Commission Expires: _March 5, 2022_


ADRIAN MUGNAINI
Notary Public - State of Florida
Commission # GG 192294
My Comm. Expires Mar 5, 2022

Page 10 of 11

## LENDER ACKNOWLEDGEMENT
### (For Lender's Signature Only)

Lender acknowledges that no representations, agreements or promises were made or any of its representations other than those representations, agreements or promises specifically contained herein. This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

Loan Servicing

_____
Authorized Officer

_____
Date

Page 11 of 11

# EXHIBIT "D"

IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA

**RICHARD DECOURSY,**

      **Plaintiff,**

                               **CASE NO.: 20-CA-001724**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee,**

      **Defendant.**

_____/

## MOTION TO DISMISS COMPLAINT AND JURY DEMAND

Defendant, **DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee,** ("DBNTC"), by and through undersigned counsel, moves this court to dismiss the Complaint and Demand for Jury Trial ("Complaint") filed by Plaintiff RICHARD DECOURSY ("DECOURSY"), and in support thereof states as follows:

## INTRODUCTION

In his two-count Complaint, DECOURSY alleges that DBNTC violated Florida's Civil Remedies for Criminal Practices Act (Count I) (Compl. ¶ 38) and is liable under an unspecified claim for its purported "series of fraudulent misrepresentations" that allegedly induced Plaintiff to enter a loan modification. (Count II)  (Compl. ¶ 43).  According to the DECOURSY, the lender "succeeded in convincing [his wife] Lilliana Decoursy to modify the Mortgage on the Property" when DECOURSY believes he could have gotten away with selling the property without paying the Mortgage. (Compl. ¶35. )

*Yes, that is actually what DECOURSY claims in this action. See again,* Compl. ¶35.

DECOURSY seeks damages in the "full amount owed under the modified mortgage" because he was not able to persuade his wife to go along with his plan to breach the Mortgage on the Property. (Compl. ¶¶ 39 & 44).

Not only does this Complaint chock the conscious, it fails to state a legitimate cause of action against DBNTC and must be dismissed.

## CLAIMS AND STATUTES

1.     This matter allegedly arises out of a third-party's foreclosure action against DECOURSY on property located in Pinellas County Florida. (Compl., ¶¶ 3, 13 & 14).

2.     Count I of the Complaint travels under §817.535 *Fla. Stats*. which prohibits recording in official records, with the intent to defraud another, any false instrument purporting to affect an owner's interest in the property. (Compl., ¶¶ 37).  However, the Complaint fails to describe any instrument recorded by DBNTC and fails to describe any falsity regarding any document – at all.

3.     Count I of the Complaint also purports to travel under §772.013 and §772.014; however, no such statutes exist in Florida Statutes. (*See* Notice of Filing Legal Authority).

4.     Count II of the Complaint is for purported fraudulent misrepresentation by an unnamed third-party to this action[1] that induced the Plaintiff – during a pending foreclosure action - to modify the Mortgage and resolve the foreclosure.

5.     For these reasons (and for the reasons set forth below) the Complaint against DBNTC must be dismissed for lack of specificity and failure to state a cause of action.

---

[1] Decoursy's lender is not a party to this action. The foreclosing lender is *Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6* – NOT DBNTC.

2

## I.     THE FORECLOSURE PROCEEDINGS.

### a.   Foreclosure on 2861 Thaxton Drive, Unit 46, Palm Harbor, Florida

Although the Complaint alleges Lillian Decoursy executed a Note and Mortgage, no such instruments are attached, and no such instruments could be found in Public Records. However, Defendant Richard Decoursy executed a Note on November 22, 2006 ("Note"), which was secured by a Mortgage encumbering real property located at 2861 Thaxton Drive, Unit 46, Palm Harbor, Florida ("Pinellas Property") (Complaint, ¶3; Req. for Jud. Notice, Exs. 12-16). DECOURSY admits payments on the loan ceased in May 2013[2] and thereafter foreclosure was initiated by his lender. On April 27, 2018, *Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6* – who is NOT the named Defendant in this action – initiated foreclosure against DECOURSY under case #2018-2701-CI ("Pinellas Foreclosure Action") (Req. for Jud. Notice, Exs. 12-16). DECOURSY settled the Pinellas Foreclosure Action with a Loan Modification Agreement[3] – to which DBNTC is not a party. (*See* Loan Modification Agreement, attached hereto as Exhibit "A"). Thereafter, the Pinellas Foreclosure Action was dismissed. (*See* Req. for Jud. Notice, Ex. 16).

---

[2] Compl. ¶13.

[3] The Court can consider the Loan Modification Agreement because DECOURSY refers to the Loan Modification Agreement in Complaint ¶35, 38 & 43 as the basis for his claim, but does not attach it.  *See Posigian v. American Reliance Ins. Co. of New Jersey,* 549 So.2d 751 (Fla. 3d DCA 1989) (trial court properly considered documents referred to in the complaint but provided by defendant on motion to dismiss); *Striton Properties, Inc. v. City of Jacksonville Beach,* 533 So. 2d 1174, 1179 (Fla. 1st DCA 1988).  *See Charles v. Deutsche Bank Nat'l Trust Co.,* 2016 WL 950968, at *3 (S.D. Fla. Mar. 14, 2016).  *Charles v. Deutsche Bank Nat'l Trust Co.,* 2016 WL 950968, at *3 (S.D. Fla. Mar. 14, 2016); se*e also Brooks v. Blue Cross and Blue Shield of Fla., Inc.,* 116 F. 3d 1364, 1369 (11th Cir. 1997) (determining that "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to a motion to dismiss will not require conversion of the motion to a motion for summary judgment").

## II.   ARGUMENT

### A.   Legal Standard On Motion To Dismiss.

The purpose of a motion to dismiss is to test the legal sufficiency of the complaint, not to determine issues in dispute. *The Fla. Bar v. Greene*, 926 So. 2d 1195, 1199 (Fla. 2006); *see Elmore v. Fla. Power & Light Co.*, 760 So. 2d 968, 971 (Fla. 4th DCA 2000). The "defense" of failure to state a cause of action is a challenge to the legal sufficiency of the affirmative pleading on its face, that is, the entitlement of the plaintiff to obtain the relief sought if that party is ultimately able to prove the facts alleged. *Lowery v. Lowery*, 654 So. 2d 1218, 1219 (Fla. 2d DCA 1995) (Rule 1.140(b)(6) motion tests legal sufficiency). Whether a complaint is sufficient to state a cause of action is an issue of law. *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 300 (Fla. 1st DCA 1999). A court must dismiss the pleading if the allegations do not entitle the claimant to the relief sought. *See Jackson Grain Co. v. Kemp*, 177 So. 2d 513, 516 (Fla. 2d DCA 1965). Moreover, a party may raise traditional affirmative defenses – such as defenses based on res judicata and collateral estoppel – in a motion to dismiss where, as here, "the defense's existence can be judged on the face of the complaint." *Ramos v. Mast*, 789 So. 2d 1226, 1227 (Fla. 4th DCA 2001); *Wildflower, LLC v. St. Johns River Water Mgmt. Dist.*, 179 So. 3d 369, 373 (Fla. 5th DCA 2015).

### B.   DECOURSY's Complaint is Barred for Failure to Comply with Rule 1.130 Fla. R. Civ. P.

Pursuant to Rule 1.130(a), Florida Rules of Civil Procedure, a copy of the instrument upon which a claim is based, must be attached to the pleadings. Count I of the Complaint alleges violation of §817.535 which relates to recorded instruments. However, DECOURSY fails to attach (or even identify) the purported recorded instrument at issue. Indeed, DECOURSY failed to attach

4

copies of *any* of the challenged/disputed documents to the Complaint as required under Rule 1.130(a). Accordingly, for failure to comply with Rule 1.130(a) the Complaint must be dismissed.

### C.    Complaint Must be Dismissed for Lack of Specificity.

To state a cause of action, a complaint must allege sufficient ultimate facts to show that the pleader is entitled to relief. *Perry v. Cosgrove*, 464 So. 2d 664, 665 (Fla. 2nd DCA 1985); and Fla. R. Civ. P 1.110(b). In fact, "[d]espite the elemental proposition that on a motion to dismiss for failure to state a cause of action all allegations are taken as true, **[a] court will not 'by inference on inference or speculation, supply essential averments that are lacking**." *Alvarez v E. & A Produce Corp*, 708 So. 2d 997, 1000 (Fla. 3d DCA 1998); *see also Conley v. Shutts & Bowen, P.A.*, 616 So. 2d 523, 524-25 (Fla. 3d DCA 1993) (affirming dismissal of complaint for failure to allege sufficient ultimate facts; refusing to permit inferences from mere speculation).

In this matter, Count I, states that it is an action "arising under the Civil Remedies for Criminal Practices Act," yet it is entirely unclear what provision in the Act has been violated. Indeed, the Complaint concludes the conduct amounts to violation of "§772.013" but there is **no such statute in Florida**. Further, DECOURSY contents he is entitled to treble damages under "§772.014"; however, **no such statute exists**. (Compl. ¶39) (*see also* Notice of Filing Legal Authority).

As well, the Complaint is silent as to any communication, actions or relationship whatsoever between DECOURSY and DBNTC. Indeed, the Complaint alleges *Lillian Decoursy* is the borrower and that she was induced to modify her Mortgage – Lillian Decoursy is not named in this action. (Compl. ¶¶3 & 35). Further, the Complaint alleges the foreclosure was initiated due to Lillian's failure to pay the loan but that Court records show *Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through*

*Certificates, Series 2007-QS6* was the foreclosing lender – but that entity is NOT named in this action. (Compl, ¶13-14) (Req. for. Jud. Notice, Ex. 13). Indeed, DBNTC was not a party to the Foreclosure Action OR the Loan Modification Agreement that resolved the Pinellas Foreclosure Action. *Id., see again* Exhibit "A". Certainly, DBNTC cannot be compelled to decipher what statutes the purported claim attempts to travel under or what conduct by DBNTC is purportedly at issue - before forming a substantive response. Likewise, DBNTC cannot be compelled to defend the unspecified documents purportedly challenged by Plaintiff herein to which DBNTC is not a party and is not alleged to have played any role whatsoever in the creation, preparation, or execution. Accordingly, the Court must dismiss the Complaint – or at a minimum – order a more definite statement.

      **D.**    **Complaint Fails To State A Claim Under the Civil Remedies for Criminal Practices Act.**

      DECOURSY seek damages for purported violation of §772.013, Florida Statutes. (Complaint, ¶37). However, *no such statute exists*. (*See* Notice of Filing Legal Authority). The Civil Remedies for Criminal Practices Act is actually codified in §772.103, et. seq. of the Florida Statutes ("RICO Act"). DECOURSY fails to allege an actual RICO Act violation by DBNTC and has no chance on the merits because a civil RICO claim requires far more than bare – and completely unfounded – accusations of criminal conduct.

      **i.**    **Claim for violation of §817.535, Florida Statutes, Fails as a Matter of Law.**

      DECOURSY cannot state a claim for violation of §817.535, Florida Statutes because DECOURSY fails to identify any false instrument  - or any instrument *at all* – that was purportedly recorded by DBNTC. *Florida Statutes.* Section 817.535, *Florida Statutes,* prohibits ***recording in official records, with the <u>intent to defraud</u> another, any <u>false instrument</u> purporting to <u>affect an owner's interest in the property</u>***. (emphasis added) However, DECOURSY fails to identify any

false instrument recorded in Public Record by DBNTC or anyone else. Accordingly, because there is no falsity identified in the Complaint - with respect to any instrument – this claims fails as a matter of law.

Further, DECOURSY fails to identify any instruments recorded or directed by recorded by DBNTC that somehow *affected his interest in the Property*. Indeed, Plaintiff does not purport to be a party to the loan, and Defendant is not a party to the loan. Likewise, DBNTC is not a party to any agreement to modify  DECOURSY's Mortgage and DBNTC is not a party to the Mortgage nor does it claim to have an interest therein. Finally, DECOURSY is unable to identify any instrument affecting his interest in the Property. These deficiencies are fatal to Count I so this Court must dismiss Count I of the Complaint.

### ii.     Claim For Violation of §772.103 of the Florida Statutes Fails As A Matter Of Law.

The prohibited activities under "§772.013" which the Complaint apparently *attempts* to travel are actually set forth in §772.103 which provides as follows:

**772.103    Prohibited activities.**—It is unlawful for any person:
(1)    Who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of criminal activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

(2)    Through a pattern of criminal activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property.

(3)    Employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity or the collection of an unlawful debt.

(4)    To conspire or endeavor to violate any of the provisions of subsection (1), subsection (2), or subsection (3).

The first three subsections of the Florida Civil RICO Act list different types of unlawful activities prohibited by the statute, while the fourth subsection states it is a RICO violation to conspire or endeavor to violate any of the first three provisions.  §772.103(4).

At its core, "[t]he Florida RICO Act…establishes civil liability when an enterprise engages in a pattern of criminal activity." *Arthur v. JP Morgan Chase Bank, NA*, 569 Fed. Appx. 669, 680 (11th Cir. 2014) (citing § 702.013, Fla. Stat.).  "In order to establish a pattern of criminal activity, the plaintiff must allege two or more criminal acts 'that have the same or similar intents, results, accomplices, victims, or methods of commission' that occurred within a five-year time span." *Id.*  (quoting § 772.102(4), Fla. Stat.); *see also Drummond v. Zimmerman*, 19-81532-CIV, 2020 WL 1845671, at *3 (S.D. Fla. Apr. 13, 2020).  More specifically, "[a] civil RICO claim … requires a demonstration of the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that caused injury to business or property.'").  Moreover, where a Florida Civil RICO claim alleges a RICO conspiracy under § 702.103(4), Fla. Stat., the plaintiff must show "(1) an agreement with the overall objective of the conspiracy; or (2) an agreement to commit two predicate acts."  *Id.* (citation omitted))

Because of the similarities between Florida and federal RICO Acts, Florida looks to federal authority regarding the interpretation and application of its act. *Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co.*, 881 So. 2d 565 (Fla. 3DCA 2004)

Notably, while "[t]he Florida RICO statute requires the same elements as a federal RICO claim, the 'violation of the Florida RICO statute requires allegations of predicate acts that violated Florida law, rather than Federal law.'" *Id.* (quoting *Asbury v. Slider*, 2020 WL 871097, at *3., n.1 (M.D. Fla. Feb. 21, 2020)).

Importantly, "'[c]ivil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an increased level of specificity' consistent with" Federal Rule of Civil Procedure 9. *Id.* (quoting *Ambrosia Coal & Constr. Co. v. Pages Morales,* 482 F.3d 1309, 1316 (11th Cir. 2007)). And "[u]nder this pleading standard, a well-pleaded complaint must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud.'" *Id.* (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1380–81 (11th Cir.1997)).

Here, DECOURSY simply claims in a single paragraph that "§772.013" was violated "through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property – to wit, the modified Mortgage." (Complaint, ¶38). First, DBNTC does not purport to have any interest in the Property or Mortgage. *See* Public Record. (Req. for Jud. Notice, Ex. 12-16). Further, while §772.103 prohibits the collection of an "unlawful debt," there are no allegations in the Complaint explain how or why DECOURSY believes the debt is "unlawful." Indeed:

- DECOURSY **admits the debt exists**. (Compl. ¶3).
- DECOURSY **admits the Mortgage exists**. (Compl. ¶3).
- DECOURSY **admits the loan was in default** when the Pinellas Foreclosure Action was filed. (Compl. ¶13). And,

DECOURSY even admits his wife, Lilliana Decoursy, signed a Mortgage on the debt to which she defaulted. (Compl. ¶3). DECOURSY *fails* to allege anything unlawful about the debt itself.

And, while the crime of unlawful filing of false documents or records against real or personal property in violation of §817.535, Fla. Stat., can qualify as Florida RICO predicate[4],

---

[4] See § 772.102(1)(a)5, 22.

—

DECOURSY fails to allege facts to support such a violation. Because, as previously stated, DECOURSY admits the validity of the debt and fails to identify any instrument affecting his ownership interest in Property, he cannot assert a RICO cause of action based upon a recorded instrument under §817.535, Florida Statutes. Instead, he merely alleges Lilliana Decoursy was convinced to modify the Mortgage which prevented DECOURSY from selling the Property without having to pay off the Mortgage. (Compl. ¶35). In other words, DECOURSY is suing DBNTC because he couldn't get away with breaching his contract with his lender. That does not constitute a cause of action and it doesn't support a RICO claim.

Further, while the Complaint does not specify any particular misrepresentations (by DBNTC or the lender) it does claim the misrepresentations - whatever they were - were made to Lilliana Decoursy rather than Plaintiff. Lillian Decoursy is not a named party in this action and a RICO claim cannot survive based upon representations to a third party. *See Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co.*, 881 So. 2d 565, 573 (Fla. 3DCA 2004) citing *Allocco v. City of Coral Gables,* 221 F.Supp.2d 1317, 1363 (S.D.Fla.2002)("a plaintiff cannot base a RICO claim for fraud on misrepresentations made to third parties")(applying Florida RICO); *see Palmas* at 573, citing *Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Capital Co.,* L.L.C., 202 F.Supp.2d 1339, 1349 (S.D.Fla.2002)(a plaintiff cannot base a RICO claim for fraud on misrepresentations made to third parties because the injury is not "direct").

### E.    Count II Fails to Meet the Pleading Requirements for Fraud.

DECOURSY has failed to meet the heightened pleading requirements for misrepresentation under Florida law.  Rule 1.120 of the Florida Rules of Civil Procedure provides, in pertinent part: "In all averments of fraud . . . the circumstances constituting fraud . . . ***shall be stated with such particularity*** as the circumstances may permit." (emphasis added).  Florida courts

have long held that when fraud is relied upon, "allegations relating thereto must be **specific**, and facts constituting fraud must be **clearly stated**." *Reina v. Gingerale Corp.*, 472 So. 2d 530, 531-31 (Fla. 3d DCA 1985); *see Cady*, 528 So. 2d at 138.

A party is required to meet this rigorous heightened standard by pleading more than mere boilerplate recitations of the prima facie elements of fraud.  Instead, the pleader *must specify the misrepresentations or omissions of material fact and identify the time, place or manner in which the statements were made*, and *how the representations or omissions were false or misleading*. *See, e.g., Robertson v. PHR Life Ins. Co.*, 702 So. 2d 555, 556 (Fla. 1st DCA 1997) (affirming dismissal of fraud claim with prejudice for failure to meet heightened pleading standard). Not one fact in support of those elements is offered by DECOURSY as to DBNTC.

Count II of the Complaint fails to meet this requirement in its entirety.  DECOURSY fails to allege ANY representations were made by DBNTC to DECOURSY– *at all*. Likewise, DECOURSY fails to allege how, when and in what manner these unidentified representations were purportedly made. And, DECOURSY fails to allege how the unidentified representations were false. Instead, DECOURSY appears to blame DBNTC for DECOURSY's inability to escape his Mortgage. DECOURSY seems to bizarrely conclude that, *but for the Pinellas Foreclosure Action*, he could have sold the house without paying the Mortgage. *See again* Compl. ¶35. This conclusion makes no sense because it is not the Foreclosure Action preventing the sale of the Property "without regard for the Mortgage"…but rather, *the Mortgage itself* that prevents the sale of the Property "without regard for the Mortgage." DECOURSY admits the Note and Mortgage were executed November 22, 2006. (Compl. ¶3) That admitted fact will prevent DECOURSY from ever selling the property without paying for the Mortgage.

Again, while the Complaint is riddled with unsubstantiated and baseless accusations against the foreclosing trust - which is not a party to this action - asserting only conclusory

11

allegations as to certain purported misrepresentations, without identifying the time, place or manner in which the alleged statements were made, or the individual who made these statements – will never meet the pleading requirements for fraud under Florida law. Accordingly, this claim must be dismissed.

## III. DECOURSY's Challenges to the Foreclosing Trust are Barred as a Matter of Law.

While DBNTC is not the Trustee and did not participate in the Pinellas Foreclosure Action referenced in this matter, it points out that DECOURSY cannot challenge the Foreclosing Trust in any event. Any claims asserted by DECOURSY that are predicated on actions or inactions of the foreclosing plaintiff, *Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6* are barred as a matter of law because DECOURSY is not a party to nor is he an intended beneficiary of the Trust and thus lacks standing to challenge the roles and responsibilities of any parties to the Trust. *See HSBC Bank USA,Nat'l Ass'n v. Buset*, 241 So. 3d 882 (Fla. 3d DCA 2018) (non-beneficiaries of the pooling and servicing agreement cannot raise purported violations of the PSA as a defense to foreclosure; *Citibank, N.A. v. Olsak*, 208 So. 3d 227, 230 (Fla. 3d DCA 2016) (non-beneficiaries of the trust cannot defeat a foreclosure by relying upon trust documents to which they are not a party); *Castillo v. Deutsche Bank Nat. Tr. Co*., 89 So. 3d 1069 (Fla. 3rd DCA 2012) (a non-party to or non-beneficiary of the trust lacks standing to raise issue with the final judgment of foreclosure in favor of the lender). Because DECOURSY cannot challenge the foreclosing Trust, this renders nearly all of this Complaint…moot. (Compl. ¶¶ 5-13; 14-34).

## CONCLUSION

For the reasons above, DECOURSY has not and cannot assert a cause of action for violation of Florida's RICO Act or misrepresentation as to DBNTC. DECOURSY's Complaint

must therefore be dismissed with prejudice and an award of fees and costs to DBNTC pursuant to §57.105 and/or §772.104, *Florida Statutes*.

WHEREFORE DBNTC respectfully requests that this Court enter an order dismissing the Complaint in its entirety and granting DBNTC attorney fees under Fla. Sta. §57.105 and/or §772.104, together with such other relief the Court deems just and appropriate under the circumstances.

Dated:

Patrick G. Broderick (FBN 88568)
broderickp@gtlaw.com
**GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Suite 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222
Secondary email:
Sandra.Famadas@gtlaw.com;

Respectfully submitted,

Beth A. Norrow (FBN 061497)
norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Suite 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: /s/ *Beth A. Norrow*
　　　　Beth A. Norrow

*Counsel for Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee*

### **CERTIFICATE OF SERVICE**

I CERTIFY that on _____, I electronically filed the foregoing with the Clerk of Court via the Florida E-Filing Portal, which shall cause a copy to be served via email to the following:

_____
Beth A. Norrow

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

RICHARD DECOURSY,

      Plaintiff,

                                                       Case No. 20-1724-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

      Defendant.

_____/

## NOTICE OF CANCELLATION OF HEARING

Please take notice of the cancellation of the hearing that was scheduled for January 6, 2021

at 8:45 a.m. CT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

via the EPortal to Beth Norrow, Esquire on this 5th day of January, 2021.

/s/ *Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

**IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT IN AND FOR BAY COUNTY, FLORIDA**

**RICHARD DECOURSY,**

　　　　**Plaintiff,**

vs.

**CASE NO.: 2020-001724-CA**

**DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee**

　　　　**Defendant.**

_____/

## MOTION TO QUASH SERVICE OF PROCESS

Defendant, **DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE** (**"DBNTC"**), by and through undersigned counsel, moves quash service of process, and as grounds therefore states:

1.　　　Plaintiff, RICHARD DECOURSY, initiated this action on October 6, 2020, naming DBNTC as the "alter ego" of the entity that foreclosed on Mr. Decoursy's property in Pinellas County, Florida.  (Complt. ¶14).

2.　　　Mr. Decoursy purportedly served the Summons and Complaint in this matter on CT Corporation ("CT Corp"), which is not the registered agent for DBNTC.  *See* Affidavit of Service filed October 14, 2020, attached hereto as **Exhibit "A"**; *see also* Rejection Letter, attached hereto as **Exhibit "B"**.

## Lack of Service of Process

3.　　　Mr. Decoursy is seeking entry of judgment by default in this matter without disclosing to this Court that both he and his counsel KNOW they did not effectuate service of process on DBNTC.

4.       Mr. Decoursy purportedly attempted to serve the Summons and Complaint on DBNTC, via CT Corp in New York.  *See again* Exhibit "A".

5.       However, CT Corporation is not the registered agent for DBNTC and thus was not authorized to accept service on its behalf.  *See again* CT Corp rejection letter, **Exhibit "B"**.

6.       Defendant DBNTC is a national banking association organized under the laws of the United States to carry on the business of a limited purpose trust company.  *See* Certificate of Corporate Existence, attached hereto as **Exhibit "C"**.  DBNTC's main office is in Los Angeles, California and its principal office of trust administration is in Santa Ana, California.  *Id.*

7.       Mr. Decoursy and his counsel, Lee Segal, Esq., have been informed by CT Corp on numerous occasions that CT Corp (a) is NOT the registered agent for DBNTC, and (b) cannot forward the Summons and Complaint to DBNTC.  *See* Other CT Corp Rejection Letters, attached hereto as **Exhibit "D"**.

8.       Indeed, CT Corp has repeatedly rejected Mr. Segal's efforts to serve process on DBNTC, yet Mr. Segal continues to improperly deliver documents to CT Corp to create the false appearance of 'valid service of process' knowing full well that DBNTC will not receive the pleadings and DBNTC will remain unaware of the pending litigation so that Mr. Segal can obtain a judgment by default.

9.       Pursuant to § 607.0501, Fla. Stat., corporations in the state of Florida must designate a registered agent to accept service of process of lawsuits filed in Florida.

10.       However, §607.0501, Fla. Stat., does not apply to banks and Trust Companies. Pursuant to §607.0501(2), Fla. Stat., "**This section does not apply to** … **banks and trust companies** subject to the provisions of the financial institutions codes."  (Emphasis added).

11.     DBNTC has not designated CT Corp as its registered agent and DBNTC is not required to designate a registered agent in the state of Florida.  *Id.*

12.     Accordingly, Mr. Decoursy's delivery of the Summons and Complaint to CT Corp was improper and failed to constitute valid service of process on DBNTC.

13.     Pursuant to the foregoing, there is an error on the face of the return of service in that it indicates the Summons and Complaint were delivered to a third-party that is not named in this action and is not the registered agent for DBNTC.  As such, service of process is defective on its face and must be quashed.

14.     Until proper service is made, the Court is without jurisdiction to hear Plaintiff's claims.  *See MAC Org., Inc. v. Harry Rich Corp.*, 374 So. 2d 81, 83 (Fla. 3d DCA 1979) (court lacks in personam jurisdiction without service upon the registered agent).

15.     Further, under Florida law, "[i]f service of process is so defective that it amounts to no notice of the proceedings, the judgment is void" and may be collaterally attacked at any time pursuant to Rule 1.540(b)(4).  *Floyd v. Fed. Nat'l Mortg. Ass'n*, 704 So. 2d 1110, 1112 (Fla. 5th DCA 1998).

16.     "The burden of proving proper service of process falls upon the party invoking the court's jurisdiction."  *Re-Employment Servs., Ltd. v. Nat'l Loan Acquisitions Co.*, 969 So. 2d 467, 471 (Fla. 2d DCA 2007) (when there is an error or omission in the return of service of process, personal jurisdiction is suspended, and it lies dormant until proper proof of valid service is submitted).

17.     Due to improper service of process, this Court lacks jurisdiction over DBNTC until such time as proper service is perfected.

3

WHEREFORE, DBNTC respectfully requests this Court enter and order quashing service of process on DBNTC together with such other relief the Court deems just and appropriate in this matter.

Dated: January 13, 2021                              Respectfully submitted,

Jason H. Okleshen, Esq.                          Beth A. Norrow, Esq.
Florida Bar No. 496170                             Florida Bar No. 061497
Okleshenj@gtlaw.com                              norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**                  **GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Ste. 300 East              450 S. Orange Ave., Ste. 650
West Palm Beach, FL 33401                    Orlando, FL 32801
Telephone: (561) 650-7915                      Telephone: (407) 420-1000
Facsimile: (561) 655-6222                       Facsimile: (407) 420-5909
                                                              Secondary email: dunnla@gtlaw.com
                                                              FLService@gtlaw.com

                                                              By: /s/ *Beth A. Norrow*
                                                                     Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company, As Trustee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 13, 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court using the State of Florida e-filing system which will send a notice of electronic service to:

Lee Segal, Esq.
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
lee@segalschuh.com
marie@segalschuh.com

                                                              /s/ Beth A. Norrow
                                                              Beth A. Norrow

4

Filing # 114929507 E-Filed 10/14/2020 09:17:21 AM

IN AND FOR BAY COUNTY FLORIDA
Attorney: Segal & Schuh Law Group P.L. PH: (727) 824-5775
Address: 18167 US Highway 19 North Suite 100 Clearwater , NY 33764

0693
Client's File.:

**AFFIDAVIT OF SERVICE**

Richard Decoursy

# EXHIBIT A

Deutsche Bank National Trust  Company as Trustee

*Plaintiff*

*Defendant*

Index Number: 200001724 CA

Date Filed: 10/6/2020

Date Received  10/6/2020 at 6:52 PM

Court Date:

---

STATE OF NEW YORK, COUNTY OF SUFFOLK, SS.:

**Michael S. Levey** , being sworn says: Deponent is not a party herein; is over the age of 18 years and resides in the State of .
On **10/8/2020, at 10:44 AM at: CT CORP  28 LIBERTY STREET, NY, NY 10005** Deponent served the within
**Summons Complaint**

upon: **DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE,**  therein named.

☐ **#1 INDIVIDUAL**
By delivering a true copy of each to said recipient personally; Deponent knew the person so served to be the person described in as said recipient therein.

☐ **#2 SUITABLE AGE PERSON**
By delivering a true copy of each to  (Authorized Agent) a person of suitable age and discretion. Said premises is recipient's:☐ actual place of business / employment  ☐ dwelling house (usual place of abode) within the state.

☐ **#3 AFFIXING TO DOOR**
By affixing a true copy of each to the door of said premises which is defendants
☐ actual place of business / employment  ▮ dwelling house (usual place of abode) within the state. Deponent was unable with due diligence to find defendant or person of suitable age and discretion thereat having called there

☒ **#4 Corporation or Partnership or Trust or LLC or Medical Profession**
By delivering thereat a true copy of each to ALEXANDER PRIVAT APPROVED MAIL ROOM CLERK  personally. Deponent knew said entity so served to be the entity described in said aforementioned document as said defendant and knew said individual to be an Authorized Agent thereof.

☐ **#5 MAILING**
On , deponent enclosed a copy of same in a postpaid envelope properly addressed to defendant at defendant's last known ☐ Actual Place of Residence ☐ Actual Place of Business,  and deposited the envelope in an official depository, personally or via agency, under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "personal and confidential" and did not indicate on the outside, thereof by return address or otherwise that the communication was from an attorney or concerned an action against the defendant.

☒ **#6 DESCRIPTION**
Sex: Male        Color of skin: Black        Color of hair: Black      Glasses:
Age: 22 - 35 Yrs.     Height: 5ft 9inches - 6ft 0inches        Weight: 161-200 Lbs. Other Features:

☐ **#7 MILITARY SERVICE**
I asked the person spoken to whether defendant was in active military service of the United States or the State of New York in any capacity whatever and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated.

☐ **#8 WITNESS FEES**  Subpoena Fee Tendered in the amount of

☒ **#9 OTHER**
Per Jacquelin Walton at the security desk,  the respondent Deutsche Bank of 60 Wall Street NY NY has directions to continue to serve process at CT Corp 28 Liberty Street NY NY 10005 as no one currently is present in the building who is authorized to accept legal papers.   As of 9/24/20 she does not know when this method will revert to the original service address.

Sworn to before me on 10/8/2020

Robert J. Monteleone
NOTARY PUBLIC STATE OF NEW YORK
No. 02M06010691
Qualified in Suffolk County
My Commission Expires October 16, 2022

Michael S. Levey
1209939

Michael S.Levey 450 Route 25 A East Setauket NY 11733 631 788 8021 received by Attorney (Firm) and or Pro Se Litigant

**o/b/o Segal & Schuh Law Group P.L.  (727) 824-5775 18167 US Highway 19 North Suite 100 Clearwater , NY 33764**

EXHIBIT B



August 27, 2020


Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. HIGHWAY 19 NORTH, SUITE 100,
CLEARWATER, FL  33764

Re:  RICHARD DECOURSY, PLTF. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, ETC., DFT.

Case No.  2020CA000397

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538160633

Sent By Regular Mail

cc:  --


**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. HIGHWAY 19 NORTH, SUITE 100,
CLEARWATER, FL  33764

**EXHIBIT C**



**Office of the Comptroller of the Currency**

Washington, DC 20219

## CERTIFICATE OF CORPORATE EXISTENCE

I, Joseph Otting, Comptroller of the Currency, do hereby certify that:

1. The Comptroller of the Currency, pursuant to Revised Statutes 324, et seq, as amended, and 12 USC 1, et seq, as amended, has possession, custody, and control of all records pertaining to the chartering, regulation, and supervision of all national banking associations.

2. "Deutsche Bank National Trust Company," Los Angeles CA (Charter No. 18608), is a national banking association formed under the laws of the United States and is authorized thereunder to transact the business of banking on the date of this certificate.

IN TESTIMONY WHEREOF, today,

February 21, 2018, I have hereunto

subscribed my name and caused my seal

of office to be affixed to these presents at

the U.S. Department of the Treasury, in

the City of Washington, District of

Columbia



Comptroller of the Currency

**2**



Office of the Comptroller of the Currency

Washington, DC 20219

## CERTIFICATION OF FIDUCIARY POWERS

I, Joseph Otting, Comptroller of the Currency, do hereby certify that:

1. The Office of the Comptroller of the Currency, pursuant to Revised Statutes 324, et seq, as amended, and 12 USC 1, et seq, as amended, has possession, custody, and control of all records pertaining to the chartering, regulation, and supervision of all national banking associations.

2. "Deutsche Bank National Trust Company," Los Angeles, California (Charter No. 18608), was granted, under the hand and seal of the Comptroller, the right to act in all fiduciary capacities authorized under the provisions of the Act of Congress approved September 28, 1962, 76 Stat. 668, 12 USC 92a, and that the authority so granted remains in full force and effect on the date of this certificate.

IN TESTIMONY WHEREOF, today, March 22, 2018, I have hereunto subscribed my name and caused my seal of office to be affixed to these presents at the U.S. Department of the Treasury, in the City of Washington, District of Columbia.



Comptroller of the Currency

3



Comptroller of the Currency
Administrator of National Banks

Attn:  Licensing Unit
50 Fremont Street, Suite 3900
San Francisco, CA 94105
(415) 545-5930, FAX (415) 442-5315

April 4, 2002

Sandra L. West
Assistant Secretary
C/o Deutsche Bank
31 West 52nd Street-M/S NYC09-0810
New York, NY 10019

Re:     **Title Change**
        **Bankers Trust Company of California, N.A.**
        **Los Angeles, California**
        **Charter No.  18608**

Dear Ms. West:

The Office of the Comptroller of the Currency (OCC) has received your letter concerning the title change, appropriate amendment to the First Article of Association of Bankers Trust Company of California, National Association.  The OCC will update their records to reflect that as of *April 15, 2002*, the title of Bankers Trust Company of California, National Association, Charter Number 18608 *will change to Deutsche Bank National Trust Company.*

The original of the bank's respective Article has been forwarded to the bank's official file with our Office and an original is hereby returned for your records.

As a result of the Garn-St Germain Depository Institutions Act of 1982, the OCC is no longer responsible for the approval of national bank name changes nor does it maintain official records on the use of alternate titles.  The use of other titles or the retention of the rights to any previously used title is the responsibility of the bank's board of directors.  Legal counsel should be consulted to determine whether or not the new title, or any previously used title, could be challenged by competing institutions under the provisions of federal or state law.

Very truly yours,

James A. Bundy
Licensing Manager

Enclosure

## BANKERS TRUST COMPANY OF CALIFORNIA, NATIONAL ASSOCIATION

I, DAVID ABRAMSON, certify that:

1.    I am the duly elected and acting Secretary of Bankers Trust Company of California, National Association (formerly, BT Trust Company of California), and as such officer, I am the official custodian of its records; that the following is a true and correct copy of resolutions adopted by the Association's shareholders; and that such resolutions are now lawfully in force and effect:

RESOLVED, that the Association is hereby authorized to amend the First Article of Association to read as follows:

FIRST:    The title of this Association shall be "Deutsche Bank National Trust Company."

FURTHER RESOLVED, that the effective date of the amendment of the First Article of Association shall be April 15, 2002.

2.    The following is a true and correct copy of a resolution of the Association's Board of Directors, and such resolution is now lawfully in force and effect:

RESOLVED, that the amendment of the First Article of Association to change the title of the Association to "Deutsche Bank National Trust Company" is hereby approved, effective April 15, 2002.

3.    The foregoing amendment to the Articles of Association has been duly approved by the Board of Directors of Bankers Trust Company of California, National Association on March 21, 2002.

4.    The Resolution and Amendment set forth above has not been modified or rescinded and is in full force and effect.

IN WITNESS WHEREOF, I have set my hand and the seal of this Association this 27th day of March 2002.

David Abramson
Secretary

(S E A L)

State of New York     )
                      ) ss.:
County of New York    )

On the 27th day of March in the year 2002 before me, the undersigned, a Notary Public in and for
said state, personally appeared David Abramson, personally known to me or proved to me on the
basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument
and acknowledged to me that he executed the same in his capacity, and that by his signature on the
instrument, the individual, or the person upon behalf of which the individual acted, executed the
instrument.

_____
Notary Public

SANDRA L. WEST
Notary Public, State Of New York
No.01WE4942401
Qualified In New York County
Commission Expires September 19, 20___

**Office of the Comptroller of the Currency**

Accepted by: _____
             James A. Bundy, Licensing Manager

Date: _____4/4/02_____ _____



Comptroller of the Currency
Administrator of National Banks

Washington, D.C. 20219

## CERTIFICATE

I, John D. Hawke, Jr., Comptroller of the Currency, do hereby certify that the document hereto attached is a true copy, as recorded in this Office, of the currently effective Articles of Association for "Bankers Trust Company of California, National Association," Los Angeles, California, (Charter No. 18608)

IN TESTIMONY WHEREOF, I have hereunto

subscribed my name and caused my seal of office

to be affixed to these presents at the Treasury

Department in the City of Washington and District

of Columbia, this Monday, February 04, 2002



*Comptroller of the Currency*

CERTIFICATE OF AMENDMENT
OF
ARTICLES OF ASSOCIATION
OF
BANKERS TRUST COMPANY OF CALIFORNIA, N.A.

I, David Abramson, certify that:

1.     I am the duly elected Secretary of Bankers Trust Company of California, N.A.

2.     On January 17, 1992, at a special meeting of the Shareholders of Bankers Trust Company of California, N.A., the following resolution and amendment to Article FIFTH of the Articles of Association of Bankers Trust Company of California, N.A. was adopted:

> RESOLVED, that Bankers Trust Holdings, Inc., the sole shareholder of Bankers Trust Company of California, N.A. ("BTCal"), hereby approves of the amendment to the first paragraph of Article FIFTH of the Articles of Association of BTCal, to read as follows:

>> The authorized amount of capital stock of this Association shall be 500,000 shares of common stock of the par value of One Hundred Dollars and no cents ($100.00) each; but said capital stock may be increased or decreased from time to time, in accordance with the provisions of the laws of the United States.

Article FIFTH of the Articles of Association of Bankers Trust Company of California, N.A. is restated in entirety, as follows:

> The authorized amount of capital stock of this Association shall be 500,000 shares of common stock of the par value of One Hundred Dollars and no cents ($100.00) each; but said capital stock may be increased or decreased from time to time, in accordance with the provisions of the laws of the United States.

No holder of shares of the capital stock of any class of the Association shall have any pre-emptive or preferential right of subscription to any shares of any class of stock of the Association, whether now or hereafter authorized, or to any obligations convertible into stock of the Association, issued, or sold, nor any right of subscription thereto other than such, if any, as the Board of Directors, in its discretion may from time to time determine and at such price as the Board of Directors may from time to time fix.

If the capital stock is increased by a stock dividend, each shareholder shall be entitled to his/her proportionate amount of such increase in accordance with the number of shares of capital stock owned by him/her at the time the increase is authorized by the shareholders, unless another time subsequent to the date of the shareholders' meeting is specified in a resolution adopted by the shareholders at the time the increase is authorized.

The Association, at any time and from time to time, may authorize and issue debt obligations, whether or not subordinated, without the approval of the shareholders.

3.    The foregoing amendment of the Articles of Association has been duly approved by the Board of Directors of Bankers Trust Company of California, N.A. on January 7, 1992.

4.    The Resolution and Amendment set forth above has not been modified or rescinded and is in full force and effect.

IN WITNESS WHEREOF, I have set my hand and the seal of this Association this 22nd day of January, 1992.

David Abramson
Secretary

DATE ACCEPTED:                    FEBRUARY 10, 1992

BY:

JOHN C. BEERS
Acting Director for Analysis
Western District

2

**BT TRUST COMPANY OF CALIFORNIA,
NATIONAL ASSOCIATION**

I, DAVID ABRAMSON, certify that:

I am the duly constituted Secretary of BT Trust Company of California, National Association, and as such officer I am the official custodian of its records; and that the following is a true and correct copy of a resolution of the Association's Shareholders, and such resolution is now lawfully in force and effect:

RESOLVED, that the amendment of the First Article of Association is hereby approved, shall be effective immediately, and shall read as follows:

FIRST:   The title of this Association shall be "Bankers Trust Company of California, National Association".

And that the following is a true and correct copy of a resolution of the Association's Board of Directors, and such resolution is now lawfully in force and effect:

RESOLVED, that the amendment of the title of the Association's By-Laws to read "Bankers Trust Company of California, National Association", is hereby approved.

Dated: _March 30, 1987_

_____
Secretary

Filed
Comptroller of The Currency
Northeastern District

Date FEB 1 3 1986

### BT TRUST COMPANY OF CALIFORNIA, NATIONAL ASSOCIATION

### ARTICLES OF ASSOCIATION

For the purpose of organizing an association to carry on the business of a limited purpose trust company under the laws of the United States, the undersigned do enter into the following articles of association:

FIRST:   The title of this Association shall be "BT Trust Company of California, National Association".

SECOND:   The main office of the Association shall be in the City of Los Angeles, County of Los Angeles, State of California.   The general business of the Association shall be conducted at its main office and its branches.

THIRD:   The Board of Directors of this Association shall consist of not less than five nor more than twenty-five shareholders, the exact number of Directors within such minimum and maximum limits to be fixed and determined from time to time by resolution of a majority of the full Board of Directors or by resolution of the shareholders at any annual or special meeting thereof.   Each director, during the full term of his or her directorship, shall own a minimum of $1,000 aggregate par value of stock of this association or a minimum par market value or equity interest of $1,000 of stock in the bank holding company controlling this association.   Unless otherwise provided by the laws of the United States, any vacancy in the Board of Directors for any reason, including an increase in the number thereof, may be filled by action of the Board of Directors.

FOURTH:   The annual meeting of the shareholders for the election of Directors and the transaction of whatever other business may be brought before said meeting shall be held at the main office or such other place as the Board of Directors may designate, on the day of each year specified therefor in the By-laws, but if no election is held on that day, it may be held on any subsequent day according to the provisions of law; and all elections shall be held according to such lawful regulations as may be prescribed by the Board of Directors.

Nominations for election to the Board of Directors may be made by the Board of Directors or by any shareholder of any outstanding class of capital stock of the Association entitled to vote for election of directors.   Nominations other than those made by or on behalf of the existing management of the Association, shall be made in writing and shall be delivered or mailed to the President of the Association and to the Comptroller of the Currency, Washington, D.C., not less than 14 days nor more than

-2-

50 days prior to any meeting of shareholders called for the
election of directors;, provided, however, that if less than 21
days' notice of the meeting is given to shareholders, such
nomination shall be mailed or delivered to the President of the
Association and to the Comptroller of the Currency not later than
the close of business on the seventh day following the day on
which the notice of meeting was mailed.  Such notification shall
contain the following information to the extent known to the
notifying shareholder:  (a) the name and address of each proposed
nominee; (b) the principal occupation of each proposed nominee;
(c) the total number of shares of capital stock of the Associa-
tion that will be voted for each proposed nominee; (d) the name
and residence address of the notifying shareholder; and (e) the
number of shares of capital stock of the Association owned by the
notifying shareholder.  Nominations not made in accordance
herewith may, in his/her discretion, be disregarded by the
chairperson of the meeting, and upon his/her instructions, the
vote tellers may disregard all votes cast for each such nominee.

    FIFTH:  The authorized amount of capital stock of this
Association shall be 5,000 shares of common stock of the par
value of One Hundred Dollars and no cents ($100.00) each; but
said capital stock may be increased or decreased from time to
time, in accordance with the provisions of the laws of the United
States.

    No holder of shares of the capital stock of any class
of the Association shall have any pre-emptive or preferential
right of subscription to any shares of any class of stock of the
Association, whether now or hereafter authorized, or to any
obligations convertible into stock of the Association, issued, or
sold, nor any right of subscription thereto other than such, if
any, as the Board of Directors, in its discretion may from time
to time determine and at such price as the Board of Directors may
from time to time fix.

    If the capital stock is increased by a stock dividend,
each shareholder shall be entitled to his/her proportionate
amount of such increase in accordance with the number of shares
of capital stock owned by him/her at the time the increase is
authorized by the shareholders, unless another time subsequent to
the date of the shareholders' meeting is specified in a
resolution adopted by the shareholders at the time the increase
is authorized.

    The Association, at any time and from time to time, may
authorize and issue debt obligations, whether of not subordi-
nated, without the approval of the shareholders.

-3-

SIXTH:  The Board of Directors (a majority of whom shall be a quorum to do business) shall appoint one of its members to be President of the Association who shall hold office (unless he shall become disqualified or be sooner removed by a two-thirds vote of the members of the Board) for the term for which he was elected a Directors.  The Board of Directors may appoint one of its members to be Chairperson of the Board, who shall perform such duties as may be designated by it.  The Board of Directors shall have power to appoint one or more Vice-Presidents; and to appoint a Cashier and such other officers and employees as may be required to transact the business of the Association.

The Board of Directors shall have the power to define the duties of the officers and employees of the Association; to fix the salaries to be paid to them; to dismiss them; to require bonds from them and to fix the penalty thereof; to regulate the manner in which any increase of the capital of the Association shall be made; to manage and administer the business and affairs of the Association; to make all by-laws that it may be lawful for them to make and generally do and perform all acts that it may be legal for a board of directors to do and perform.

SEVENTH:  The Board of Directors shall have the power to change the location of the main office of the Association to any other place within the limit of the City of Los Angeles, without the approval of the shareholders but subject to the approval of the Comptroller of the Currency; and shall have the power to establish or change the location of any branch or branches of the Association to any other location, without the approval of the shareholders but subject to the approval of the Comptroller of the Currency.

EIGHTH:  The corporate existence of this Association shall continue until terminated in accordance with the laws of the United States.

NINTH:  The Board of Directors of this Association, or any three or more shareholders owning, in the aggregate, not less than 25 percent of the stock of this Association, may call a special meeting of shareholders at any time.  Unless otherwise provided by the laws of the United States, a notice of the time, place, and purpose of every annual and special meeting of the shareholders shall be given by first-class mail, postage prepaid, mailed at least ten days prior to the date of such meeting to each shareholder of record at his/her address as shown upon the books of this Association.

-4-

TENTH: Any person, his/her heirs, executors or administrators, may be indemnified or reimbursed by the Association for liability and reasonable expenses (including amounts paid in settlement or in satisfaction of judgments or as fines or penalties) actually incurred in connection with any claim, action, suit, or proceeding, civil or criminal, whether or not by or in the right of the Association, in which he/she or they shall be involved or threatened to be involved by reason of his/her being or having been a director, officer, or employee of the Association or of any firm, corporation, or organization which he/she serves or has served in any such capacity at the request of the Association (provided he/she so served at the specific request of the Association in writing signed by the Chairperson of the Board or the President and specifically referring to this Article Tenth); provided, however, that no person shall be so indemnified or reimbursed (1) in relation to any matter in an action, suit or proceeding as to which he/she shall finally be adjudged to have been guilty of, or liable for, willful misconduct, gross neglect of duty or criminal acts in the performance of his/her duties to the Association or such firm, corporation or organization; or (2) in relation to any matter in a claim, action, suit or proceeding which has been made the subject of a settlement except with the approval of (a) a court of competent jurisdiction, (b) the Board of Directors, acting by vote of Directors not parties to the same or substantially the same action, suit or proceeding, constituting a majority of the whole number of the Directors, or (c) the shareholders, acting by vote of a majority of the outstanding shares of capital stock; and provided further that, in the case of persons serving another firm, corporation or organization at the request of the Association, the indemnity provided in this Article Tenth shall apply only if and to the extent that, after making such efforts as the Board of Directors or shareholders shall deem adequate under the circumstances, such person shall be unable to obtain indemnification from such firm, corporation or organization. The foregoing provisions for indemnification or reimbursement shall not be exclusive of other rights to which such person, his/her heirs, executors or administrators, may be entitled by contract or otherwise. Unless the context clearly requires otherwise, the term "the Association" as used in this Article shall include any predecessor corporation.

The Association may, upon the affirmative vote of a majority of its Board of Directors, purchase insurance for the purpose of indemnifying its directors, officers and other employees to the extent that such indemnification is allowed in the preceding paragraph. Such insurance may, but need not, be for the benefit of all directors, officers, or employees.

-5-

ELEVENTH:  The powers of the Association shall be limited to conducting the business of a trust company under a national bank charter, and no amendment to such powers may be made without the prior approval of the Comptroller of the Currency.

TWELFTH:  These Articles of Association may be amended at any regular or special meeting of the shareholders by the affirmative vote of the holders of a majority of the stock of this Association, voting in person or by proxy, unless the vote of the holders of a greater amount of stock is required by law, and in that case by the vote of the holders of such greater amount.

IN WITNESS WHEREOF, we have hereunto set our hands this on the date appearing opposite our names.


Peter E. Lengyel _____     10/7/85 _____ date

Harold K. Atkins _____     10/7/85 _____ date

John L. Murphy _____     10/7/85 _____ date

Allan C. Martin _____     10/7/85 _____ date

Rein Lumi _____     10/7/85 _____ date

Gerard P. Hourihan _____     10/7/85 _____ date

State of New York

County of New York

        Before the undersigned, a Notary Public of the State of
New York personally appeared Peter E. Lengyel, to me known, who
acknowledged that he executed the foregoing certificate for the
purposes therein mentioned.

Witness my hand and seal of office this _7_ day of
_October_, 1985.

_Notary Public_

DAVID ABRAMSON
Notary Public, State of New York
No. 60-0007785
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 1987

State of _New York_

County of _New York_

        Before the undersigned, a Notary Public of the State of
_New York_ personally appeared John L. Murphy, to me
known, who acknowledged that he executed the foregoing certi-
ficate for the purposes therein mentioned.

Witness my hand and seal of office this _7_ day of
_October_, 1985.

_Notary Public_

DAVID ABRAMSON
Notary Public, State of New York
No. 60-0007785
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 1987

State of _New York_

County of _New York_

        Before the undersigned, a Notary Public of the State of
_New York_ personally appeared Harold K. Atkins, to me
known, who acknowledged that he executed the foregoing certi-
ficate for the purposes therein mentioned.

Witness my hand and seal of office this _7_ day of
_October_, 1985.

_Notary Public_

DAVID ABRAMSON
Notary Public, State of New York
No. 60-0007785
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 1987

** TOTAL PAGE.13 **

**EXHIBIT D**

<u>**AFFIDAVIT OF ALEXANDRE C. HALOW FOR CT CORPORATION SYSTEM**</u>

STATE OF GEORGIA         )
                                    )

COUNTY OF CLARKE         )

        Alexandre C. Halow, being first duly sworn on oath, deposes and states as follows:

        1.     I am over the age of 18 and competent to testify as to the matters contained herein.

        2.     C T Corporation System ("CT") is a commercial registered agent, and in that capacity exists to receive and forward service of process on behalf of its customers.

        3.     I am a Representation Services Advisor for CT. As such, I am familiar with the records maintained by CT in the ordinary course of business for the purpose of handling and processing the service of process CT receives on behalf of its customers. All statements made in this affidavit regarding service of process received by CT are made based on my review of those records.

        4.     Based on my review of CT's records, CT is not the designated registered agent for an entity named "Deutsche Bank National Trust Company" in the state of New York.

        5.     On July 13, 2020, CT Corporation received a Summons and Complaint in the matter entitled: *Carla Turner-Hahn and Jeffrey M. Hahn vs. Deutsche Bank National Trust Company, As Trustee For GSAA Home Equity Trust 2006-10, Asset-Backed Certificates, Series 2006-10*, Pinellas County Circuit Court Case # 2020-3116-CI (the "Matter"). Based on CT's records, the Matter was served on CT in New York.

        6.     By letter dated July 15, 2020 (the "Rejection Letter") to Lee Segal, Esquire of Segal and Schuh Law Group, P.L., 18167 US Highway 19 North, Suite 100, Clearwater, FL

33764, CT Corporation rejected service of the Summons and Complaint received in the matter on July 13, 2020. A true and correct copy of the Rejection Letter is attached as **Exhibit A**.

      7.      CT did not forward the Summons and Complaint received in the Matter to Deutsche Bank National Trust Company.

      8.      CT's records do not reflect receipt of any other service related to the Matter.

**FURTHER AFFIANT SAYETH NAUGHT**.

DATED: December 8 , 2020

_Alexandre C. Halow_ (signature)
Alexandre C. Halow
Representation Services Advisor for CT
Personally Known _____ OR
Produced Identification  X

Subscribed and sworn to before me
this 8th day of December, 2020, by
Alexandre C. Halow.

_Tracie Burns_ Notary Public

State of Georgia
My Commission expires: 08/26/2024

Type of Identification Produced: GA Driver's License

(Notary seal: TRACIE BURNS, NOTARY PUBLIC, MADISON COUNTY, GA, Exp. May 26, 2024)



July 15, 2020

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste 100,
Clearwater, FL 33764

Re: JEFFREY M. HAHN and CARLA TURNER HAHN, Pltfs. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, etc., Dft.

Case No. 20003116CI

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation
System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST
COMPANY.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 537939543

Sent By Regular Mail

cc: --
**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste 100,
Clearwater, FL 33764

## AFFIDAVIT OF ALEXANDRE C. HALOW

STATE OF GEORGIA          )
                          )
COUNTY OF CLARKE          )

Alexandre C. Halow, being first duly sworn and on oath, deposes and states as follows:

1.    I am over the age of 18 and competent to testify as to the matters contained herein.

2.    C T Corporation System ("CT") is a commercial registered agent, and in that capacity exists to receive and forward service of process on behalf of its customers.

3.    I am a Representation Services Advisor for CT. As such, I am familiar with the records maintained by CT in the ordinary course of business for the purpose of handling and processing the service of process CT receives on behalf of its customers. All statements made in this affidavit regarding service of process received by CT are made based on my review of those records.

4.    Based on my review of CT's records, CT is not the designated registered agent for an entity named "Deutsche Bank National Trust Company" in the state of New York.

5.    On July 24, 2020, CT received a Summons and Complaint in the matter entitled: *Jacaranda, LLC, as Trustee for the Certificateholders of the Brev 1144 Land Trust v. Deutsche Bank National Trust Company, as Trustee for Soundview Home Loan Trust 2004-1, Asset-Backed Certificates, Series 2004-1*, Brevard County Circuit Court Case # 05-2020-CA-035223 (the "Matter"). Based on CT's records, the Matter was served on CT in New York.

6.    By letter dated July 27, 2020 (the "Rejection Letter) to Lee Segal, Esquire of Segal and Schuh Law Group, P.L., 18167 US Highway 19 North, Suite 100, Clearwater, FL

33764, CT Corporation rejected service of the Summons and Complaint received in the Matter on July 24, 2020. A true and correct copy of the Rejection Letter is attached as **Exhibit A**.

      7.      CT did not forward a copy of the Summons and Complaint received in the Matter to Deutsche Bank National Trust Company.

      8.      CT's records do not reflect receipt of any other service related to the Matter.

**FURTHER AFFIANT SAYETH NAUGHT**.

DATED: November 25, 2020

Alexandre C. Halow
Representation Services Advisor for CT
Personally Known _____ OR
Produced Identification ✓ .

Type of Identification Produced: GA Driver's License

Subscribed and sworn to before me
this 25ᵗ day of November, 2020, by
Alexandre C. Hallow .

_____, Notary Public

State of Georgia
My Commission expires: 05/26/2024



Exhibit A



July 27, 2020

Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL  33764

Re:  Jacaranda, LLC, etc., Pltf. vs. Deutsche Bank National Trust Company, etc., Dft.

Case No.  052020CA035223XXXXXX

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 537994646

Sent By Regular Mail

cc:  --


**(Returned To)**

Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL  33764



August 18, 2020

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL  33764

Re:  INLAND ASSETS, LLC, ETC., PLTF. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, ETC.,
DFT.

Case No.  2020CA001794CAAXWS

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation
System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST
COMPANY.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 538115335

Sent By Regular Mail

cc:  --
  **(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL  33764



October 27, 2020


Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 1.00,
Clearwater, FL  33764

Re:  4417 RUDDER WAY LAND TRUST, ETC., PLTF. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, ETC., DFT.

Case No.  20245CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538459207

Sent By Regular Mail

cc:  --

**(Returned To)**

Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 1.00,
Clearwater, FL  33764



November 09, 2020

MEGAN LAZENBY
Lazenby Law, LLC
4927 Southfork Drive,
Lakeland, FL  33813

Re:  ABUNDANT LIFE HOMES, LLC, Pltf. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, etc.,
Dft.

Case No.  20194CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation
System is not the registered agent for an entity by the name of Deutsche Bank National Trust Company.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 538556685

Sent By Regular Mail

cc: --
 **(Returned To)**

 MEGAN LAZENBY
 Lazenby Law, LLC
 4927 Southfork Drive,
 Lakeland, FL  33813



October 20, 2020


Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764

Re:  WALLACE COOK, Pltf. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, etc. and DEUTSCHE
BANK TRUST COMPANY AMERICAS, etc., Dfts.

Case No.  20CA270

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST CO.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538419381

Sent By Regular Mail

cc:  --


**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764



October 09, 2020


Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764

Re:  RICHARD DECOURSY, PLTF. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, ETC., DFT.

Case No.  20001724CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538379908

Sent By Regular Mail

cc:  --


**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764



August 19, 2020

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764

Re:  JEFFREY M. HAHN and CARLA TURNER HAHN, Pltfs. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, etc., Dft.

Case No.  2020CA002487000000

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation
System is not the registered agent for an entity by the name of Deutsche Bank National Trust Company.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 538124660

Sent By Regular Mail

cc: --
 **(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764



September 25, 2020


Carla Turner-Hahn
Carla Turner-Hahn, P.A.
615 Whisper Woods Drive,
Lakeland, FL  33813

Re:  MICHAEL HAULSEE AND MARCIA HAULSEE, PLTFS. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, ETC., DFT.

Case No.  20001663CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538305571

Sent By Regular Mail

cc:  --


**(Returned To)**

Carla Turner-Hahn
Carla Turner-Hahn, P.A.
615 Whisper Woods Drive,
Lakeland, FL  33813

# CT

November 30, 2020

LAUREN L. BRODIE
COLLIER COUNTY - 20th JUDICIAL CIRCUIT COURT
3315 TAMIAMI TRAIL EAST,
SUITE 203,
NAPLES, FL 34112

Re: TAMMY KENNY, Pltf. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, etc., Dft.

Case No. 112020CA0033090001XX

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 538662072

Sent By Regular Mail

cc: --

**(Returned To)**

LAUREN L. BRODIE
COLLIER COUNTY - 20th JUDICIAL CIRCUIT COURT
3315 TAMIAMI TRAIL EAST,
SUITE 203,
NAPLES, FL 34112

FILED 12/ 9 /20 14:51 Collier Co

RECEIVED

DEC - 8 2020

LAUREN L. BRODIE
CIRCUIT JUDGE